UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal Action No. 5: 17-018-DCR |
| V. | ) ) | |
| EDGAR VILLA-CASTANEDA, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Edgar Villa-Castaneda's ("Villa" or "Defendant") motion to suppress statements made to FBI agents during an interview in November 2016. [Record No. 18] Today, the Court conducted a hearing and the parties presented evidence regarding the defendant's motion to suppress. For the following reasons, the defendant's motion will be denied.

## I.   BACKGROUND

A federal grand jury returned an indictment charging Villa and others with various crimes, including conspiring to distribute controlled substances.[1] [Lexington Criminal Action No. 15-13-KKC] Following his arraignment, Villa was detained and held at the Woodford County Detention Center ("WCDC") pending trial. In September 2015, the local FBI office received a letter from the attorney of another inmate at WCDC, known as "T.M." T.M. had advised his attorney that Villa was attempting to hire someone to kill an Assistant United States

---

[1] Villa pled guilty to conspiring to distribute marijuana and conspiring to commit money laundering. He was sentenced to 204 months of imprisonment. [Lexington Criminal Action No. 15-13-KKC, Record No. 817]

Attorney ("AUSA") involved in Villa's prosecution. An investigation ensued and, on February 2, 2017, Villa was charged with threatening to murder the AUSA, as well as soliciting T.M. to murder him. [Record No. 1]

In November 2015, as part of their investigation into the alleged conduct, FBI Special Agents Whitehead and VanAelstyn interviewed the defendant at WCDC. Apparently, the defendant made inculpatory statements but later told the agents he had not been serious about wanting the AUSA killed. Prior to the interview, Villa was read a *Miranda* warning in English, which he and both agents signed. Villa, a native-Spanish speaker, now contends that he does not have a sufficient understanding of the English language to have validly waived his rights.

## II. DISCUSSION

In reviewing the validity of a *Miranda* waiver, the Court must examine the totality of the circumstances to determine whether the waiver was the product of a free and deliberate choice made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *United States v. Lawrence*, 735 F.3d 385, 437 (6th Cir. 2013). Statements made in response to custodial police interrogation must be suppressed unless the defendant first waived his *Miranda* rights "voluntarily, knowingly, and intelligently." *Colorado v. Spring*, 479 U.S. 436, 444 (1987). The voluntariness and comprehension aspects of the waiver should be examined primarily from the perspective of the officers such that, where the police had no reason to believe the defendant misunderstood the warning, there is no reason to invalidate the waiver. *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010).

The United States presented substantial, compelling evidence to establish that Villa had a sufficient understanding of English such that the waiver of his *Miranda* rights was knowing

and voluntary. Eight audio clips were played at the hearing, which were derived from FBI recordings of conversations between T.M. and Villa during their time at WCDC. Although the precise nature of the conversation is unclear at times due to the quality of the recordings, it is very clear that the men conversed exclusively in English. Agent Whitehead testified that, before interviewing Villa, he had spoken to other inmates and staff at WCDC regarding their communications with Villa, and they were all reported to be in English.

The agents' communications with Villa at the time of the interview further led them to conclude that he had no difficulty understanding and speaking English. Neither agent spoke Spanish, and each asked the defendant if he understood English, to which he responded "yes." Agent VanAelstyn testified to having asked Villa if he needed a translator, which Villa declined. According to the agents, the defendant provided detailed answers to open-ended questions in English. For instance, he explained his plans to involve his sister in the alleged plot to kill the AUSA.

Villa contends that he has, at best, a rudimentary understanding of the English language. He testified that he was born in Mexico and had very little schooling, but learned a little English informally to find work in the United States. However, evidence introduced at the suppression hearing indicates that he *significantly understates* his ability to speak and understand English. First, he has had several encounters with the criminal justice system and has been in the United States since at least 2006. *See United States v. Palomino*, 100 F.3d 446, 450 n.2 (6th Cir. 1996).

Susan Boyd, Chief Deputy of WCDC, testified that she interacted with Villa on a daily basis during his incarceration. During their exchanges, Villa always spoke English. Boyd reviewed the defendant's intake documents and noted that a translator was not requested. Villa

routinely approached her with requests such as cell changes and extra time for visits. She remembered a specific incident in June 2015, when Villa came to her and explained, in English, that another inmate was causing a problem by "hogging" the television, the remote control, and being disrespectful to Villa and other inmates. Ultimately, Boyed testified that she never had any difficulties communicating with Villa in English.

Villa argues that the government's position is undermined by the fact that the Court appointed him an interpreter for these proceedings, as well as in Lexington Criminal Action No. 15-13-KKC. Although the Court has provided an interpreter in these matters, it did not make a determination that the defendant was unable to speak or comprehend English. Instead, the defendant requested an interpreter and the Court provided one. While this might be a factor to consider in determining whether the defendant's ability to speak English affected his *Miranda* waiver, it is not outcome determinative.

In short, Villa's claim that he cannot speak or understand English, and that he did not understand the *Miranda* warning, is not credible. In the recordings presented at the hearing, the defendant is heard engaging in quick, back-and-forth dialogue in English. These recordings are corroborated by the credible testimony of the FBI agents and Chief Deputy Boyd, who all stated that they communicated with the defendant in English without difficulty. This is in stark contrast to Villa's testimony that he simply responded "yes," to whatever the agents asked because he could not understand them. Based on the foregoing, it is hereby

**ORDERED** that the defendant's motion to suppress [Record No. 18] is **DENIED**.

This 12th day of May, 2017.



Signed By:
*Danny C. Reeves* DCR
United States District Judge