```
              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
                    CENTRAL DIVISION
                 LEXINGTON, KENTUCKY

UNITED STATES OF AMERICA,     ) Lexington Criminal
                              ) Action No. 17-18
        Plaintiff,            )
                              ) At Lexington, Kentucky
-vs-                          )
                              ) May 12, 2017
EDGAR VILLA-CASTANEDA,        ) 9:00 a.m.
                              )
        Defendant.            )
```

```
        TRANSCRIPT OF SUPPRESSION HEARING PROCEEDINGS
            BEFORE THE HONORABLE DANNY C. REEVES
                 UNITED STATES DISTRICT JUDGE
```

Appearances of Counsel:

On behalf of Plaintiff:       A. SPENCER McKINESS, JR., ESQ.
                              Assistant U.S. Attorney
                              1717 West Broadway
                              Louisville, Kentucky  40202

On behalf of Defendant:       BENJAMIN D. ALLEN, ESQ.
                              Gess Mattingly & Atchison PSC
                              201 West Short Street
                              Lexington, Kentucky  40507

Spanish Interpreter:          MARTA ROLLER

Court Reporter:               PEGGY W. WEBER, RPR
                              Official Court Reporter
                              U.S. District Court
                              P.O. Box 362
                              Lexington, Kentucky  40588
                              (859) 421-0814

Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
 1        (Whereupon, the Suppression Hearing proceedings

 2   commenced on Friday, May 12, 2017, at 9:00 a.m., on the

 3   record in open court, as follows.)

 4             THE COURT:  Thank you.

 5             Good morning everyone.

 6             Madam Clerk, if you would call the matter

 7   scheduled for 9 o'clock, please.

 8             THE CLERK:  Yes, Your Honor.

 9             Lexington Criminal Action Number 17CR18,

10   United States of America versus Edgar Villa-Castaneda,

11   called for suppression hearing.

12             THE COURT:  All right.  Thank you.

13             If counsel could state their appearances,

14   please.

15             MR. McKINESS:  Good morning, Your Honor.

16             Spencer McKiness here for the United States.

17             THE COURT:  All right.  Thank you.

18             MR. ALLEN:  Good morning, Your Honor.

19             Ben Allen on behalf of Edgar Villa-Castaneda,

20   who is seated to my left.

21             THE COURT:  All right.  Thank you.

22             This matter is scheduled for hearing on the

23   defendant's motion to suppress.  We'll begin with that

24   motion here in just a moment.

25             There's also a joint motion to continue the
```

1   trial date.  I wanted to have the parties present before

2   taking that motion up, so we'll take that up separately.

3           And then there's a sealed motion filed by the

4   defendant that could be affected by the outcome of the

5   suppression issue, and I'll take that up with counsel at

6   the end of the proceeding.

7           Are the parties ready to proceed?

8           MR. McKINESS:  Yes sir.

9           MR. ALLEN:  Yes, Your Honor.

10          THE COURT:  All right.  Thank you.

11          I believe the United States has the burden of

12   proof in this matter, and you may -- you may proceed.  I

13   understand you'll have some witnesses to present today?

14          MR. McKINESS:  Yes, sir.

15          THE COURT:  All right.

16          MR. ALLEN:  And, Your Honor, I'd like to invoke

17   the rule separating witnesses at this time.  I know

18   Mr. McKiness has several witnesses here who are seated

19   outside.

20          THE COURT:  All right.  There's no one other

21   than the case agent that's in the courtroom, but I will

22   invoke the rule on witnesses at this time.

23          You may proceed.

24          MR. McKINESS:  Thank you, Your Honor.

25          The United States would call Special Agent

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    4

1   Whitehead to the stand.

2              THE COURT:  Thank you.

3              MR. McKINESS:  Your Honor --

4              THE COURT:  Yes, sir.

5              MR. McKINESS:  -- if I may, where would you

6   like counsel to stand.

7              THE COURT:  You can stand at counsel table, or

8   if you'd like to use the lectern, you can do that,

9   whichever is more comfortable for you.

10             MR. McKINESS:  Thank you, Your Honor.

11             THE COURT:  All right.

12             THE CLERK:  Raise your right hand, please.

13             Do you swear or affirm that the testimony

14  you're about to give in this matter shall be the truth,

15  the whole truth, and nothing but the truth, as you shall

16  swear unto God, or affirm, subject to the penalty of

17  perjury?

18             THE WITNESS:  I do.

19             THE COURT:  Thank you.

20             Mr. McKiness, you may proceed.

21             MR. McKINESS:  Thank you, Your Honor.

22                      JOHN WHITEHEAD,

23  having been first duly placed under oath, was examined

24  and testified as follows:

25                      DIRECT EXAMINATION

1   BY MR. McKINESS:

2   Q.    Special Agent Whitehead, could you please introduce

3   yourself to the Court?

4   A.    Special Agent John Whitehead with the FBI.

5   Q.    And what is your occupation at the FBI?

6   A.    I'm a special agent, been there almost 20 years now,

7   and I investigate gangs, drugs, and violent crime

8   matters.

9   Q.    And what are your responsibilities, or what were

10  your responsibilities, regarding the investigation into

11  Mr. Edgar Villa-Castaneda?

12  A.    After our office received the initial complaint, I

13  was assigned to be the case agent and to conduct the

14  investigation from the beginning to the end.

15  Q.    And how did your investigation into

16  Mr. Villa-Castaneda begin?

17  A.    Our office received a letter from a defense attorney

18  concerning his client who's also an inmate at the same --

19  at Woodford County jail saying that Villa-Castaneda

20  wanted to hire someone to kill the prosecutor,

21  Assistant United States Attorney Rob Duncan.

22  Q.    All right.  And was the inmate Inmate TM?

23  A.    Yes, that is correct.

24  Q.    Did you ever speak with Inmate TM about

25  Mr. Villa-Castaneda?

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                6

1   A.    Yes, I did.

2   Q.    What did TM tell you about Mr. Villa-Castaneda?

3   A.    That he was incarcerated with him at the Woodford

4   County Jail, and that they both had the same prosecutors

5   in their respective cases.  And during the course of the

6   conversation, Villa-Castaneda tried to get TM's help in

7   hiring someone to cause physical harm to Rob Duncan.

8   Q.    And you say you've spoken with Mr. TM.  Did he speak

9   Spanish?

10  A.    No, he does not speak Spanish.

11  Q.    Do you know if he was bilingual?

12  A.    I asked him if he spoke Spanish.  He said he just

13  spoke English.

14  Q.    Did TM ever indicate that Mr. Villa-Castaneda only

15  spoke Spanish or did not understand English?

16  A.    He never said that he didn't understand English, no.

17  Q.    On October 15, 2005, was TM involved in a consensual

18  recording of conversations that he had with

19  Mr. Villa-Castaneda?

20  A.    That's correct.

21  Q.    And how were those recordings made?

22  A.    There was a recording device in a transport van, the

23  U.S. Marshal transport van, and there was also recording

24  devices in the holding cells.

25  Q.    Have you listened to those recordings?

JOHN WHITEHEAD - DIRECT BY MR. McKINESS

1  A.    Yes, I have.

2  Q.    Can you make out the voices of Mr. Villa-Castaneda

3  and TM from those recordings?

4  A.    Yes.

5  Q.    Okay.  What I'm going to do is I'm going to play you

6  several clips from the recordings, and I'd like for you

7  to tell the Court who and what you're hearing.  And the

8  total run time for these clips combined is approximately

9  12 minutes.

10  A.    Okay.

11            THE COURT:  While you're keying that up, I

12  think you may have misspoken.  I believe the date that

13  you were meaning to refer to was October 15th, 2015,

14  instead of 2005.  Is that correct?

15            MR. McKINESS:  Yes, sir.

16            THE COURT:  All right.  Thank you.

17  BY MR. McKINESS:

18  Q.    I'm going to play clip one for you.

19        And as I've stated, could you please tell us what

20  we're listening to and whose voices are whom?

21  A.    Okay.

22  Q.    Thank you.

23        (Whereupon, clip number one was played in open

24  court.)

25  A.    And that's Villa-Castaneda and TM talking.

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    8

 1          (Clip number one was paused.)
 2  Q.    And who's that that just spoke right there that's --
 3  A.    Just at the very end was TM.
 4  Q.    Okay.
 5          (Clip number one continued to be played to the end.)
 6  BY MR. McKINESS:
 7  Q.    All right.  That was clip one.  So did you hear both
 8  by Mr. TM and Mr. Villa-Castaneda speaking in that clip?
 9  A.    Yes.
10  Q.    And did it sound to you that the people in that clip
11  were understanding each other?
12  A.    Yes, they were conversing.
13  Q.    I'll play clip number two.
14          (Whereupon, clip number two was played in open
15  court, and then was paused.)
16  Q.    Who was that that was speaking?
17  A.    Villa-Castaneda.
18  Q.    All right.
19          (Clip number two continued to be played, then
20  paused.)
21  Q.    And who was that that was responding right there?
22  A.    TM.
23          (Clip number two continued to be played to the end.)
24  Q.    All right.  That was clip two.
25          And, again, who were the two individuals speaking in

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    9

1   that clip?

2   A.    TM and Villa-Castaneda.

3   Q.    We'll go to clip three.

4         (Whereupon, clip number three was played in open

5   court, and then was paused.)

6   Q.    And who are we hearing converse in this?

7   A.    TM and Castaneda.  You can tell they're

8   understanding each other because they're talking back and

9   forth.

10  Q.    And how can you tell the difference between the two

11  voices?

12  A.    Villa-Castaneda, although he's speaking English, he

13  has a Spanish accent, but TM has kind of like a country

14  boy, deep voice, whatever, very authoritative type voice,

15  no accent.

16  Q.    Okay.  I'm going to continue with this clip.

17        (Clip number three continued to be played to the

18  end.)

19  Q.    All right.  That was the end of clip three.

20        Did the people in that clip seem to understand each

21  other?

22  A.    Yes, they do.

23  Q.    I'll play clip number four for you.

24        (Whereupon, clip number four was played in open

25  court, and then was paused.)

JOHN WHITEHEAD - DIRECT BY MR. McKINESS          10

1    Q.   And who was that that we just heard speaking in that

2    clip?

3    A.   Villa-Castaneda.

4    Q.   And did he appear to be speaking English to you?

5    A.   Yes.

6         (Clip number four continued to be played to the

7    end.)

8    Q.   All right.  Now, moving to clip number four.  Hold

9    on, excuse me, clip number five.

10        (Whereupon, clip number five was played in open

11   court, and then was paused.)

12   Q.   And I'm pausing it for a second.

13        And can you tell us who was speaking right there?

14   A.   Villa-Castaneda and TM.  Villa-Castaneda was doing

15   the vast amount of the talking, and you can hear TM

16   responding, yeah, yeah, several times.

17   Q.   I'll continue this clip.

18        (Whereupon, clip number five continued to be played

19   to the end.)

20   Q.   Did the men in that clip seem to understand each

21   other?

22   A.   Yes, they did.

23   Q.   We'll go on to number six out of eight clips.

24        (Whereupon, clip number six was played in open court

25   to the end.)

JOHN WHITEHEAD - DIRECT BY MR. McKINESS          11

1  Q.    And who did we hear communicating in that clip?

2  A.    Villa-Castaneda and TM.

3  Q.    And did those men tend to be understanding each

4  other?

5  A.    Yes, sir.

6  Q.    This is clip number seven.

7        (Whereupon, clip number seven was played in open

8  court, and then was paused.)

9  Q.    And what did we just hear right there?

10 A.    Villa-Castaneda and TM conversing.

11       (Clip number seven continued to be played to the

12 end.)

13 Q.    All right.  That was clip seven.

14       And the last clip, clip eight.

15       (Whereupon, clip number eight was played in open

16 court, and then was paused.)

17 Q.    And who are we hearing speak right there?

18 A.    Villa-Castaneda and TM.

19 Q.    And who was that that was saying something about the

20 marshal and prosecutor?

21 A.    That was Villa-Castaneda.

22       (Clip number eight continued to be played to the

23 end.)

24 Q.    All right.  So are the clips that I just played for

25 you from the consensual recording that we mentioned

1  earlier?

2  A.   Yes, sir.

3          MR. McKINESS:  United States has a CD of these

4  clips that it would like to admit as Government's

5  Exhibit 1.

6          THE COURT:  Any objection?

7          MR. McKINESS:  I have a copy to give to defense

8  counsel.

9          MR. ALLEN:  The only point I would make is I

10  don't believe Mr. -- or, sorry, Agent Whitehead has

11  testified as to how he came to know Mr. Villa's voice.  I

12  could be mistaken, but I don't think he testified to

13  that.

14          THE COURT:  All right.  Very well.

15          If you would like to follow up with that one

16  area.

17          MR. McKINESS:  No problem.

18  BY MR. McKINESS:

19  Q.   Special Agent Whitehead, how are you familiar with

20  the voices of Mr. Villa-Castaneda and the voice of

21  Mr. TM?

22  A.   For one, I've listened to those recordings before,

23  and I've interviewed TM and Villa-Castaneda before.

24          THE COURT:  Okay.  Any other objections?

25          MR. ALLEN:  No, Your Honor.

 1              THE COURT:  Exhibit 1 will be admitted.

 2         (Whereupon, Government's Exhibit Number 1 was

 3   admitted into the record.)

 4              MR. McKINESS:  United States -- can we approach

 5   the --

 6              THE COURT:  Yes, sir.

 7              MR. McKINESS:  Thank you.

 8   BY MR. McKINESS:

 9   Q.    Special Whitehead, let's talk about the interview of

10   Mr. Villa-Castaneda.

11         On or about November 6, 2015, did you have a chance

12   to interview Mr. Edgar Villa-Castaneda?

13   A.    Yes, that's correct.

14   Q.    And where did that interview take place?

15   A.    The Grayson County jail.

16   Q.    And did you read Mr. Villa-Castaneda his Miranda

17   rights at that time?

18   A.    Yes.

19   Q.    In what language?

20   A.    In English.

21   Q.    Why?

22   A.    Well, for several reasons.  When we interviewed TM,

23   he said all their conversations were in English.

24         We also interviewed several other inmates in the

25   Woodford County jail who had conversations with him.

1   They said they were all in English.

2        And I also spoke to the staff of Woodford County

3   jail, and they said their dialogue with him was in

4   English as well.

5   Q.   All right.  Did Mr. Villa-Castaneda make any

6   statements to you whether he preferred Spanish or English

7   communication?

8   A.   No, he did not.

9   Q.   Okay.  Did Mr. Villa-Castaneda say anything to you

10  about understanding English?

11  A.   We asked him if he understood English.  I had

12  another agent with me who was also present for the

13  interview, and we both actually asked him if he could

14  understand what we were saying, and if we could read this

15  in English.  And after we read him his rights, he said he

16  understood us in English, and he also signed it -- his

17  name in English.

18  Q.   Okay.

19            MR. McKINESS:  Your Honor, may I use the Elmo?

20            THE COURT:  Yes, sir.

21  BY MR. McKINESS:

22  Q.   Special Agent Whitehead, I am showing you what has

23  been premarked as Government's Exhibit 2.

24        Do you recognize this document?

25  A.   Yes, I do.

1  Q.    How do you recognize this document?

2  A.    It's the advice of rights form that we went over

3  with Edgar Villa-Castaneda.

4          MR. McKINESS:  All right.  United States would

5  like -- move to admit Government's Exhibit 2 in evidence.

6          THE COURT:  All right.  Any objection?

7          MR. ALLEN:  No objection, Your Honor.

8          THE COURT:  Exhibit 2 is admitted.

9          MR. McKINESS:  Thank you, Your Honor.

10      (Whereupon, Government's Exhibit Number 2 was

11  admitted into the record.)

12  BY MR. McKINESS:

13  Q.    Now, is this the document that you discussed

14  earlier that you stated Mr. Villa-Castaneda waived his

15  Miranda rights?

16  A.    Yes, sir.

17  Q.    And can you tell us what it says in the location

18  area at the top?

19  A.    Where it says your rights?

20  Q.    Right here where my finger is at.

21  A.    Oh.  Place, Grayson County jail.

22  Q.    All right.  And where it says consent and signed,

23  whose signature appears there?

24  A.    It says Edgar Villa.

25  Q.    All right.  Did you sign this document as well?

1   A.   Yes, I did.

2   Q.   Where?

3   A.   In the very first witness line it says J. Whitehead.

4   Q.   And what were you stating you were a witness to?

5   A.   That we had advised him of his rights.

6   Q.   Were you also witnessed to him waiving his rights?

7   A.   Yes.

8   Q.   What does Mr. Edgar Villa-Castaneda's signature on

9   this document tell you?

10  A.   That he understood the rights that we read to him

11  and that he was waiving his right to counsel, is willing

12  to talk to us.

13  Q.   Now, during your interview with Mr. Villa-Castaneda,

14  did he ever indicate that he did not understand you?

15  A.   No, he did not.

16  Q.   Could you understand Mr. Villa-Castaneda?

17  A.   Yes.

18  Q.   Did he respond to you in English?

19  A.   Yes, he did.

20  Q.   And your questions were in English?

21  A.   Yes, that's correct.

22  Q.   Do you speak Spanish?

23  A.   No, I do not.

24  Q.   Did you experience any issues at all while trying to

25  communicate with Mr. Villa-Castaneda?

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                17

1   A.    No.

2   Q.    Did you ask Mr. Villa-Castaneda leading questions or

3   open-ended questions?

4   A.    Open-ended questions.

5   Q.    Can you give us an example of type of question you

6   would ask Mr. Villa-Castaneda?

7   A.    I did ask him if he had conversations regarding

8   Rob Duncan and trying to hire someone to kill Rob Duncan.

9   Q.    And how did he respond?

10  A.    He responded that he said, yes, he did on several

11  occasions.

12  Q.    And did he go into in-depth explanation?

13  A.    The only explanation he offered at -- he said that

14  he on several occasions did try to hire someone and talk

15  to someone about hiring and involving the money and

16  giving up his sister's telephone number, because she had

17  the money to pay them, and they could meet up that way.

18  But his explanation for all of that at the very end was

19  he was just joking.

20  Q.    And you stated you were asking leading questions --

21  or open-ended questions.  Why were you asking questions

22  in that nature?

23  A.    Because I wanted to make sure he did understand me.

24  I didn't -- during an interview I normally don't ask yes

25  and no questions because I want details.

JOHN WHITEHEAD - DIRECT BY MR. McKINESS          18

1   Q.   And you stated that you weren't alone during the

2   interview.  Who was with you?

3   A.   Special Agent Mike Vanaelstyn.

4   Q.   Also with the FBI?

5   A.   Yes, sir.

6   Q.   Did Mr. Villa-Castaneda make any admissions during

7   his interview other than the ones you just mentioned?

8   A.   Well, that was the main admission.  We were, I

9   guess, regarding causing harm to Rob Duncan.

10  Q.   And those admissions, again, they were in English?

11  A.   Yes, sir.

12  Q.   Was this interview recorded?

13  A.   No, it was not.

14  Q.   Why not?

15  A.   I had a second agent with me, and right now we do

16  have a policy in place when we're interviewing subjects

17  to record them, and if we don't want to we have to seek

18  permission, but at that time we weren't mandated to

19  record the interviews.  And a lot of times we do

20  interviews by ourselves, but since I had a second agent

21  there as a witness, we didn't record it.

22  Q.   Was there any concerns about the interview happening

23  in a jail cell -- or not a jail cell, but in the Grayson

24  County Detention Center?

25  A.   Well, sometimes -- in my own -- in my experience

1   sometimes the jails are concerned about recorders being

2   in there.  And that, knowing that I also had a second

3   witness for the interview, I wasn't concerned about

4   taking a recorder in there.

5              MR. McKINESS:  That's all the questions I have

6   for you.

7              THE COURT:  Thank you.

8              Thank you.  Mr. --

9              MR. McKINESS:  Ask if I could publish

10  Government's Exhibit 2 to the Court.

11             THE COURT:  All right.  Very well.

12       (Whereupon, Government's Exhibit Number 2 was

13  admitted into the record.)

14             MR. McKINESS:  United States is done with this

15  witness.

16             THE COURT:  All right.  Thank you.

17             Mr. Allen.

18             MR. ALLEN:  Briefly, Your Honor, under

19  Rule 26.2 I don't know of any such statements that

20  exist, but I would ask for production at this time by

21  the witness.

22             THE COURT:  All right.  Thank you.

23             MR. McKINESS:  United States has provided

24  Mr. -- or, excuse me, Special Agent Whitehead's

25  statements to the defense.

1          THE COURT:  All right.  Thank you.

2                    CROSS-EXAMINATION

3  BY MR. ALLEN:

4  Q.    Good morning, Agent Whitehead.

5  A.    Good morning, sir.

6  Q.    Which office, FBI office, do you work out of?

7  A.    In the Lexington resident agency.

8  Q.    And are there any agents in that office that speak

9  Spanish?

10  A.    Yeah, actually we have one now, Colleen Minya.

11  Q.    Was she in the office in --

12  A.    No, she was not.  She was not assigned to our office

13  at that time.

14  Q.    But it's safe to say that in the FBI, particularly

15  maybe in Kentucky, there are some agents who speak

16  Spanish; correct?

17  A.    Yes, that's correct.

18  Q.    And you don't dispute, do you, that Mr. Villa is a

19  non-native speaker of English; correct?

20  A.    Say that again, I'm sorry.

21  Q.    You don't dispute that Mr. Villa does not speak

22  English; correct, as a native -- as his first language;

23  correct?

24  A.    That's correct.

25  Q.    He speaks Spanish; correct?

1  A.   Yes.

2  Q.   Okay.  And you discussed providing the Miranda -- I

3  won't call them rights, they're actually warnings -- form

4  to Mr. Villa in English.  There is a Spanish version of

5  that form; am I correct?

6  A.   Yes, there is.

7  Q.   And that number is -- F -- I think the FBI form is

8  FD-395, but the Spanish form is FD-395.15; is that

9  correct?

10          THE INTERPRETER:  Your Honor, for needs of the

11 interpreter could you repeat the number of the FBI form

12 one more time?

13          MR. ALLEN:  Sure.

14          THE COURT:  If you could repeat it.

15          MR. ALLEN:  It's FDI -- FD-395.15.

16          THE WITNESS:  I believe that's correct, yes.

17 BY MR. ALLEN:

18 Q.   And you don't -- you use that form typically;

19 correct, when someone does not speak English as their

20 first language; correct?

21 A.   No.  In fact, I've only used it a couple times, and

22 that was when they spoke zero English.

23 Q.   Okay.  But that's not an FBI policy just to use that

24 when someone speaks zero English.  How do you determine

25 that they speak zero English?

1   A.    Well, you actually try to -- you actually ask them

2   if they understand English or if there's someone around,

3   a witness or family member or somebody else that is --

4   who is bilingual, we may ask them does this person speak

5   any English?

6   Q.    You've had interactions with non-native speakers

7   before; correct?  There are some people who may speak

8   some English who may not fully understand what you're

9   talking to them about; correct?

10  A.    That's correct.

11  Q.    Okay.  And you would want to use that form in that

12  situation; correct?

13  A.    Correct.

14  Q.    So that's someone who speaks maybe a very

15  rudimentary understanding of English might still need

16  that form; correct?

17  A.    Yes.

18  Q.    Because when you're warning someone of their

19  Miranda, or giving someone their Miranda warnings,

20  they're waiving substantive rights; correct?

21  A.    Correct.

22  Q.    Right to contact their counsel, right not to speak

23  to you; correct?

24  A.    Yes.

25  Q.    So I just want to make sure.  Even if someone may be

1  able to say order a gallon of milk using English, if

2  their level of understanding, comprehension of English is

3  such, you should give them that form; correct?

4  A.   It depends on how much English that they talk.  If

5  they're fully conversational, like your client, then I'm

6  not going to do that.

7  Q.   And you testified that you read through the advice

8  of rights form; correct?

9  A.   That's correct.

10 Q.   How many times did you read through it with him?

11 A.   Just once.

12 Q.   Just one time?

13 A.   Yes.

14 Q.   And you did not speak Spanish; correct?

15 A.   Correct.

16 Q.   Okay.  You had the other agent with you.  I'm sorry,

17 what was his name?

18 A.   Mike Vanaelstyn.

19 Q.   Mike Vanaelstyn.  He doesn't speak Spanish; correct?

20 A.   No, he does not.

21 Q.   Okay.  And you've testified this video -- I'm sorry,

22 this interview was not videotaped; correct?

23 A.   It wasn't recorded, no.

24 Q.   There's no audio recording whatsoever?

25 A.   Correct.

JOHN WHITEHEAD - CROSS BY MR. ALLEN                    24

1  Q.    And you've testified as to DOJ policy regarding

2  recording of interviews; correct?

3  A.    Correct.

4  Q.    And I believe you testified that the policy was not

5  in effect at the time you interviewed?

6  A.    The policy actually started in 2015, but then they

7  reversed it for a while because there was not a way for

8  us -- it had something to do with how we were going to be

9  downloading the recordings and getting them into our

10  system.  So our chief division counsel at the time for

11  our Louisville division said we didn't have to do that

12  until they re-tweaked the policy.

13          MR. ALLEN:  Your Honor, I'd like to hand a

14  document to the witness.

15          THE COURT:  Yes, sir.

16  BY MR. ALLEN:

17  Q.    Agent Whitehead, what I have handed you is a memo

18  from James Cole, Deputy Attorney General, dated May 12th,

19  2014, entitled Policy Concerning Electronic Recordings of

20  Statements.

21      Are you familiar with that document?

22  A.    Yeah, I've never actually read it, but I'm familiar

23  with the -- its existence.

24  Q.    Is this the recording policy you were referring to?

25  A.    I believe so.

1  Q.   Okay.  In your interview of Mr. Castaneda, took

2  place in November 2015; correct?

3  A.   Correct.

4  Q.   All right.  But it's your testimony that somehow the

5  DOJ reversed its policy between May 2014 and the date of

6  your interview?

7  A.   No.  I said I believe that the policy started in

8  2015, and our division for a period of time didn't --

9  wasn't required to record because they were trying to

10 figure out how they were going to be downloading.  We

11 were just told from our CDC we didn't have to record for

12 a time being, and then it was reinstituted.

13 Q.   What -- I'm sorry, what is the CDC?

14 A.   Chief Division Counsel.

15 Q.   Okay.  What was his name?

16 A.   It wasn't a he, it was a she.

17 Q.   I'm sorry.

18 A.   Mary Troutman.

19 Q.   But you -- it's my understanding though, you would

20 agree, that understanding -- I'm sorry, understanding

21 what counsel said that DOJ policy at least up until that

22 reversal was you were required to record interviews such

23 as that; correct?

24 A.   Yes, unless there was some exemption.

25 Q.   Okay.  And if you requested -- if there was an

 1  exemption, you would request that from your superiors;

 2  correct?

 3  A.   Correct.

 4  Q.   And you did not request an exemption here?

 5  A.   No.

 6  Q.   And you also testified that you did not bring a

 7  recording device because you were concerned about

 8  bringing it into the jail.  Where in Grayson County

 9  Detention Center did you interview Mr. Villa?

10  A.   It was like a conference room I believe.

11  Q.   Okay.

12  A.   I don't know what the room is used for, like a

13  multi-purpose room.

14  Q.   Okay.

15  A.   You know what, I take that back.  It was in a -- it

16  was in an office, somebody's office.

17  Q.   In an office --

18  A.   Yeah.

19  Q.   -- at the detention center?

20  A.   Yeah.

21  Q.   You -- you're an FBI agent.  Did someone tell you

22  you could not bring a recorder into the jail?

23  A.   I've been told that -- I've just done interviews

24  before, not in the Grayson County jail, where they're

25  nervous about, you know, phones, recording devices being

1    brought into the jail.  Of course, that was -- you know,

2    because we never used to record our interviews anyway.

3    Q.    Right.  But you're not claiming that the policy

4    of the Grayson County Detention Center would somehow

5    trump a directive from the Department of Justice, would

6    you?

7    A.    No, not at all.

8    Q.    But you could have recorded this interview; correct?

9    A.    Like I said, at that time we didn't have to record

10   the interviews.  That's why I wasn't worried about

11   recording the interview.

12   Q.    And you've testified -- I understand why you did not

13   have one there, but you did not have a translator with

14   you during this interview; correct?

15   A.    No, I did not.

16   Q.    Okay.  And the FBI has translators available to

17   them; correct?

18   A.    Yes, when needed.

19   Q.    And there's not a -- you did not have Mr. Villa sign

20   a written statement; correct?

21   A.    A written statement?  No, just the advice of rights

22   form.

23   Q.    Okay.  So the only record we have of what he said to

24   you was I believe your form that you prepared; correct?

25   A.    Yes.

1   Q.   Your statement.  And this is your summary of what he

2   said; correct?

3   A.   Yes.

4   Q.   Let's talk briefly about the audio recordings.

5   Maybe it's just my hearing, but I couldn't hear much of

6   what was said on those recordings.  Is that a fair --

7   fairly accurate description of the --

8   A.   Yes, I had to use headphones --

9   Q.   -- quality of those recordings?

10  A.   -- when I -- you listen to them.

11  Q.   And I've used headphones too, and I -- I can

12  understand what you're testifying as to the -- as to the

13  conversations being English, but I can't tell -- we can't

14  tell much from the actual substance of those

15  conversations; correct?

16  A.   Currently, right now, no.

17          MR. ALLEN:  Okay.  Your Honor, I have no

18  further questions at this time.  Thank you.

19          THE COURT:  All right.  Thank you.

20          Anything else of the witness?

21          MR. McKINESS:  Just quickly, Your Honor.

22          THE COURT:  Yes, sir.

23                      REDIRECT EXAMINATION

24  BY MR. McKINESS:

25  Q.   You stated that you didn't bring a translator or a

1   Spanish language, Miranda waiver, into the jail.  Did you

2   think you needed one?

3   A.    No, I did not.

4   Q.    Why not?

5   A.    Because all of the people that we interviewed,

6   including the jail and the other inmates, said, you know,

7   all their conversations were in English, and they didn't

8   have a hard time understanding each other.

9   Q.    Okay.  And with regards to the DOJ policy that

10  defense counsel was giving you, isn't it true that the

11  FBI has its own policy that is derived from this, but is

12  somewhat different?

13  A.    Yes.  And I haven't -- and I know there's a policy

14  because this encompasses several different -- like the

15  ATF, FBI, everybody else, and we do have our own version

16  of it, but I haven't actually read it.

17           MR. McKINESS:  Okay.  Thank you.

18           THE COURT:  Anything else?

19           MR. ALLEN:  Nothing further, Your Honor.

20           THE COURT:  Thank you.

21           Special Agent Whitehead, you may step down,

22  sir.  Thank you.

23           Mr. McKiness, you may call your next witness.

24           MR. McKINESS:  Thank you, Your Honor.

25           Next United States would call Mike Vanaelstyn.

```
 1                    THE COURT:  Thank you.

 2                    THE CLERK:  Raise your right hand, please.

 3              Do you swear or affirm that the testimony

 4  you're about to give in this matter shall be the truth,

 5  the whole truth, and nothing but the truth as you shall

 6  swear unto God, or affirm, subject to the penalty of

 7  perjury?

 8                    THE WITNESS:  I do.

 9                    THE CLERK:  Thank you.

10                    THE COURT:  Thank you.  You may proceed.

11                          MIKE VANAELSTYN,

12  having been first duly placed under oath, was examined

13  and testified as follows:

14                         DIRECT EXAMINATION

15  BY MR. McKINESS:

16  Q.   Good morning, Special Agent.

17       Could you please state your name for the record?

18  A.   Yes.  It's Michael Vanaelstyn.

19  Q.   And what is your occupation?

20  A.   I'm a special agent with the Federal Bureau of

21  Investigation.

22  Q.   And what were your responsibilities regarding the

23  investigation into Mr. Edgar Villa-Castaneda?

24  A.   Variety of different interviews, and I was co-cased

25  with Special Agent John Whitehead.
```

1  Q.   All right.  Did you participate in the interview of

2  Mr. Villa-Castaneda?

3  A.   I did.

4  Q.   Do you recall whether Mr. Villa was read his Miranda

5  rights at that time?

6  A.   I do.

7  Q.   In what language?

8  A.   In English.

9  Q.   I'm going to show you on the Elmo Government's

10  Exhibit 2.

11       Do you recognize this document?

12  A.   I do.

13  Q.   Did you sign this document?

14  A.   I did.

15  Q.   Where did you sign this document?

16  A.   I'm the second witness.  That scribbly line is my

17  name.

18  Q.   And what were you attesting that you witnessed?

19  A.   That he had been read his rights and that he

20  understood his rights.

21  Q.   And Mr. Villa is a native Spanish speaker.  Why did

22  you believe that he understood his rights?

23  A.   I actually asked him if he needed a translator, to

24  which he replied that he did not, that he understood what

25  we were asking him.

1  Q.    During the interview did Mr. Villa ever indicate

2  that he could not understand the questions that were

3  being asked of him?

4  A.    No, he did not.

5  Q.    Did he ever indicate that he could not understand

6  English?

7  A.    No, he did not.

8  Q.    Were his responses in English?

9  A.    They were.

10  Q.    Could you understand Mr. Villa-Castaneda?

11  A.    I could.

12  Q.    Do you speak any Spanish?

13  A.    I don't, very, very little.

14  Q.    Did you experience any issues at all communicating

15  with Mr. Villa-Castaneda?

16  A.    No, none whatsoever.

17         MR. McKINESS:  I have no further questions from

18  this witness, Your Honor.

19         THE COURT:  All right.  Thank you.

20         Mr. Allen.

21                  CROSS-EXAMINATION

22  BY MR. ALLEN:

23  Q.    Good morning, Agent Vanaelstyn.

24  A.    Good morning.

25  Q.    Mr. Vanaelstyn, I'm going to assume that you have

1   some experience interviewing non-native speakers;

2   correct?

3   A.   Yeah, in the course of my job, yes, we oftentimes

4   interview people of various languages.

5   Q.   Okay.  And you can understand that someone who might

6   speak some English might not fully understand the context

7   or the meanings of certain words; correct?

8   A.   In -- can I have you repeat that question?

9   Q.   I guess what I'm trying to get to is someone who

10  is -- who may have a small understanding of English, or

11  I'll reverse the situation.

12  A.   Sure.

13  Q.   If I'm speaking to someone in Spanish, I know a tiny

14  amount of Spanish.  Is it possible that someone who's

15  speaking with a non-native speaker, or the non-native

16  speaker, might indicate their understanding when they

17  might not actually fully understand everything that's

18  been said?

19       In other words, would they have a compulsion to

20  perhaps acknowledge what you're saying without fully

21  understanding the meaning of what you're saying?

22  A.   Are you asking me to talk about the probability of

23  what a non-native speaker would do, because I can't

24  really answer that.

25  Q.   I guess what I'm saying is there a possibility

MICHAEL VANAELSTYN - CROSS BY MR. ALLEN          34

1  Mr. Villa could have indicated that he understood what

2  you were saying but maybe not fully understand the

3  meaning, the rights, he was giving up?

4       In other words, you've testified that he understands

5  English, but would his level of understanding be

6  sufficient -- are there examples when the level of

7  understanding would be sufficient to fully understand

8  what you're talking to them about?

9  A.   I can't really comment to what Mr. Villa-Castaneda

10 was thinking.  Is that what you're --

11 Q.   I'll withdraw that question.

12      You've interviewed non-native speakers; correct?

13 A.   Correct.

14 Q.   You've used translators for those speakers, I

15 assume; correct?

16 A.   If they're -- if they're totally non-native speaker

17 and they say they need a translator, absolutely, yes.

18 Q.   But there are circumstances when someone may

19 understand some English but may still need a translator;

20 correct?

21 A.   I'm sure that's a possibility, sure.

22 Q.   Okay.  And so you're not saying that someone has to

23 have a zero level understanding of the English language

24 in order to merit a translator?

25 A.   Can you repeat that again?

MICHAEL VANAELSTYN - CROSS BY MR. ALLEN                35

1  Q.    Someone might still need a translator; correct, even

2  if they may have a basic understanding of English?

3  A.    There's a possibility.

4            MR. ALLEN:  Okay.  No further questions,

5  Your Honor.  Thank you.

6            THE COURT:  All right.  Thank you.

7            Anything else?

8            MR. McKINESS:  We're finished with this

9  witness, Your Honor.

10           THE COURT:  All right.  Thank you.

11           You may step down.

12           THE WITNESS:  Thank you, Your Honor.

13           MR. McKINESS:  Next United States would like to

14  call Susan Boyd to the stand.

15           THE COURT:  Thank you.

16           THE CLERK:  Raise your right hand, please.

17           Do you swear or affirm that the testimony

18  you're about to give in this matter shall be the truth,

19  the whole truth, and nothing but the truth, as you shall

20  swear unto God, or affirm, subject to the penalty of

21  perjury?

22           THE WITNESS:  Yes.

23           THE COURT:  Thank you.

24           Mr. McKiness, you may proceed.

25           MR. McKINESS:  Thank you, Your Honor.

1                          SUSAN BOYD,

2    having been first duly placed under oath, was examined

3    and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. McKINESS:

6    Q.    Good morning, Major Boyd.

7          Could you please introduce yourself to the Court?

8    A.    Yes.  I'm Major Susan Boyd, the Woodford County

9    Detention Center.

10   Q.    And what do you -- what is your position at the

11   Woodford County Detention Center?

12   A.    Chief deputy.

13   Q.    And what do you do as chief deputy at the Woodford

14   County Detention Center?

15   A.    In charge of all day-to-day operations, inmate

16   housing, inmate grievances, pretty much everything.

17   Q.    All right.  And how long have you been working at

18   the Woodford County Detention Center?

19   A.    Seven years.

20   Q.    Seven years.  And how long have you been chief

21   deputy?

22   A.    Three.

23   Q.    All right.  In your day-to-day activities as

24   chief deputy at the Woodford County Detention Center,

25   did you ever interact with Mr. Villa-Castaneda,

1   Edgar Villa-Castaneda?

2   A.   Yes.

3   Q.   How often would you say you've interacted with him?

4   A.   I would see him on a daily basis while he was there

5   as I do my walks around the floor.

6   Q.   Okay.

7   A.   Whenever he needed to speak with me about anything.

8   Q.   All right.  And I was going to ask, did you ever

9   talk with him or interact with him?

10  A.   Yes.

11  Q.   All right.  Can you tell us about some of those

12  conversations and interactions?

13  A.   It would be Mr. Castaneda asking general questions,

14  can I move to another cell, extra time for visits,

15  general questions.

16  Q.   Okay.  Let me ask you this.  Do you speak Spanish?

17  A.   Very limited.

18  Q.   Did you ever speak Spanish with Mr. Villa-Castaneda?

19  A.   No.

20  Q.   When he would ask you questions, what language would

21  he ask them to you in?

22  A.   English.

23  Q.   And do you remember any specific interactions you've

24  had with Mr. Villa-Castaneda?

25  A.   I do remember specific interaction.

SUSAN BOYD - DIRECT BY MR. McKINESS                    38

 1  Q.    Could you tell us about that?

 2  A.    Yes.  Mr. Castaneda was housed with another inmate

 3  and was having issues with this inmate, as was other

 4  inmates in the cell.  I was walking on the floor, he

 5  knocked, and motioned for me to come speak with him.  I

 6  spoke with him, and he explained the issues they were

 7  having, as far as inmate hogging the remote and the TV

 8  and being disrespectful to himself and others in the

 9  cell.

10  Q.    And this interaction, what language did this

11  interaction occur in?

12  A.    English.

13  Q.    And when did this happen, if you recall,

14  approximately?

15  A.    June 2015.

16  Q.    Okay.  Did Mr. Villa ever indicate to you that he

17  did not understand English?

18  A.    No.

19  Q.    Did you ever receive any indication that he didn't

20  understand you?

21  A.    No.

22  Q.    Did you ever use a translator when communicating

23  with him?

24  A.    No.

25  Q.    Could you understand him?

SUSAN BOYD - DIRECT BY MR. McKINESS                39

1   A.   Yes.

2   Q.   Did you experience any issues at all in

3   communicating with Mr. Villa?

4   A.   No.

5   Q.   Are you comfortable saying that Mr. Villa-Castaneda

6   understood English?

7   A.   Yes.

8   Q.   Why is that?

9   A.   We didn't have any issues communicating.  I spoke to

10  him in English.  He replied in English.  He asked me

11  questions in English.

12  Q.   All right.  Have you seen any documents that would

13  lead you to believe that Mr. Villa-Castaneda speaks

14  English?

15  A.   Yes.

16  Q.   What would that be, what documents?

17  A.   Documents we use to book him into the jail, which is

18  to enter him into our system saying he's in our custody,

19  medical questions.

20  Q.   Okay.

21  A.   Things such as that.

22          MR. McKINESS:  United States would like to use

23  the Elmo.

24          THE COURT:  Yes, sir.

25  BY MR. McKINESS:

SUSAN BOYD - DIRECT BY MR. McKINESS                    40

1   Q.    Major Boyd, I'm showing you what has been premarked

2   as Government Exhibit 3.

3         Do you recognize this document?

4   A.    I do.

5   Q.    How do you recognize this document?

6   A.    This is a document we use in our booking process.

7   It's used for every inmate that's booked into the jail.

8   It's our standard medical questions.

9              MR. McKINESS:  United States moves to admit

10  Government's Exhibit 3 into the evidence.

11             THE COURT:  Any objection?

12             MR. ALLEN:  No objection, Your Honor.

13             THE COURT:  Exhibit 3 is admitted.

14             MR. McKINESS:  Thank you, Your Honor.

15        (Whereupon, Government's Exhibit Number 3 was

16  admitted into the record.)

17             MR. McKINESS:  Thank you, Your Honor.

18  BY MR. McKINESS:

19  Q.    Can you tell us what we're looking at on this

20  particular document?

21  A.    Yes.  This is questions that we ask inmates that are

22  being booked into the jail to know if they have any

23  medical questions or mental health issues, or basically

24  let us know what they need and how to take care of them.

25  Q.    Whose name appears at the top of this document?

SUSAN BOYD - DIRECT BY MR. McKINESS            41

1   A.    Edgar Villa-Castaneda.

2   Q.    All right.  Does -- what does that indicate to you

3   about this document?

4   A.    That these questions were asked to him.

5   Q.    All right.  And what is the date of this document?

6   A.    It appears to be 2/11/2015.

7   Q.    All right.  Who fills out this form?

8   A.    The booking officer.

9   Q.    And this form -- what's it called?  What's the title

10  of this document?

11  A.    Jail Intake Assessment, Staff Screening Questions.

12  Q.    All right.  And is there anything about this

13  document that leads you to believe that

14  Mr. Villa-Castaneda speaks English?

15  A.    Yes, sir.

16  Q.    Can you tell us what that is?

17  A.    I mean, if you look at the bottom, the third to last

18  question, there's a question that says, "Do you feel that

19  the arrestee was capable of understanding the questions?"

20  The booking officer marked yes.

21        There is a comment section there.  If a translator

22  was needed, it would have put -- the officer would have

23  marked translated by and --

24  Q.    Okay.

25  A.    -- the translator's name.

SUSAN BOYD - CROSS BY MR. ALLEN                    42

1  Q.   So this document indicates that, I think as you

2  said, the arrestee was capable of understanding the

3  questions?

4  A.   Yes.

5  Q.   And there's no question that a translator was needed

6  on this document?

7  A.   Correct.

8          MR. McKINESS:  United States has no further

9  questions for this witness.

10          THE COURT:  All right.  Thank you.

11          Mr. Allen.

12          MR. ALLEN:  Your Honor, again, under Rule 26 I

13  would request any statements given by this particular

14  witness.

15          THE COURT:  Let's see if the United States has

16  any Rule 26.

17          MR. McKINESS:  The United States doesn't have

18  any.

19          THE COURT:  All right.  Thank you.

20                    CROSS-EXAMINATION

21  BY MR. ALLEN:

22  Q.   Good morning, Major Boyd.

23  A.   Good morning.

24  Q.   Now, you've testified that you have very limited

25  understanding of Spanish; is that correct?

 1  A.    That's correct.

 2  Q.    Does the detention center have a translator on

 3  staff?

 4  A.    We have officers that speak Spanish.  We also have

 5  other inmates that speak Spanish and in dire cases we can

 6  use them.

 7  Q.    Okay.  And these officers you speak of can you

 8  testify as to the level of understanding?  Would you say

 9  they're fluent?

10  A.    I cannot.

11  Q.    Okay.  So you testified regarding the intake form

12  and making a translator available if they did not

13  understand the form.  Where would you get the translator

14  from?

15  A.    We have documents that are already translated into

16  Spanish.

17  Q.    So the intake form, you have a Spanish equivalent of

18  that?

19  A.    Yes.

20  Q.    Who was the intake officer when that was filled out?

21  A.    I believe that was Sergeant Desimone.

22  Q.    Desimone?

23  A.    Desimone.

24  Q.    Does he speak Spanish?

25  A.    No.

SUSAN BOYD - CROSS BY MR. ALLEN                    44

 1  Q.   And, of course, you were not present when Mr. Villa

 2  would, say, meet with his family or his officer -- I'm

 3  sorry, his attorney?  So you don't -- you can't testify

 4  as to what language he spoke during those meetings;

 5  correct?

 6  A.   That's correct I cannot.

 7  Q.   The handwriting at the top --

 8           MR. ALLEN:  And if I may approach the Elmo,

 9  Your Honor?

10           THE COURT:  Yes, sir.

11  BY MR. ALLEN:

12  Q.   Do you see that?  There it goes.

13  A.   Not yet.

14  Q.   The handwriting at the top.

15  A.   Yes.

16  Q.   Do you know whose that is?

17  A.   I cannot, I do not.

18  Q.   You didn't prepare this form; correct?

19  A.   No, sir.

20  Q.   And you weren't present when the intake form was

21  filled out; correct; do I understand your testimony?

22  A.   Not that I can remember.

23           MR. ALLEN:  Okay.  No further questions,

24  Your Honor.

25           THE COURT:  All right.  Thank you.

1              Anything else?

2              MR. McKINESS:  United States has no more

3  witnesses.

4              THE COURT:  All right.  Any other questions of

5  Major Boyd?

6              MR. McKINESS:  No, sir.

7              THE COURT:  All right.  Thank you.

8              You may step down.

9              Thank you.  Mr. Allen, do you have any

10 witnesses to present?

11             MR. ALLEN:  Your Honor, we call

12 Mr. Villa-Castaneda.

13             MR. McKINESS:  Your Honor, the United States

14 wanted to excuse Major Boyd if that's okay.

15             THE COURT:  I assume she's not needed for any

16 other purpose.

17             MR. ALLEN:  No.

18             THE COURT:  That's fine.  She's excused.

19             MR. McKINESS:  Thank you.

20             THE CLERK:  Raise your right hand, please.

21             Do you swear or affirm that the testimony

22 you're about to give in this matter shall be the truth,

23 the whole truth, and nothing but the truth, as you shall

24 swear unto God, or affirm, subject to the penalty of

25 perjury?

EDGAR VILLA-CASTANEDA - DIRECT BY MR. ALLEN                46

 1                    THE INTERPRETER:  Yes.

 2                    THE COURT:  Thank you.

 3                Mr. Allen, you may proceed.

 4                       EDGAR VILLA-CASTANEDA,

 5    having been first duly placed under oath, was examined

 6    and testified as follows:

 7                       DIRECT EXAMINATION

 8    BY MR. ALLEN:

 9    Q.    Good morning, Mr. Villa.

10    A.    (By interpreter) Good morning.

11    Q.    Could you please state your full name for the

12    record?

13    A.    Edgar Francisco Villa-Castaneda.

14    Q.    And, Mr. Castaneda, where are you from?

15    A.    Tepic, Nayarit, Mexico.

16    Q.    Were you born in Mexico?

17    A.    (By interpreter) Yes.

18    Q.    What is your age?

19    A.    43.

20    Q.    Okay.  And when you were in Mexico, did you go to

21    school?

22    A.    (By interpreter) Only three years.

23    Q.    Okay.  And while you were in school, did you learn

24    English?

25    A.    (By interpreter) No.

1  Q.    Okay.  Did you graduate from school?

2  A.    (By interpreter) No.

3  Q.    After you -- after you left school, what did you do

4  in Mexico?

5  A.    (By interpreter) I worked to help my family.

6  Q.    Can you tell me a little bit more about those jobs,

7  what you did?

8  A.    (By interpreter) In the fields I became proficient

9  in ceramics and in construction.

10  Q.    Did any of those jobs in Mexico require you to learn

11  the English language?

12  A.    (By interpreter) No.

13  Q.    Aside from working in ceramics, were you in the

14  armed services in Mexico?

15  A.    (By interpreter) It's not exactly being in the armed

16  forces.  It's being in service.  They don't pay to do

17  that.

18  Q.    Okay.  Was part of the service did you learn to

19  speak English?

20  A.    No.

21  Q.    Did you learn to read or write English?

22  A.    (By interpreter) No, no.

23  Q.    Prior to your arrest, how long had you resided in

24  the United States?

25  A.    (By interpreter) Before this arrest?

 1  Q.    Your arrest in the previous case.

 2  A.    (By interpreter) Three-and-a-half years, almost

 3  four.

 4  Q.    And while in the United States were you employed?

 5  A.    (By interpreter) Yes.

 6  Q.    And while in the United States, did you have the

 7  occasion to learn to speak some English?

 8  A.    (By interpreter) Yes.

 9  Q.    Can you read English?

10  A.    (By interpreter) No.

11  Q.    How did you learn -- how did you learn to speak

12  English?

13  A.    (By interpreter) Well, I am in a country that is not

14  mine.  This is not my language so I have to learn a

15  little bit so I can go forward and get a job.

16  Q.    While you have been here, have you taken any classes

17  to learn to read or write English?

18  A.    (By interpreter) No.

19  Q.    When you're at home speaking to your family, do you

20  speak to them in English or Spanish?

21  A.    (By interpreter) In Spanish.

22  Q.    And while in the United States, have you been

23  arrested in cases other than the current action?

24  A.    (By interpreter) Yes.

25  Q.    And in those cases did you have interpreters

1  appointed for you?

2  A.   (By interpreter) Yes.

3  Q.   Have you been arrested in a federal proceeding

4  before?

5  A.   (By interpreter) Only in the one I am currently at

6  for conspiracy.

7  Q.   You're currently serving a sentence for that federal

8  case?

9  A.   (By interpreter) Yes.

10 Q.   And in that case did the Court appoint an

11 interpreter for you?

12 A.   (By interpreter) Always.

13 Q.   Did you have an attorney in that case?

14 A.   (By interpreter) Yes.

15 Q.   And without telling me what you actually discussed

16 with your attorney, can you tell me whether your attorney

17 spoke Spanish?

18 A.   (By interpreter) Yes.

19          MR. ALLEN:  Your Honor, if I may approach the

20 Elmo.

21          THE COURT:  Yes.

22 BY MR. ALLEN:

23 Q.   Mr. Villa, I want to ask you about your interview

24 with the FBI.

25 A.   (By interpreter) Yes.

EDGAR VILLA-CASTANEDA - DIRECT BY MR. ALLEN                50

1   Q.    What I put on the screen here is what has been

2   introduced as Government Exhibit 2.

3        Do you recognize that document?

4   A.    (By interpreter) Yes.

5   Q.    Can you read any of the words on that document?

6   A.    (By interpreter) Nothing.

7   Q.    Do you recall -- do you recall sitting down for the

8   interview with the FBI agents?

9   A.    (By interpreter) Yes.

10  Q.    Did they read that form to you in Spanish?

11  A.    (By interpreter) No.

12  Q.    Okay.  And you heard the agents testify, you were up

13  here, testified that they asked you if you understood

14  what they were telling you, and that you said yes.  Why

15  did you say yes?

16  A.    (By interpreter) I understood what they were telling

17  me.  I didn't understand what the paper said.

18  Q.    And you've testified that you had an attorney at

19  that time for the drug case.  Did they give you an

20  opportunity to contact your attorney?

21  A.    (By interpreter) No.

22  Q.    What did the agents tell you regarding the form

23  that's on the screen there?

24  A.    (By interpreter) The little what they understood is

25  that fellow told me -- not this gentleman but the shorter

EDGAR VILLA-CASTANEDA - DIRECT BY MR. ALLEN          51

 1  one -- I understood two or three things he told me in

 2  Spanish, a little bit.

 3  Q.   So one of the agents spoke a little bit of Spanish

 4  to you?

 5  A.   (By interpreter) Two or three words, very little was

 6  understood.

 7  Q.   Did they explain to you that what you told them

 8  could be used against you later?

 9  A.   (By interpreter) I replied to everything yes, and I

10  didn't understand what they were asking me.

11  Q.   Did you tell them that you did not understand what

12  they were saying?

13  A.   (By interpreter) One time.

14  Q.   Okay.  And what did they say?

15  A.   (By interpreter) That I didn't understand why they

16  were telling me to sign the document.

17  Q.   Are you -- what you're telling me is that they told

18  you to sign the document anyway?

19  A.   (By interpreter) Yes.

20          MR. ALLEN:  If I may approach the Elmo once

21  more.

22          THE COURT:  Yes, sir.

23  BY MR. ALLEN:

24  Q.   The -- explain here what has been introduced as

25  Government Exhibit 3.

1       Were you an inmate at the Woodford County Detention

2    Center?

3    A.   (By interpreter) Yes.

4    Q.   Do you recall giving the information for that

5    document?

6    A.   (By interpreter) And I remember who helped me too.

7    Q.   Who helped you?

8    A.   (By interpreter) In the same pod where all of the

9    conspiracy defendants were, they gave us one document.

10   And Lunda Luna (phonetic) who studied in the states, was

11   the one who helped me.

12   Q.   Did he speak Spanish?

13   A.   (By interpreter) Yes.

14   Q.   Can you read that document?  Can you read any words

15   on that document?

16   A.   (By interpreter) No.

17   Q.   And let's talk briefly about your -- you obviously

18   can speak Spanish.  How well would you say you can

19   actually read Spanish?

20   A.   (By interpreter) Only like tickets.  Tickets, I used

21   to work at the restaurant, and I can read a ticket.

22   Q.   In Spanish?

23   A.   (By interpreter) In English.

24        MR. ALLEN:  No further questions, Your Honor.

25   Thank you.

EDGAR VILLA-CASTANEDA - CROSS BY MR. McKINESS          53

1          THE COURT:  Mr. McKiness.

2                    CROSS-EXAMINATION

3   BY MR. McKINESS:

4   Q.    Mr. Villa-Castaneda, you've been arrested several

5   times in the United States, haven't you?

6   A.    (By interpreter) Yes.

7   Q.    When was the first time you were arrested in the

8   United States?

9   A.    (By interpreter) I don't remember.  It must have

10  been because either drunkenness or a ticket.

11  Q.    Would the first time you've been arrested in the

12  United States been sometime in 2006?

13  A.    (By interpreter) Possibly.

14  Q.    All right.  So you were at least in the

15  United States since 2006?

16  A.    (By interpreter) Yes.  I went to Mexico, and I

17  returned again.

18  Q.    And when did you originally come to the

19  United States?

20  A.    (By interpreter) I don't remember well.  I remember

21  the last time.  I came, and I was arrested.

22  Q.    Were you ever deported?

23  A.    (By interpreter) I think so.

24  Q.    When were you first deported?

25  A.    (By interpreter) I don't remember the first time.

1  The last time I am not certain if it was February of

2  2011.

3  Q.   All right.  How many times have you been deported?

4  A.   (By interpreter) One or twice I think.

5  Q.   You stated that you've been arrested several times.

6  Have you ever been found incompetent to stand trial?

7  A.   (By interpreter) I don't understand the question.

8  Q.   How old did you say you were again?

9  A.   (By interpreter) 43.

10          MR. McKINESS:  United States doesn't have

11  anymore questions for this witness.

12          Thank you.

13          THE COURT:  All right.  Thank you.

14          Anything else, Mr. Allen?

15          MR. ALLEN:  No, Your Honor.

16          THE COURT:  Thank you.  You may step down.

17          Mr. Allen, any additional witnesses?

18          MR. ALLEN:  No, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Thank you.  Anything else to be presented with

21  regard to this issue?

22          MR. McKINESS:  United States has no more

23  witnesses and nothing to add.  I think the Court can

24  decide based on the motions filed and the testimony here

25  today.

1          THE COURT:  All right.  Thank you.

2          Mr. Allen, anything else?

3          MR. ALLEN:  Nothing further, Your Honor.

4          THE COURT:  All right.  I will take the motion

5   under advisement.  I would expect to issue a written

6   opinion on this issue hopefully today, this afternoon.

7          I do want to take up with the parties motion to

8   continue the trial of this matter, which I believe is

9   currently scheduled for July 5th.  I've read the motion,

10  the joint motion, that was filed.

11         Would the parties be available to commence

12  trial on July 24th?

13         MR. ALLEN:  If I may look at my calendar,

14  Your Honor.

15         THE COURT:  Yes, sir.

16         MR. ALLEN:  July 24th, Your Honor?

17         THE COURT:  Yes, sir.

18         MR. ALLEN:  I am available.

19         THE COURT:  All right.  Thank you.

20         Mr. McKiness, I believe that will give you an

21  extra two weeks after the date that you indicated.  I

22  believe it was July 10th that you would be available

23  after that date.

24         MR. McKINESS:  I'm just reading my calendar,

25  Your Honor.

1          THE COURT:  Yes, sir.

2          MR. McKINESS:  So, Your Honor, July 10th will

3  be my first day back in the office.

4          THE COURT:  Yes, sir.

5          MR. McKINESS:  I might need three weeks to

6  prepare to kind of refigure out what was going on in the

7  case and to talk to all of the witnesses, but I don't

8  think I would need much more than three weeks.

9          THE COURT:  That would give you two if we set

10 this on the 24th, but you think you would need an

11 additional week?

12         MR. McKINESS:  Yes, sir.

13         THE COURT:  All right.

14         MR. ALLEN:  Your Honor, and my calendar is

15 available that following week as well.

16         THE COURT:  Well, believe it or not, I have a

17 few other things scheduled myself, but --

18         MR. ALLEN:  I understand.

19         THE COURT:  -- you-all are causing quite a

20 problem with my calendar.

21         I will reschedule this matter for Monday,

22 July 31st, to commence at 9 o'clock, with counsel to be

23 present at 8:30 on that date.

24         The time between the current trial date and the

25 newly scheduled trial date of July 31st would be excluded

1   under the Speedy Trial Act as necessary for effective

2   preparation by counsel as indicated in the motion.  That

3   time would be excluded under the act, and the matter will

4   be reset for trial on that date.

5            There's one other motion that's been filed

6   under seal.

7            Mr. Allen, if you would like to come up to

8   sidebar, and I'll have some questions for you on that.

9            MR. ALLEN:  And, Your Honor, thank you for

10  being accommodating with your schedule.

11           MR. McKINESS:  United States concurs in that.

12  Thank you.

13           THE COURT:  Yes, sir.

14     (Whereupon, a SEALED bench conference was had with

15  the Court and Mr. Allen out of the hearing of the open

16  court, and may be found under separate cover, after which

17  the proceedings continued, as follows.)

18           THE COURT:  Thank you.

19           I'll be addressing, again, all pending motions.

20  I hope to do that by the end of the day, but I do have a

21  full day of hearings scheduled.  As a matter of fact, the

22  next hearing is scheduled for 10 o'clock.  Then we have

23  another at 10:30.

24           Let's see if the attorneys are present in the

25  civil case for the 10:30 matter.

1        (No response)

2              THE COURT:  All right.  All right.  If the

3   attorneys are not present for the 10:30 matter, then

4   we'll call the 10 o'clock matter up here in just a

5   moment.

6              We'll be in recess for five minutes.

7        (Whereupon, the Suppression Hearing Proceedings

8   concluded at 10:30 a.m.)

9                    C E R T I F I C A T E

10       I, Peggy W. Weber, certify that the foregoing is a

11  correct transcript from the record of proceedings in the

12  above-entitled matter.

13

14
    June 22, 2017                    s/Peggy W. Weber
15  DATE                             PEGGY W. WEBER, RPR

16

17

18

19

20

21

22

23

24

25

1                       **W I T N E S S E S**

2                                                              <u>Pages</u>

3    <u>PROOF ON BEHALF OF THE GOVERNMENT:</u>

4    Testimony of JOHN WHITEHEAD
            Direct Examination by Mr. McKiness            5
5           Cross-Examination by Mr. Allen               19
            Redirect Examination by Mr. McKiness         28
6
     Testimony of MICHAEL VANAELSTYN
7           Direct Examination by Mr. McKiness           30
            Cross-Examination by Mr. Allen               32
8
     Testimony of SUSAN BOYD
9           Direct Examination by Mr. McKiness           35
            Cross-Examination by Mr. Allen               42
10
     <u>PROOF ON BEHALF OF THE DEFENDANT:</u>
11
     Testimony of DEFENDANT EDGAR VILLA-CASTANEDA
12          Direct Examination by Mr. Allen              45
            Cross-Examination by Mr. McKiness            52
13
     Certificate of Reporter                             58
14   Index of Witnesses                                  59
     Index of Exhibits                                   60
15

16

17

18

19

20

21

22

23

24

25

1                          **E X H I B I T S**

2                                                        Admitted

3     GOVERNMENT'S EXHIBITS:

4
      No. 1   CD of clips of conversations between
5             Defendant Edgar Villa-Castaneda and
              TM at Woodford County Jail                   12
6
      No. 2   FBI Advice of Miranda Rights signed
7             by Defendant Edgar Villa-Castaneda           15

8     No. 3   Woodford County Detention Center
              Intake Assessment form for
9             Defendant Edgar Villa-Castaneda
              dated 02/12/15                               40
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25