```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF KENTUCKY
                         CENTRAL DIVISION
                      LEXINGTON, KENTUCKY

UNITED STATES OF AMERICA,      ) Lexington Criminal
                               ) Action No. 17-18
        Plaintiff,             )
                               ) At Lexington, Kentucky
-vs-                           )
                               ) October 16, 2017
EDGAR VILLA-CASTANEDA,         ) 9:00 a.m.
                               )
        Defendant.             ) DAY 1
```

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE DANNY C. REEVES
UNITED STATES DISTRICT JUDGE

Appearances of Counsel:

On behalf of Plaintiff:      ADRIEN S. McKINESS, JR., ESQ.
                             Assistant U.S. Attorney
                             717 West Broadway
                             Louisville, Kentucky  40202

On behalf of Defendant:      BENJAMIN D. ALLEN, ESQ.
                             Gess Mattingly & Atchison, PSC
                             201 West Short Street
                             Lexington, Kentucky  40507

Court Reporter:              PEGGY W. WEBER, RPR
                             Official Court Reporter
                             U.S. District Court
                             P.O. Box 362
                             Lexington, Kentucky  40588
                             (859) 421-0814

Proceedings recorded by mechanical stenography,
transcript produced by computer.

1        (Whereupon, Day 1 of the Jury Trial proceedings

2    commenced on Monday, October 16, 2016, at 9:00 a.m., on

3    the record in open court, without the prospective juror

4    members present, as follows.)

5             THE COURT:  All right.  Thank you.

6             Good morning everyone.

7             Madam Clerk, if you would call the matter

8    scheduled for 9 o'clock.

9             THE CLERK:  Yes, Your Honor.

10            Lexington Criminal Action Number 17-18,

11   United States of America versus Edgar Villa-Castaneda,

12   called for jury trial.

13            THE COURT:  Thank you.

14            If counsel would state their appearances,

15   please.

16            Mr. McKiness.

17            MR. McKINESS:  Yes, sir.  Spencer McKiness here

18   for the United States.

19            THE COURT:  Thank you.

20            Mr. Allen.

21            MR. ALLEN:  Your Honor, Ben Allen for the

22   defendant Edgar Villa-Castaneda.

23            THE COURT:  And this is Mr. Villa-Castaneda at

24   counsel table.

25            Thank you.

1              The jury is scheduled to come in at 9:30 this

2    morning, and I have just a couple of matters to review

3    with the parties before we proceed.

4              First, Mr. McKiness, would you like for me to

5    identify your potential trial witnesses in the case, or

6    do you wish to do that during voir dire?

7              MR. McKINESS:  Excuse me, Your Honor.  That can

8    happen now.

9              THE COURT:  All right.  I'll do that during my

10   portion of the voir dire.  And, of course, the parties

11   can always supplement.

12             Mr. Allen, do you have any witnesses you would

13   like for me to identify?

14             MR. ALLEN:  Not at this time, Your Honor.

15             THE COURT:  Okay.

16             MR. ALLEN:  But if I do, I will certainly bring

17   that up in voir dire.

18             THE COURT:  All right.  Thank you.

19             I anticipate this matter can be tried in a

20   little over a day.

21             Is that a fair estimate, Mr. McKiness?

22             MR. McKINESS:  I believe that's a fair

23   estimate, Your Honor.

24             THE COURT:  All right.

25             MR. ALLEN:  I do, Your Honor.  If it lasts

1    longer than a day, I don't think it will be a full two

2    days.

3            THE COURT:  All right.  If we get toward the

4    end of the day today, I would not plan to keep the jury

5    late this afternoon.  We would instead come back tomorrow

6    morning and finish up if we get to that point today.

7            Also -- and you-all can be seated.  I'm sorry.

8            I plan to seat one alternate in the case.  And

9    I will go over the selection procedures again here in

10   just a moment.  But just a couple of additional matters

11   before I do that.

12           How much time would you like for your opening

13   statements, Mr. McKiness?

14           MR. McKINESS:  25 minutes would be --

15           THE COURT:  All right.  I was anticipating

16   20 to 30.  Is that sufficient for the defendant?

17           MR. ALLEN:  That would be more than sufficient

18   for me, Your Honor.  Thank you.

19           THE COURT:  All right.  Also, Mr. Allen, if you

20   would like to reserve opening statement, you can alert me

21   to that at the appropriate time.

22           After I select the -- or after we select the

23   jury, would the parties like me to invoke the rule on

24   exclusion of witnesses under Rule 615?

25           MR. ALLEN:  The defendant would, Your Honor.

```
 1              THE COURT:  All right.  I'll do that at the
 2  appropriate time.
 3              This morning you should have been given the
 4  statement of the case that I -- that I plan to read to
 5  the jury during my portion of the voir dire just to
 6  explain what the case is about.
 7              And then also you should have on your table
 8  preliminary jury instructions.  I think it's about five
 9  pages.  For the most part they're boilerplate
10  instructions.
11              I do include in the preliminary instructions
12  the elements of the two offenses that are charged in the
13  case.
14              Does anyone have any questions about either of
15  those two?
16              MR. McKINESS:  Yes, sir.  I believe that in the
17  elements for Count 1 that generally there is an element
18  of a true threat, and I didn't see that addressed in the
19  elements there.
20              THE COURT:  Let me take a look here.
21              MR. McKINESS:  On page 4.
22              THE COURT:  All right.
23              MR. McKINESS:  Again from page 3 and page 4.
24              THE COURT:  It is -- that requirement is set
25  forth in the full version of the instructions, and I
```

1  think you've also been given.  Let me turn to those.

2          Here we go.  What I've done, if you'll look at

3  the standard instructions, the draft instructions that

4  you were given, on page 16, sub-paragraph (b), "a true

5  threat is defined as," and then it goes on to define what

6  that definition would include.

7          MR. McKINESS:  We saw that, Your Honor, and it

8  looks like although it defines what a true threat is,

9  there's no reference anywhere else.

10          THE COURT:  All right.  How would you like for

11  me to amend that in the preliminary instructions, and

12  I'll certainly do that?

13          MR. McKINESS:  I believe that it would -- as

14  simple as it can be stated, I guess, United States would

15  need to show that the threat was a true threat and not

16  just idle talk, something along those lines.

17          THE COURT:  All right.

18          MR. McKINESS:  I believe that both our proposed

19  jury instructions contain some sort of language on that.

20          MR. ALLEN:  And, Your Honor, for the defense, I

21  have no general issue with the way that the true threat

22  is defined.

23          THE COURT:  Yes, sir.

24          MR. ALLEN:  I think that's appropriate.  My

25  concern and I think the government's concern is that it

1  needs to be clear to the jury in the final jury

2  instructions that that finding must be made beyond a

3  reasonable doubt.

4             THE COURT:  All right.

5             MR. ALLEN:  And to the extent that's not -- not

6  clearly stated.

7             And, again, with -- in my proposed

8  instructions, I had made a specific finding as to the

9  true threat.

10            THE COURT:  Let me suggest this and then, of

11  course, we can always modify the final instructions.  But

12  on the preliminary instructions on page 3, the very

13  bottom of the page, where we have sub-paragraph (a), the

14  elements, "The defendant threatened to murder or assault

15  a federal law enforcement officer."  And I would include,

16  "Further, the United States must establish that the

17  threat was a true threat."

18            MR. McKINESS:  I think that's fair.

19            THE COURT:  Would that be sufficient?

20            MR. McKINESS:  Yes.

21            THE COURT:  And then we can --

22            MR. ALLEN:  For the preliminary instructions,

23  yes.

24            THE COURT:  -- elaborate -- we can elaborate

25  further in the final instructions in terms of what that

1    means.  We'll flesh that out.

2              And then I can also elaborate further on the

3    burden of proof in the final instructions as well.

4              All right.

5              MR. McKINESS:  Your Honor, in adjusting the

6    burden of proof, I think that you clearly set that out in

7    the instructions where you talk about what needs to be

8    found beyond a reasonable doubt, and it states that all

9    the elements.  So if the Court puts it in the element

10   section, then I think that takes care of the issue.

11             THE COURT:  All right.  In the final version?

12             MR. McKINESS:  Yes, sir, in the final version.

13             THE COURT:  Yes.  If you'll notice in the

14   preliminary instructions, of course, the United States

15   does have the burden of proof beyond a reasonable doubt,

16   and that's set forth just before the summary of the

17   charges.  So I believe that will be sufficient in terms

18   of the preliminary instructions.

19             MR. McKINESS:  Yes, sir.

20             THE COURT:  All right.  I'll make that -- I'll

21   make that modification.

22             Anything else about the preliminary

23   instructions that you-all have questions about?

24             MR. McKINESS:  Not from the United States.

25             THE COURT:  All right.  Mr. Allen?

1              MR. ALLEN:  Not from the defense, Your Honor.

2              THE COURT:  All right.  Thank you.

3              A couple of other matters I have to go over.

4    Well, let me turn to the jury selection.  I think we went

5    over this earlier, but just so everyone is clear about

6    the way that I do the jury selection.  I'll begin with

7    questioning the panel, and I anticipate I would take

8    probably 30 minutes just to go through my standard

9    questions for the jury.

10             Because we have a relatively short trial as

11   trials go here, I would not anticipate giving the jury

12   that's finally selected, or that's seated in the case,

13   notebooks to take notes if it's a one-day trial.  I

14   really don't think they will need to take notes in the

15   case.

16             But after I've gone through my questions for

17   the jury panel, then I'll turn to the United States next,

18   and you can follow up with whatever questions you wish.

19   I generally limit that to about 15 minutes.  If you need

20   a little more time than that, just let me know.

21             But after you've gone through your questions,

22   and, Mr. Allen, you've gone through your questions for

23   the panel, I'll ask you to come up to sidebar to exercise

24   any challenges for cause that you might think would be

25   appropriate.

10

1          So at that point we'll excuse any jurors for

2   cause, and then after we've done that, I'll ask the clerk

3   to call effectively what amounts to two panels.  It's a

4   panel of 28, and then it's a panel of three, but she'll

5   just call numbers of 31 jurors.

6          For the first panel we'll seat the jury, and

7   then from those last three jurors we'll select the

8   alternate.

9          From the first panel of 28, the United States

10  has six peremptory challenges, and the defendant has, of

11  course, 10.  So you'll exercise those, and then the first

12  12 called but not stricken from the main panel will be

13  seated in the case.

14          So if you -- if you strike the same people,

15  again, we just go to the first 12 called but not stricken

16  that would be seated.  And then the first alternate for

17  those last three, the first alternate called but not

18  stricken, would be the alternate that would be seated in

19  the case.

20          Hopefully we'll be able to get through our

21  questions before we have to take a break.  Sometimes we

22  may have a juror or two that will need to take a quick

23  bathroom break.  And if we do that, we'll just -- we'll

24  play that by ear, but generally we can finish the jury

25  selection before we have to take a break.

11

1            And then we would take about 20 minutes to

2  allow you to exercise your peremptory challenges against

3  those two panels.

4            Hopefully we'll be able to get back and get the

5  opening statements finished, but if we don't -- if it

6  doesn't look like we have enough time for the opening

7  statements, I don't like to have one side give an opening

8  and the other side not have that opportunity before we

9  take a lunch break.  So if we get to that point, if we

10 need to stop a little bit early for lunch, then we'll do

11 that, but we'll have both openings either before lunch or

12 after lunch, as the case may be.

13            Mr. Allen, if you decide to reserve, you can

14 let me know, and that may change that a bit, and then

15 hopefully we'll be able to start with presentation of

16 proof.

17            After we've selected the jury at that point,

18 I'll exercise -- or I'll invoke the rule on exclusion of

19 witnesses under Rule 615, and then if there are any other

20 issues that you need to take up at that point.

21            After we have seated the jury -- and I

22 neglected to mention this.  After we've seated the jury,

23 that's when I'll give the preliminary jury instructions

24 before you begin with your opening statements.  As you

25 can tell, five pages, it won't take long to get through

1    those instructions.

2              Also, I wanted to give you the final

3    instructions, the draft at least today, and I think I may

4    have given you a draft earlier.  I made maybe just a

5    couple of modifications to those instructions that were

6    given to you earlier, and there was one change I wanted

7    to call to your attention and explain the reason for it

8    if you have those handy.

9              And, of course, I'll need to make a change on

10   the issue we talked about just a few moments ago on true

11   threat and burden of proof, but I'll be working on that.

12             Let's see.  Here we go.  Now, if you could turn

13   to page 19 of those draft instructions that you were

14   given, it's the last paragraph, sub-paragraph (b).

15             Recently I had a trial, and the jury was a

16   little confused between the -- between elements and

17   factors that could be considered in proving elements.  So

18   I wanted to clarify this a little bit, and so now it

19   reads, "Some factors strongly corroborative of intent or

20   offers of payment, repeated solicitations, expressions of

21   seriousness, or instructions or preparations about how to

22   proceed to commit the offense."  And then I changed the

23   next sentence.  "These are just some things for you to

24   consider; however, they do not have to be present.  Also

25   these factors are not exclusive or conclusive."

1          So I've done that.  I've made that change again
2    because I would like to avoid any jury confusion about
3    the difference between elements and factors that may be
4    considered in determining whether elements have been
5    proven in the case.
6          Again, I just wanted to call that to your
7    attention.  You can look at this, and you can look at the
8    other instructions, of course, but I wanted to call that
9    to your attention before we get through our instructions
10   conference if we move along as rapidly as the parties
11   have indicated.  Again, I wanted to give you as much time
12   as possible to be looking through those instructions.
13         All right.  Now, let me see if the attorneys
14   have any issues that you would like to take up.
15         Anything else I haven't covered at this point,
16   Mr. McKiness?
17         MR. McKINESS:  United States doesn't have any
18   additional issues.
19         THE COURT:  All right.  Mr. Allen, anything
20   else?
21         MR. ALLEN:  Your Honor, only one.  This could
22   be raised, I guess, when the panel is seated, but there
23   is a member of the pool who is a secretary in my office.
24         THE COURT:  All right.
25         MR. ALLEN:  Maybe she wouldn't last long, but I

14

```
 1   thought I would go ahead and --
 2                THE COURT:  If you would like, I can go ahead
 3   and excuse her.
 4                MR. ALLEN:  Yes.  That is --
 5                THE COURT:  You may want her to get back to
 6   work.
 7                MR. ALLEN:  She's not my secretary but --
 8                THE COURT:  Well, I take it back.
 9                MR. ALLEN:  That's number 220.
10                THE COURT:  All right.  She's apparently a new
11   juror.  I could qualify her and then explain or tell her
12   that I understand that she's -- she works for your firm,
13   and we would go ahead and excuse her at that point.  That
14   way she's been qualified.
15                MR. ALLEN:  That's fine if you want to do it
16   that way.
17                THE COURT:  Just do that.
18                MR. ALLEN:  I thought I would go ahead and let
19   the Court know.
20                THE COURT:  All right.  I appreciate that.  We
21   should have plenty of jurors for the case, but for some
22   reason if I forget, please --
23                MR. ALLEN:  I will be sure to --
24                THE COURT:  -- remind me.
25                MR. ALLEN:  -- remind you, Your Honor.
```

```
 1                  THE COURT:  Yes, sir.

 2                  All right.  Anything else we need to take up,

 3   Mr. Allen, that you're aware of?

 4                  MR. ALLEN:  Nothing further from the defense,

 5   Your Honor.

 6                  THE COURT:  Mr. McKiness, anything else?

 7                  MR. McKINESS:  No, sir.

 8                  THE COURT:  You prefer Adrien or Spencer when I

 9   introduce you to the jury?

10                  MR. McKINESS:  Spencer, Your Honor.

11                  THE COURT:  Spencer, all right.

12                  MR. McKINESS:  Thank you.

13                  THE COURT:  Yes, sir.

14                  All right.  I'll make this change to the

15   preliminary jury instructions while -- well, before we

16   start at 9:30, and I'll give you the changes that were

17   made.  And if you notice any other problems, call it to

18   my attention before we start with the jury.

19                  All right.  We'll be in recess until 9:30 this

20   morning.

21            (Whereupon, a recess was taken at 9:20 a.m., and

22   Day 1 of the Jury Trial proceedings continued at

23   9:30 a.m., on the record in open court, with the

24   prospective juror members present, as follows.)

25                  THE COURT:  All right.  Thank you.
```

1               Good morning everyone.

2               Madam Clerk, you've called the roll of the

3    jury; is that correct?

4               THE CLERK:  Yes, Your Honor.

5               THE COURT:  All right.  Thank you.  If --

6               THE CLERK:  49 jurors are present.

7               THE COURT:  Thank you.

8               If counsel would state their appearances,

9    please.

10              MR. McKINESS:  Good morning, Your Honor.

11              Spencer McKiness here for the United States.

12              THE COURT:  Thank you.

13              MR. ALLEN:  Good morning, Your Honor.

14              Ben Allen on behalf of the defendant,

15   Edgar Villa-Castaneda, who is seated to my left.

16              THE COURT:  Thank you.

17              And, Madam Clerk, if you would call the matter

18   scheduled for trial this morning.

19              THE CLERK:  Yes, Your Honor.

20              Lexington Criminal Action Number 17-18,

21   United States of America versus Edgar Villa-Castaneda,

22   called for jury trial.

23              THE COURT:  All right.  Thank you.

24              And, let's see, I believe we have some new

25   jurors that need to be sworn in, but before we do that

17

```
 1    let's administer the oath to all jurors that are present.
 2              Ladies and gentlemen, if you would please
 3    stand, and the clerk will administer the oath for you.
 4              THE CLERK:  Raise your right hand, please.
 5              Do you and each of you solemnly swear or affirm
 6    that you will true and perfect answers make to the
 7    questions, which will now be asked of you, touching upon
 8    your qualifications to sit as jurors in the United States
 9    District Court in the Eastern District of Kentucky, as
10    you shall answer unto God?  Do each of you so swear or
11    affirm?
12         (Affirmative responses heard.)
13              THE COURT:  Thank you, and please be seated.
14              We may need a headset for one of our jurors,
15    Madam Clerk.
16              THE CLERK:  Yes, sir.
17              THE COURT:  I think he's having a hard time
18    hearing.
19              THE CLERK:  Does somebody need a headset?
20         (Raised hand)
21              THE CLERK:  This gentleman there.
22              Okay.  Give him the headset, and he'll be able
23    to hear.
24              THE COURT:  We'll try that and see if that
25    helps a little bit.
```

1          How are we now?  Good?

2       (Nods head)

3          THE COURT:  All right.  Now, we have some new

4    jurors that will need to be qualified.

5          Madam Clerk, if you could call the numbers of

6    our new jurors, and I have just a few questions for you

7    to answer.  If you could stand as your number is called,

8    please, if you're a new juror.

9          THE CLERK:  Juror Number 137, 179, 204, 211,

10   212, 213, 215, 220, 222, 223, 228, 230, 232, 233, 236,

11   237, 241, and 242.

12         THE COURT:  All right.  Thank you.

13         Now, I have just a few questions for you.  If

14   you could respond to each of the following, and these are

15   questions that you answered earlier when you filled out

16   those questionnaires, and I just want to make sure the

17   information is still accurate.

18         Are each of you citizens of the United States?

19      (Affirmative responses)

20         THE COURT:  Are each of you 18 years of age or

21   older?

22      (Affirmative responses)

23         THE COURT:  Has your primary residence for the

24   past year been in this state and also in the same county?

25      (Affirmative responses)

1          THE COURT:  Do each of you read, write, speak,
2     and understand the English language?
3          (Affirmative responses)
4          THE COURT:  Are any charges now pending against
5     you for a violation of state or federal law punishable by
6     imprisonment for a term exceeding one year?
7          (Negative responses)
8          THE COURT:  Have any of you ever been
9     convicted, either by a guilty or nolo contendere plea, or
10    by a court or jury trial, of a state or federal crime for
11    which punishment could have been more than one year in
12    prison?
13         (Negative responses)
14         THE COURT:  Do any of you have any physical or
15    mental disabilities that would interfere with or prevent
16    you from serving as a juror if you're selected?
17         (Negative responses)
18         THE COURT:  Thank you, and you may be seated.
19             All of these jurors are qualified.
20             I believe we have one juror that is employed by
21    Mr. Allen's law firm, and so I'm going to go ahead and
22    excuse you before we get started.  I anticipate that
23    we'll be able to excuse you early so you don't have to
24    sit through the questioning so you can get back to work.
25    I know that's important.

1              PROSPECTIVE JUROR NUMBER 220:  Thank you.

2              THE COURT:  All right.  Now, ladies and

3     gentlemen, let me go through the procedures that we're

4     going to follow in selecting the jury to be seated in

5     this case.

6              I'm going to begin by asking each of you

7     questions to see if you know anything about this case and

8     to ensure that you are otherwise qualified to serve as

9     jurors.  So I'll be asking you a number of questions, and

10    then the attorneys will follow up with some additional

11    questions.

12             As I ask you questions, if you need to respond,

13    if you could, identify yourself until you are called on.

14    When I do call on you or when the attorneys call on you

15    to answer, if you could just identify yourself every time

16    by giving us your juror number.  We're making a

17    transcript of the proceedings, and I may recognize you

18    after awhile, but we're not going to know that on paper.

19    So every time that you answer a question, you need to

20    give your number, and also you need to speak up so not

21    only can I hear you, but also so the attorneys can hear

22    you as well.

23             I do ask you as we go through the jury

24    selection process if you would not speak among

25    yourselves.  There may be times when I'll have the

 1   attorneys to come up to sidebar over here to my right to

 2   answer some questions or to have a conversation, and when

 3   we're having that conversation, that's fine if you do

 4   want to talk with your neighbors, but as we're -- as

 5   we're asking questions of you, I would appreciate it and

 6   I'm sure the attorneys would appreciate it if you would

 7   not do that.

 8          Also, let me remind you that, of course, you

 9   have been placed under oath so you need to give full and

10   complete answers to all of the questions that are being

11   asked.

12          Now, let me -- let me begin by giving you just

13   a brief summary of what the case is about.  It will be

14   presented to you today and perhaps into tomorrow a bit.

15          Ladies and gentlemen, there are two counts or

16   charges that will be presented for your consideration

17   during this trial.  Now, this is a criminal case.

18          Defendant Edgar Villa-Castaneda is charged in

19   Count 1 of the indictment with threatening to murder an

20   Assistant United States Attorney with the intent to

21   retaliate against him on account of the performance of

22   his official duties, in violation of Title 18 of the

23   United States Code, Section 115(a)(1)(B).

24          The defendant is charged in Count 2 of the

25   indictment with solicitation to commit the murder of an

1   official of the United States, in violation of Title 18

2   of the United States Code, Section 373(a).

3            Now, the events are alleged to have occurred on

4   or about between August 5th, 2015, and September 22nd,

5   2015, in Woodford County, in the Eastern District of

6   Kentucky.

7            Now, the defendant denies the charges against

8   him.

9            Now, I want to begin by asking if any our

10  potential jurors have heard anything at all about this

11  case, or if you know anything about the case.

12           So if you have, if you could please indicate so

13  by raising your hand.

14       (No response)

15           THE COURT:  Now, I'm assuming if no one raises

16  their hand, that you haven't heard anything about the

17  case, and you don't know anything about it personally.

18           All right.  Well, let me again introduce the

19  attorneys that stood up just a moment ago when the case

20  was called, and I asked them to introduce themselves.

21           The Assistant United States Attorney that

22  will be handling this case for the government is

23  Spencer McKiness, and he's seated over to my left, which

24  for you in the back would be to your right.

25           And also at counsel table with Mr. McKiness is

1    the agent on the case, the case agent, John Whitehead.

2    He's a Special Agent with the Federal Bureau of

3    Investigation here in Lexington.

4            Now, over to my right is Benjamin Allen who

5    will be representing the defendant in the case.

6    Mr. Allen is with the firm of Gess Mattingly and Atchison

7    here in Lexington.

8            And, of course, seated at counsel table with

9    him is the Defendant, Edgar Villa-Castaneda.

10           Well, let me begin by asking if anyone knows

11   either the attorneys, the case agent in this matter, or

12   the defendant, if any of you know any of the individuals

13   I've identified so far.

14       (No response)

15           THE COURT:  Well, let me expand it a little

16   bit.  I want to ask you a few more questions about the

17   attorneys, and I want to see if you've had any cases with

18   the attorneys, if you've been involved as a juror or

19   maybe as a party in the case, a witness, anything of that

20   nature, if you've had any proceedings, official or

21   otherwise, with the attorneys that I've made reference

22   to.

23       (No response)

24           THE COURT:  Anyone or member of your family

25   been involved in litigation matter?

 1              Yes, sir.

 2              JUROR NUMBER 154:  I've been a juror from

 3  another case.

 4              THE COURT:  All right.

 5              COURT REPORTER:  I'm sorry?

 6              THE COURT:  What was your number?

 7              PROSPECTIVE JUROR NUMBER 154:  I've been a

 8  juror of another case with different -- this is my second

 9  time.

10              THE COURT:  Okay.  What was your number again?

11              PROSPECTIVE JUROR NUMBER 154:  154.

12              THE COURT:  154, all right.  I'll be asking you

13  a couple of questions a little bit later about prior

14  service as jurors.  I know we've got about half of our

15  panel that are new, and half have been qualified and

16  maybe have served in civil or criminal cases.  I'll ask

17  just a couple of questions in just a few moments about

18  prior service.

19              All right.  Thank you.

20              Now, let me take just a moment, and I want to

21  identify some potential witnesses in the case, and then

22  I'll see if anyone knows any of the witnesses that I'll

23  be identifying here.

24              Now, I do anticipate this will be a relatively

25  brief case so I only have a few witnesses to go over with

1  you.  This does not limit the parties from calling other

2  witnesses in the case if they choose to do that, but at

3  that point I believe these witnesses may be called in the

4  case.

5           Now, earlier I identified Special Agent John

6  Whitehead who is seated over at counsel table, and I

7  believe everyone indicated -- or no one indicated that

8  you know him or that you've had cases with him in the

9  past.

10          Now, you indicated, sir, that you had been on

11 another case.  Was Mr. Whitehead the case agent in that

12 matter, if you know?

13          PROSPECTIVE JUROR NUMBER 154:  No.

14          THE COURT:  All right.  Thank you.

15          Now, I also anticipate that we may hear

16 testimony in this matter from Robert Duncan who's an

17 Assistant United States Attorney here in Lexington.

18 Mr. Duncan has been recently nominated to be the

19 U.S. Attorney for the Eastern District of Kentucky, and

20 so some of you may have seen his name or heard of him in

21 the past.

22          So let me see if anyone knows Mr. Duncan.  If

23 you do, if you've had a case with him perhaps, if he's

24 handled cases here in court, or if you know him

25 otherwise, if you could raise your hand.

1           (No response)

2                 THE COURT:  All right.  Again, I assume since

3    no one raised their hand, that you don't know Mr. Duncan

4    and you haven't had any cases with him.

5                 Also, I would anticipate that we may have

6    testimony from an individual, Talbert Marshal, and also

7    Gill -- I believe it's Garrett, G-A-R-R-E-T-T, Gill

8    Garrett.

9                 Does anyone know either of those two

10   individuals?  And I think they're from Central Kentucky,

11   but I'm not sure.  Anyone know either of those

12   individuals?

13          (No response)

14                THE COURT:  All right.  Well, let me ask if any

15   of our potential jurors are either currently or formally

16   employed in a law enforcement capacity.  Do we have

17   anyone here that's either currently or previously a

18   member of any law enforcement office?  That would include

19   sheriff, anything of that nature.

20                Yes, ma'am.

21                PROSPECTIVE JUROR NUMBER 140:  Juror 140.  I

22   work for pretrial services.

23                THE COURT:  All right.  Is that for the state?

24                PROSPECTIVE JUROR NUMBER 140:  Yes.

25                THE COURT:  What county are you located in?

```
 1                  PROSPECTIVE JUROR NUMBER 140:  Montgomery,
 2   Bath, Menifee, Rowan.
 3                  THE COURT:  Okay.  Is that -- where is your
 4   office located, your primary office?
 5                  PROSPECTIVE JUROR NUMBER 140:  Mt. Sterling.
 6                  THE COURT:  In Mt. Sterling, all right.
 7                  As a result of your employment, would that in
 8   any way prevent you from being fair and impartial to both
 9   sides if you're seated as a juror in the case?
10                  PROSPECTIVE JUROR NUMBER 140:  No, sir.
11                  THE COURT:  And will you be able to listen to
12   all of the evidence and give it the appropriate weight
13   that you think it deserves?
14                  PROSPECTIVE JUROR NUMBER 140:  Yes, sir.
15                  THE COURT:  All right.  Thank you, ma'am.
16                  Anyone else?
17        (No response)
18                  THE COURT:  All right.  Now, from time to time
19   we have jurors that have family members that may be
20   employed by law enforcement, and my question is not -- I
21   don't -- I'm not asking you to tell me if you have a
22   second cousin that's a deputy sheriff somewhere.  What
23   I'm asking you if you have a person that's in law
24   enforcement in your family, if that would in any way
25   prevent you from being fair and impartial to both sides
```

1    in the case.  Would that in any way influence your

2    decision if you do, in fact, have someone that's in law

3    enforcement?  If you do, if you could just raise your

4    hand.

5        (No response)

6            THE COURT:  All right.  Let me ask if any of

7    our potential jurors have been involved in a litigation

8    matter with the United States government.  That could be

9    a Social Security case, land dispute, anything of that

10   nature.  Anyone have -- previously had or currently have

11   a dispute with the federal government?

12       (No response)

13           THE COURT:  I'll expand it a bit to the state

14   government.  Anyone have a dispute at any point with any

15   agency of state government?

16       (No response)

17           THE COURT:  Is there anyone that's been

18   involved in a litigation matter, regardless of what kind

19   of matter it may be, that in your opinion would prevent

20   you from being a fair and impartial witness in the case?

21   In other words, based on something that might have

22   happened in the past, you might feel either favorable or

23   unfavorable to one side or the other in this case.

24   Anything at all?

25           (No response)

 1                    THE COURT:  Is there anyone that's had an

 2      experience in the past, whatever it may have been, that

 3      would make it difficult or impossible for you to sit as a

 4      juror?  Anything in your past that --

 5                    Yes, sir.

 6                    PROSPECTIVE JUROR NUMBER 189:  189.

 7                    THE COURT:  Yes, sir.

 8                    PROSPECTIVE JUROR NUMBER 189:  Yes, sir.  My

 9      brother spent 10 years in prison, and my uncle is still

10      in prison, and I don't believe I could do that to

11      somebody's family.

12                    THE COURT:  All right.  So you would have a

13      difficult time if you were seated in this case being fair

14      to both sides?

15                    PROSPECTIVE JUROR NUMBER 189:  Yes, sir.

16                    THE COURT:  All right.  I appreciate your

17      candor, sir.

18                    Anyone else?

19          (No response)

20                    THE COURT:  Now, ladies and gentlemen, as I

21      indicated, this is a criminal case, and criminal cases

22      are different than civil cases.

23                    In a civil case the party that has the burden

24      of proof, and that's usually the plaintiff in the case,

25      has to prove his or her case by what's called a

1   preponderance of the evidence.  And this is in those

2   cases.

3          Now, in a criminal case it's different.  In a

4   criminal case the party with the burden of proof, and

5   that's the government, has to prove every element of

6   every offense that's been charged beyond a reasonable

7   doubt.  That's a higher standard than in a civil case.

8          Is there anyone who doesn't understand that

9   there is a higher burden of proof in a criminal case as

10  compared with a civil case?

11      (No response)

12          THE COURT:  All right.  Now, one of our jurors

13  earlier had indicated that he had previously served as a

14  juror here in federal court, so I want to see how many of

15  our other potential jurors here have previous experience

16  in sitting as a juror in a case.  If you have --

17  we have a few folks, maybe 12 or so, 13 or so.

18          Now, for those of you that have served

19  previously, how many served in a criminal case?

20      (Raised hands)

21          THE COURT:  A little bit more than half.

22          How many only a civil case?

23      (No response)

24          THE COURT:  All right.  So everyone that's

25  served has served in a criminal case.

1        All right.  Is there anything about your prior

2   service, either the way the Court handled the matter, the

3   way the matter was prosecuted or defended, anything at

4   all about the case that would prevent you from being fair

5   and impartial if you were seated in this case?  Anything

6   at all?

7        (No response)

8        THE COURT:  Maybe the clerk didn't treat you

9   right or said something to you untoward.  Anything?

10       (No response)

11       THE COURT:  All right.  Now, ladies and

12  gentlemen, if you are seated in this case, you'll be

13  required to render a verdict based solely on the evidence

14  that's presented here in court and also in the context of

15  the law that I'll be giving to you.

16       I give some preliminary jury instructions when

17  we start, and then I give a long set of instructions at

18  the end of the case.  And if you've been seated before,

19  you know that those instructions at the end of the case

20  can be pretty long, but you do have to decide the case

21  based on the facts and also in the context of the law

22  that you'll be given.

23       Is there anyone for whatever reason believes

24  that you could not do that?

25       Yes, sir.  For the reason that you stated

1   earlier?

2          PROSPECTIVE JUROR NUMBER 189:  Yes, sir.

3          THE COURT:  All right.  And that's Juror

4   Number 189.

5          All right.  Thank you.

6          Ladies and gentlemen, is there anyone who

7   believes that just because a person has been charged with

8   an offense or with a crime, that that person must be

9   guilty of something by virtue of being charged with an

10  offense?

11     (No response)

12         THE COURT:  Everyone understands that in order

13  to convict, there must be proof presented by the

14  government, and that proof has to be convincing to you by

15  the requisite standard, which is beyond a reasonable

16  doubt.

17         Everyone understands that?

18     (No response)

19         THE COURT:  All right.  Now, I know that one of

20  our jurors asked for those headphones earlier.  Can you

21  hear me okay?  Everything is okay?

22     (Nods head)

23         THE COURT:  Is there anyone who has a hard time

24  either hearing or seeing that would make it hard for you

25  to be seated as a juror?

1              Yes, sir, back in the back.

2              PROSPECTIVE JUROR NUMBER 147:  147.  I have a

3  hearing aid.

4              THE COURT:  All right.  Have you been able to

5  hear me okay so far?

6              PROSPECTIVE JUROR NUMBER 147:  So far.

7              THE COURT:  All right.  Now, if you're seated

8  as a juror, you will be over here in the jury box, over

9  here to my left.  And if you have a problem hearing

10 either the parties or witnesses -- sometimes witnesses

11 are soft spoken -- if you have a hard time hearing, would

12 you bring that to my attention, make sure that I'm aware

13 of it, and I will ask whoever it is to speak up, or I'll

14 speak up if need be.

15             PROSPECTIVE JUROR NUMBER 147:  Yes.

16             THE COURT:  All right.  Anyone else?

17     (No response)

18             THE COURT:  Let me ask kind of the catchall

19 question, and you may have been over -- over here seated

20 and waiting for me to ask just the right question, and if

21 I ask the question you're going to raise your hand and

22 you are going to say, you know, I just can't be fair in

23 this case, or I don't think I should be a juror.  I think

24 there's something that really prevents me from being a

25 fair and impartial juror to both sides in the case, but I

34

1   haven't asked the question so you haven't raised your

2   hand.

3          So is there anyone that has anything like that

4   that you feel like would prevent you from being a fair

5   juror if you were seated?  If there's something out

6   there, you need to -- yes, sir.  And Juror 189, and

7   you've told me already.

8          All right.  Anyone else?

9     (No response)

10          THE COURT:  Well, ladies and gentlemen, what

11  I'm going to do is I'm going to turn the questioning over

12  to the attorneys, and they may have some follow up that

13  they want to ask you about.  So if you would, I would

14  appreciate it if you would give them, of course, the same

15  attention that you've given me to this point in the case.

16          Mr. McKiness, would you like to question the

17  jury?

18          MR. McKINESS:  Yes, sir.  Would you like me to

19  stand at the podium?

20          THE COURT:  Whatever is more comfortable for

21  you is fine.

22          MR. McKINESS:  Good morning everyone.

23     (Good morning responses)

24          MR. McKINESS:  Let's see here, have any of you

25  ever been a victim of a crime?  If you have, just raise

35

1    your hand.

2         (Raised hands)

3         MR. McKINESS:  All right.  I think we have like

4    four folks.

5         Would being a victim of a crime in any way put

6    you in a position where you don't believe you could be a

7    fair and impartial juror?

8         (No response)

9         MR. McKINESS:  And I know that Judge already

10   kind of asked this question, but does anyone, outside of

11   that gentleman back there, have any reason why they

12   believe they should not be a juror in this case?

13        (No response)

14        MR. McKINESS:  Let me ask you this.  Do any of

15   you believe that a person who testifies in return for the

16   hope of a more lenient sentence is not worthy of belief,

17   even if his or her testimony is supported by the

18   evidence?

19        (No response)

20        MR. McKINESS:  All right.  Do any of you

21   believe that testimony from a person who has previously

22   been convicted of a crime is not worthy of your belief

23   even if his testimony is corroborated by other evidence?

24        (No response)

25        MR. McKINESS:  Now, you-all are going to hear

36

1    some testimony from witnesses who have been convicted of

2    crimes, and you'll be instructed by the Judge to examine

3    their testimony with greater caution.  Would you have any

4    difficulty accepting the testimony by these individuals

5    under any circumstances?

6         (No response)

7              MR. McKINESS:  Let me ask this.  Have any of

8    you or your close relatives had any contact with the

9    federal government, like the FBI, or the U.S. Attorney's

10   office, and would that contact prevent you from being

11   fair and impartial in this case to either the defendant

12   or the United States?

13             Yes, sir.

14             PROSPECTIVE JUROR NUMBER 203:  Juror 203.  In

15   my previous job and current job I'm sometimes in contact

16   with the U.S. Attorney's office.

17             MR. McKINESS:  All right.  And what do you do?

18             PROSPECTIVE JUROR NUMBER 203:  The chief

19   privacy office for the University of Kentucky Healthcare.

20   And previously I worked for the Cabinet of Health and

21   Family Services.

22             MR. McKINESS:  And would your role there make

23   it hard for you to be impartial for the United States or

24   for the defense?

25             PROSPECTIVE JUROR NUMBER 203:  No.

```
 1              MR. McKINESS:  Thank you.

 2              Is there anyone else?

 3         (No response)

 4              MR. McKINESS:  Have -- and this is kind of a

 5    personal question, but have you or anyone in your family

 6    suffered from drug addiction?

 7         (Raised hands)

 8              MR. McKINESS:  Your juror number?

 9              PROSPECTIVE JUROR NUMBER 186:  186.

10              MR. McKINESS:  186.  Having that in your

11    background would it be hard for you to accept testimony

12    from someone who has dealt drugs in the past?

13              PROSPECTIVE JUROR NUMBER 186:  No.

14              MR. McKINESS:  Thank you.

15              Anyone else?

16              PROSPECTIVE JUROR NUMBER 230:  230.

17              MR. McKINESS:  230.  Same question, would you

18    have any problem accepting testimony from someone who has

19    dealt in drugs in the past?

20              PROSPECTIVE JUROR NUMBER 230:  No, sir.

21              MR. McKINESS:  All right.

22              PROSPECTIVE JUROR NUMBER 155:  155.

23              MR. McKINESS:  Same question to you, would you

24    have any problem accepting testimony from someone who has

25    dealt drugs in the past?
```

```
 1                    PROSPECTIVE JUROR NUMBER 155:  Maybe.

 2               MR. McKINESS:  Maybe?

 3               All right.

 4               PROSPECTIVE JUROR NUMBER 196:  196.

 5               MR. McKINESS:  All right.

 6               PROSPECTIVE JUROR NUMBER 196:  Possibly, yeah.

 7  It was my dad.

 8               MR. McKINESS:  Okay.

 9               PROSPECTIVE JUROR NUMBER 191:  191.

10               MR. McKINESS:  191.  Yeah, and the same,

11  question, would you have a problem accepting testimony

12  from someone who has dealt drugs in the past?

13               PROSPECTIVE JUROR NUMBER 191:  No.

14               PROSPECTIVE JUROR NUMBER 197:  Juror 197.

15               MR. McKINESS:  And the same question to you,

16  would you have any problem accepting testimony from

17  someone who has dealt drugs in the past?

18               PROSPECTIVE JUROR NUMBER 197:  Possibly.  It's

19  my two older brothers.

20               MR. McKINESS:  Okay.

21               PROSPECTIVE JUROR NUMBER 197:  It's been very

22  hard for my family.

23               MR. McKINESS:  All right.  Thank you.

24               Did we miss anyone?

25               PROSPECTIVE JUROR NUMBER 237:  No, sir.
```

39

1   Juror 237.  I have a daughter, and, yes, I would probably

2   have an issue with that.

3            MR. McKINESS:  All right.  Thank you.

4            PROSPECTIVE JUROR NUMBER 145:  Juror 145.  I

5   wouldn't have any problem.

6            MR. McKINESS:  Okay.  Thank you.

7            Have we gotten everyone?

8       (No response)

9            MR. McKINESS:  Well, I appreciate your honesty,

10  and thank you guys very much.

11           THE COURT:  Thank you, Mr. McKiness.

12           Mr. Allen.

13           MR. ALLEN:  Thank you, Your Honor.

14           Good morning.

15      (Good morning responses)

16           MR. ALLEN:  Thank you for being here this nice

17  fall day, but as the Court already introduced me, I'm

18  Ben Allen, and my client is Edgar Villa-Castaneda seated

19  at the table there.

20           And, you know, couple ground rules.  I'm not

21  here to play gotcha with anyone.  I think, as the Court

22  has expressed, the goal here is to ensure that we have a

23  fair and impartial jury for both sides.

24           So I'm going to ask you a couple questions.

25  Some of them may be personal in nature, and if you feel

40

 1    uncomfortable with any questions I ask, and want to come

 2    up front, the Court will accommodate you, and we can

 3    approach the bench.

 4              Okay.  And if you don't understand what I'm

 5    saying, because people who know me I can tend to mumble

 6    sometimes.  So if you don't hear what I'm saying,

 7    don't -- I won't be offended if you ask me to repeat it.

 8              Now, the Court had asked you if anyone had been

 9    employed or knew anyone who's been employed by the

10    federal government.  Many of you answered that question

11    in the negative, but I want to be a little more specific.

12              Does anyone know anyone employed by say the

13    FBI, U.S. Attorney's office, ATF?

14              Okay.  And I'll ask you, if you raise your

15    hand, I ask that you keep them raised until I call on

16    you.

17              Okay.  Let's start in the back corner.  Yes,

18    ma'am.

19              PROSPECTIVE JUROR NUMBER 137:  Juror 137.  My

20    brother is a retired FBI agent in Kentucky.  My nephew is

21    an FBI agent --

22              MR. ALLEN:  Okay.

23              PROSPECTIVE JUROR NUMBER 137:  -- in New

24    Orleans, and my other nephew is Kentucky State trooper.

25              MR. ALLEN:  Thank you.

41

```
 1              Yes, sir.
 2              PROSPECTIVE JUROR NUMBER 236:  Juror 236.  My
 3  company manufactures drones for surveillance, and we do a
 4  lot of work with the UID --
 5              MR. ALLEN:  So you're --
 6              PROSPECTIVE JUROR NUMBER 237:  -- and
 7  government agencies.
 8              MR. ALLEN:  Okay.
 9              COURT REPORTER:  I'm sorry, I can't hear you.
10              PROSPECTIVE JUROR NUMBER 237:  My company
11  builds drones for surveillance, so we do a lot of work
12  with the UID and with government organizations in
13  Kentucky and the Kentucky Aerospace organization.
14              MR. ALLEN:  Thank you, sir.
15              Front row, yes, sir.
16              PROSPECTIVE JUROR NUMBER 203:  203.  I have a
17  friend who works with the Social Security Administration,
18  special agent with several of the government entities.
19              MR. ALLEN:  Thank you.
20              And, yes, sir.  You've already told me you work
21  sometimes with the U.S. Attorney's office, as I recall.
22  And that's -- I'm sorry, what was your juror number
23  again?
24              PROSPECTIVE JUROR NUMBER 203:  203.
25              MR. ALLEN:  203.
```

42

1          Is there anyone else who knows anyone, has done

2  work for any government agency?

3      (No response)

4          MR. ALLEN:  Thank you.

5          Now, as you can tell, my client is using an

6  interpreter, so English is not his first language.  As a

7  matter of fact, over the course of this trial you may

8  hear that he is from the country of Mexico.

9          Does that -- by show of hands does anyone have

10 any strong feelings by the fact that my client is not a

11 native of this country?

12     (No response)

13         MR. ALLEN:  A show of hands, does anyone have

14 any concerns or any strong opinions on the fact that

15 English is not my client's native language?

16     (No response)

17         MR. ALLEN:  By the fact that my client is

18 Hispanic, does that -- does anyone have any strong

19 feelings about that?  And, again, if you -- if you have

20 an opinion, and you want to share it privately with

21 counsel and the Judge, feel free to approach.

22     (No response)

23         MR. ALLEN:  Now, I'm going to kind of explain

24 this.  The parties are going to explain this in their

25 opening statements, but this case has a great deal to do

43

1    with words and speech.  By a show of hands anyone not

2    familiar with the First Amendment?

3         (No response)

4              MR. ALLEN:  Does anyone believe that someone

5    can't be punished for their speech?

6         (No response)

7              MR. ALLEN:  Mr. Villa has been charged with

8    making certain threats to a federal employee.  If -- by

9    the nature of those charges, a show of hands is that --

10   anyone have an issue with that?

11        (No response)

12             MR. ALLEN:  Thank you.

13             A defendant also has a right to testify or not

14   to testify in their own behalf.  If Mr. Villa were to

15   choose not to testify on his own behalf, does anyone

16   have -- anyone want to discuss that or have any concerns

17   about that?  Would that influence your opinion of him in

18   any way?

19        (No response)

20             MR. ALLEN:  And I just wanted to follow up.  I

21   think we had a juror who had testified that he had been

22   on a panel before, and I was kind of confused whether it

23   was on a panel in a case with -- in which I was involved.

24   Did that involve my firm?

25             PROSPECTIVE JUROR NUMBER 154:  No.

44

1          COURT REPORTER:  What's your number?

2          PROSPECTIVE JUROR NUMBER 154:  154.

3          MR. ALLEN:  And related question too.  My firm

4   has been around for quite some time.  Has anyone -- and

5   raise your hand if it's that case -- ever been in a case

6   involving my firm?  Not necessarily me or anyone in my

7   firm, Gess Mattingly & Atchison, you know, whether we

8   represented you or whether we represented the party on

9   the other side.

10      (No response)

11          MR. ALLEN:  Okay.  That's all the questions I

12  have, Your Honor.  Thank you.

13          THE COURT:  All right.  Thank you.

14          Sir, do you need some water?  You got a

15  scratchy throat?

16          PROSPECTIVE JUROR:  No.  It's allergies.

17          THE COURT:  All right.  Thank you.

18          Ladies and gentlemen, we've gone through our

19  series of questions, so let me just follow up just one

20  more time, and based on all of the questions asked, does

21  anyone need to modify or change an answer to a question,

22  or is there anything that's come to light that you think

23  would prevent you from being fair and impartial?

24      (No response)

25          THE COURT:  All right.  If not, counsel, if

1   you-all would like to come up to sidebar, please.

2        (Whereupon, a bench conference was had with the

3   Court and counsel out of the hearing of the open court

4   and prospective juror members, as follows.)

5        THE COURT:  All right.  Let me see if we have

6   any challenges for cause.  I assume that both parties

7   believe that 189 should be excused.

8        MR. McKINESS:  Yes, sir.

9        MR. ALLEN:  Yes, sir.  His brother and uncle in

10  prison.

11       THE COURT:  Yeah.

12       MR. ALLEN:  I think he's made it pretty clear,

13  Your Honor.

14       THE COURT:  All right.  There were a couple of

15  jurors that said they might have a problem accepting

16  testimony from a person that has been involved in drugs.

17  The fact that they may have a problem doesn't necessarily

18  excuse them from the case.

19       We also have the one juror who said, yes --

20       MR. McKINESS:  Yes.

21       THE COURT:  -- and probably would have an

22  issue, 237.

23       MR. McKINESS:  Yes, sir.  And the ones that

24  specifically states, yes, I believe can be -- should be

25  excused for cause.

46

1          THE COURT:  That's the only one that I recall

2    is that specifically yes.

3          MR. ALLEN:  And I think that actually cuts both

4    ways considering the nature of Mr. Villa's prior

5    conviction.

6          THE COURT:  That's what I was going to ask

7    about.  If there were any of these others, by agreement,

8    if you want to excuse them, I'll do that, but based on

9    the nature of the way they answered the questions, I

10   wouldn't excuse them for cause otherwise.

11         MR. McKINESS:  I think anyone that said maybe

12   they'd have a problem, I would say if you agree to it, we

13   just strike them.

14         MR. ALLEN:  Some said might have a problem.

15         MR. McKINESS:  Right.

16         MR. ALLEN:  That would be 155.

17         THE COURT:  196, 197, and then 237 we've

18   already talked about.

19         MR. ALLEN:  I think given the nature of

20   Mr. Villa's prior conviction.

21         THE COURT:  Yes.

22         MR. McKINESS:  What numbers are those again

23   that we're striking?

24         THE COURT:  The way that they answered -- the

25   order in which they answered.  155 was the first one that

47

 1   said may have a problem accepting testimony.  196 was

 2   next.  He said possibly, her dad.

 3              MR. McKINESS:  Yeah.

 4              THE COURT:  197, it's possible two of his

 5   brothers.

 6              MR. McKINESS:  Yeah.

 7              THE COURT:  237 is the one that said, yes,

 8   probably would have an issue.  So it would be those four.

 9              And then 189.

10              And those were the only five that we have at

11   this point that would be -- unless you have --

12              MR. ALLEN:  I don't believe so.

13              THE COURT:  Excused by agreement?

14              MR. McKINESS:  No, I don't think so.

15              THE COURT:  All right.

16              MR. McKINESS:  It occurs to me that we didn't

17   ask whether juror 154 had been the foreperson in his

18   jury.  I think we probably should figure that out.

19              THE COURT:  I will ask that follow up.  I don't

20   think it's going -- it wouldn't be something that would

21   cause him to be excused for cause, but I'll ask the

22   follow up, and then if he says -- well, the other

23   question I'll ask him, if he was, whether they were able

24   to reach a verdict in the case.

25              MR. McKINESS:  Yes, sir.

48

1              MR. ALLEN:   The only other one that caught my

2    eye was 137.   She had a brother who's an FBI agent,

3    nephew, and a Kentucky state trooper.   Given the threat,

4    I almost feel, at least like to take the opportunity to

5    make a challenge for cause on her.

6              THE COURT:   I don't think her answers were

7    sufficient to excuse for cause because she did not

8    indicate she had a problem, and the fact that she has a

9    relative in law enforcement wouldn't be sufficient

10   standing alone to excuse for cause.

11             If you want to follow up with 154.   Would you

12   like me to do that?

13             MR. ALLEN:   That's fine, yes, sir.

14             MR. McKINESS:   Thank you.

15             THE COURT:   All right.   After I excuse these,

16   and if there are other reasons to excuse 154, we may have

17   to come back up.   But assuming there's not, I'll excuse

18   those five, and then I'll have to move the jurors out of

19   the box because we'll fill the box up first, and we'll

20   have the first three rows on the right side and maybe

21   more.   But we'll play a little bit of musical chairs as

22   we do that.

23             And then after we've done that, we'll go ahead

24   and take our break at that point.   You can exercise your

25   peremtories.

49

1        (Whereupon, the bench conference concluded.)

2            THE COURT:  All right.  Ladies and gentlemen,

3    thank you for your attention.

4            I'm going to go ahead and excuse five of our

5    potential jurors now.

6            Let me tell you the way that we have to do this

7    in this small courtroom.  I'm going to excuse five of our

8    jurors, and then after I have done that -- and make sure

9    that we don't lose more than five.  Sometimes people hear

10   their numbers when they're not called.

11           Then I'm going to have to ask you-all to move

12   back behind the attorneys over there, because I fill the

13   jury box up first, then I start over on the right and

14   fill up those rows because we will need 31 jurors in the

15   next phase of this selection.  So if you would, bear with

16   me here.

17           The following jurors will be excused at this

18   time.  And, ladies and gentlemen, thank you again for

19   being here today, and thank you for your attention.

20           The jury -- the clerk will advise you as to

21   when you should report next.

22           The following jurors will be excused; number

23   189, 1-8-9, 237, 2-3-7, 155, 1-5-5, 196, 1-9-6, and 197,

24   1-9-7.  Those five jurors will be excused.

25           And then I have just a couple of questions for

1   one of our other jurors after they've been excused.

2       (Whereupon, the five excused prospective jurors

3   leave the courtroom.)

4           THE COURT:  Now, just a couple of additional

5   questions.

6           Juror 154, you told me that you'd served

7   previously on a case.  Was that with Judge Hood or

8   Judge Caldwell, do you remember?

9           PROSPECTIVE JUROR NUMBER 154:  One of the older

10  judges.

11          THE COURT:  Oh, that would have to be

12  Judge Hood.

13          PROSPECTIVE JUROR NUMBER 154:  He was the one.

14          THE COURT:  Were you the foreperson in that

15  jury?

16          PROSPECTIVE JUROR NUMBER 154:  I'm sorry?

17          THE COURT:  Were you the foreperson of the

18  jury?

19          PROSPECTIVE JUROR NUMBER 154:  Yes.

20          THE COURT:  You were?  Was your jury able to

21  reach a decision in the case?

22          PROSPECTIVE JUROR NUMBER 154:  Yes.

23          THE COURT:  It was?  Okay.  Thank you, sir.

24          All right.  Now, let's see.  We didn't lose

25  more than five, did we?  No?

```
 1              Okay.  If you-all don't mind, if I could ask
 2    you to move back.  And if you want, you can stand in the
 3    aisle.  You don't have to be seated, because we're going
 4    to have to bring up folks to put in the box first.
 5              But at this time if you could go back to the
 6    back.
 7              Now, again, ladies and gentlemen, the clerk
 8    will -- in just a moment she'll call the numbers of
 9    31 potential jurors, and we'll fill the box up over here
10    first, and then we'll probably need about the first three
11    rows over to my right.  I'm not going to ask you to move
12    until we get to that -- to that point.
13              But at this time, Madam Clerk, if you could
14    call the numbers of 31 prospective jurors.
15              THE CLERK:  Yes, Your Honor.
16              Number 232, 233, 195, 203, 147, 143, 162, 172,
17    159, 173, 145, 187, 179, 170, 125, 171, 131, 150, 151,
18    222, 204, 208, 137, 209, 202, 241, 140, 215.
19              THE COURT:  Let's see if we have enough room
20    there.
21              All right.  Okay.  We're ready.
22              THE CLERK:  Number 213, 180.
23              THE COURT:  One more.
24              THE CLERK:  And 230.
25              31 jurors have been called, Your Honor.
```

52

```
 1              THE COURT:  All right.  Thank you.

 2              See if we have any issues to take up before I

 3    excuse the -- I think we had about a dozen jurors that

 4    were not called.

 5              Any issues?  No.

 6              Ladies and gentlemen, thank you for being here.

 7    Again, I saw a couple smiles on your face that you

 8    weren't chosen over there, but you're going to miss a

 9    good trial, but I hope to see you again real soon.

10              The clerk will advise you as to when you should

11    report next, but at this time, ladies and gentlemen,

12    those of you over on the left, you'll be excused.

13              Thank you.

14        (Whereupon, the remaining excused prospective jurors

15    leave the courtroom.)

16              THE COURT:  Now, ladies and gentlemen, I like

17    you to know what we're about to do before we do it so

18    you'll know kind of what to expect.

19              We're going to take a break, about a 20-minute

20    break at this time, to allow the attorneys to exercise

21    what's called peremptory challenges.  So when we come

22    back, we'll be able to make the final selection.  We'll

23    be able to seat the jury.

24              And at that point I'll be able to give you some

25    preliminary instructions in the case, and then hopefully
```

1    we'll be able to proceed with the opening statements.  I

2    don't know that we'll get to the testimony before the

3    lunch break, but I do anticipate that we will get that

4    far.

5            Now, as we take our break, I do want to give

6    you just a few instructions about what to do and what not

7    to do when we're -- when we are taking our breaks.

8            When we take this break, you'll go back over to

9    the jury assembly room where you were earlier this

10   morning.  Then when we come back and after the jury is

11   selected, you'll be able to use the jury room back over

12   here to my left.

13           As we do go into a recess, please remember not

14   to talk about the case.  You haven't been selected yet.

15   The final jury hasn't been selected, but really you

16   should not be discussing the case.  You should not allow

17   anyone to approach you to discuss the case.

18           If that should ever happen, either in this case

19   or any other case, you should report that to the Court

20   and allow the Court to deal with that.  You shouldn't

21   have to deal with that yourself.

22           So don't talk about the case, and don't allow

23   anyone to approach you to discuss the case.

24           Throughout the course of the case, you should

25   never read, watch, or listen to any accounts of the

1    matter, if there should ever be any.

2         Don't do any type of research or investigation,

3    and you shouldn't visit any of the locations that you may

4    hear about during the course of the trial.

5         Recently, I've been talking to jurors a lot

6    about social media.  I don't know if you use social

7    media, if you have accounts, Twitter accounts, or any

8    other type of accounts that you use.  But during the

9    course of the trial, you shouldn't communicate that

10   you're a juror or anything about a case that you're

11   participating in.

12        So avoid all social media while you're a juror

13   in the case, and things will be fine.

14        But if you were to discuss a case on social

15   media, lots of problems can happen.  So please don't do

16   that.

17        And, of course, don't make up your mind about

18   the matter until it is finally submitted to you.

19        As I indicated earlier, I think this case will

20   move along fairly quickly, but you have to wait until the

21   end of the case to start deliberating.  You can't really

22   talk about the case.  Even once you're selected, you

23   can't go back and start talking about some of the

24   evidence that you've heard.  Wait until the end of the

25   case to do that.

55

1              So with that instruction, you'll be -- yes,

2  sir.

3              PROSPECTIVE JUROR NUMBER 222:  Juror 222.

4              THE COURT:  Yes, sir.

5              PROSPECTIVE JUROR NUMBER 222:  I had -- you

6  kept asking awhile ago about government agencies and

7  stuff.

8              THE COURT:  Yes, sir.

9              PROSPECTIVE JUROR NUMBER 222:  I'm a state

10 employee.  I work for the Department of Public Advocacy.

11 I'm an investigator.

12             THE COURT:  All right.

13             PROSPECTIVE JUROR NUMBER 222:  So I didn't know

14 if I needed to point that out.

15             THE COURT:  What do your duties entail?  Can

16 you tell me just generally what you do?

17             PROSPECTIVE JUROR NUMBER 222:  When a client

18 gets charged, he gets appointed a county or a --

19             THE COURT:  Public defender?

20             PROSPECTIVE JUROR NUMBER 222:  Public defender.

21             THE COURT:  Yes, sir.

22             PROSPECTIVE JUROR NUMBER 222:  Then I get

23 assigned the case, and I go out and talk to witnesses.  I

24 do investigations and that kind of stuff.

25             THE COURT:  All right.

56

```
 1              PROSPECTIVE JUROR NUMBER 222:  So I didn't
 2   know.  You kept saying government, but --
 3              THE COURT:  Yes, sir.  Let me ask you this.  Is
 4   there anything about your position or any of the work
 5   that you've done in the past that you believe would
 6   prevent from you being fair to both sides in this case?
 7              PROSPECTIVE JUROR NUMBER 222:  No.
 8              THE COURT:  You don't think that there is?
 9              PROSPECTIVE JUROR NUMBER 222:  No.
10              THE COURT:  All right.
11              PROSPECTIVE JUROR NUMBER 222:  But I just
12   wanted to bring that -- I wanted to make the Court aware
13   of that.
14              THE COURT:  All right.  I appreciate you doing
15   that.  Your number was 222?
16              PROSPECTIVE JUROR NUMBER 222:  Yes.
17              THE COURT:  All right.  Well, at this time I'll
18   go ahead and excuse everyone to go back over to the
19   assembly room across the hallway, and I would expect to
20   call you back in about -- in about 20 minutes, ladies and
21   gentlemen.
22              If you want to leave those in here, you can.
23              Madam Clerk, if you could collect those.
24              THE CLERK:  You can just lay it on the bench.
25   I'll grab them.
```

57

1          Thank you.

2          THE COURT:  Thank you.

3      (Whereupon, the prospective juror members leave the

4  courtroom.)

5          THE COURT:  All right.  Thank you.

6          Before we recess, inasmuch as one of our jurors

7  brought up some additional information after the parties

8  exercised challenges for cause, I want to see if that in

9  any way affects the panel that's been preliminarily

10  selected to this point.

11         MR. McKINESS:  The United States would move to

12  strike him for cause as it appears he's an investigator

13  for essentially public defenders.

14         THE COURT:  All right.  I don't think that it

15  would rise to the level of an excuse for cause in the

16  case.  I did follow up and asked him if that would affect

17  his ability to be fair and impartial, and I don't see

18  that it would cause prejudice in the case.

19         But if you -- if you believe that it would, I

20  will give you a chance to make further record.  Do you

21  want to add anything else at this point?

22         MR. McKINESS:  I have nothing to add,

23  Your Honor.

24         THE COURT:  All right.  20 minutes sufficient

25  for everyone?

1        MR. McKINESS:  I think that will work.

2        THE COURT:  All right.  We'll take 20 minutes.

3   If you need a little bit longer, you can alert me to

4   that.

5        And then when we come back, I'll have the clerk

6   call the numbers of the first 12 called but not stricken

7   from the main panel.  And the first alternate from those

8   last three would be the alternate that would be -- that

9   would be seated in the case.

10       All right.  We will be in recess for

11  approximately 20 minutes.

12     (Whereupon, a recess was taken at 10:30 a.m.,

13  and Day 1 of the Jury Trial proceedings continued at

14  10:50 a.m., on the record in open court, with the

15  prospective juror members present, as follows.)

16       THE COURT:  Thank you.

17       Madam Clerk, at this time if you would call the

18  numbers of the 13 jurors selected for the trial.

19       THE CLERK:  Yes, Your Honor.

20       232.

21       THE COURT:  And, ladies and gentlemen, as your

22  number is called, if you could please come up and be

23  seated in the jury box.

24       THE CLERK:  Number 233, 162, 172, 145, 179,

25  170, 171, 131, 151, 204, 208, and 213.

```
 1                    THE COURT:  All right.  Thank you.

 2                    Are there any issues we need to take up before

 3    I excuse the remaining jurors?

 4                    Mr. McKiness, any issues to take up for the

 5    government?

 6                    MR. McKINESS:  No, sir.

 7                    THE COURT:  Thank you.

 8                    Mr. Allen.

 9                    MR. ALLEN:  No, Your Honor.

10                    THE COURT:  All right.  Ladies and gentlemen,

11    thank you for being with us this morning.  Unfortunately,

12    you've not been called as a juror in this case, but the

13    clerk will advise you as to when you should report again.

14                    I do again want to -- again, I want to thank

15    you for your attention in this case.

16                    At this time you'll be excused.

17                    Thank you.

18        (Whereupon, the remaining excused prospective juror

19    members leave the courtroom.)

20                    THE COURT:  And, Madam Clerk, at this time if

21    you would please administer the oath to the jury that

22    will be trying the case.

23                    THE CLERK:  Yes, Your Honor.

24                    Would you-all please stand and raise your right

25    hand?
```

60

1         Do you and each of you solemnly swear or affirm

2   that you will well and truly try, and a true deliverance

3   make, on the case now on trial, United States of America

4   versus Edgar Villa-Castaneda, and render a true verdict

5   according to the law and the evidence, so help you God?

6   Do each of you so swear or affirm?

7         (Affirmative responses)

8               THE COURT:  Thank you, and please be seated.

9               One other housekeeping matter before I provide

10  you with some preliminary instructions.

11              I'll invoke the rule on exclusion of witnesses

12  at this time.  Of course, other than the parties in the

13  case and case agent, any individual expected to testify

14  will be excluded from the courtroom, and testimony

15  presented may not be provided directly or indirectly to

16  prospective witnesses in the case.

17              All right.  Members of the jury, now that you

18  have been sworn, I will give you some preliminary

19  instructions to guide you in your participation in the

20  trial.

21              It will be your duty to find from the evidence

22  what the facts are.  You and you alone will be the judges

23  of the facts.

24              You will then have to apply those facts to the

25  law as the Court will instruct you.  You must follow that

1    law whether you agree with it or not.

2           The evidence from which you will find the facts

3    will consist of the testimony of witnesses, documents,

4    and other things received into the record as exhibits,

5    and any facts that the lawyers agree to or stipulate to

6    or that the Court may instruct you to find.

7           Now, certain things are not evidence and must

8    not be considered by you.  I'll list them for you now.

9           Statements, arguments, and questions by the

10   lawyers are not evidence.

11          Objections to questions are not evidence.

12   Lawyers have an obligation to their clients to make

13   objections when they believe the evidence is being -- or

14   evidence being offered is improper under the rules of

15   evidence.

16          You should not be influenced by the objection

17   or by the Court's ruling on it.  If an objection is

18   sustained, ignore the question.  If it's overruled, treat

19   the answer like any other.

20          If you are instructed that some items of

21   evidence are received for a limited purpose only, then

22   you must follow that instruction.

23          Testimony that the Court has excluded or told

24   you to disregard is not evidence and must not be

25   considered.

62

1            Anything that you may have seen or heard

2    outside the courtroom is not evidence and must be

3    disregarded.

4            You're to decide the case based solely on the

5    admissible evidence presented here in the courtroom.

6            Now, there are two kinds of evidence; direct

7    and circumstantial.

8            Direct evidence is direct proof of a fact such

9    as the testimony of an eyewitness.

10           Circumstantial evidence is proof of facts from

11   which you may infer or conclude that other facts exist.

12           I'll give you further instructions on these, as

13   well as other matters at the end of the case, but keep in

14   mind that you may consider both kinds of evidence.

15           It will be up to you to decide which witnesses

16   to believe, which witnesses not to believe, and how much

17   of any witness's testimony to accept or reject.

18           I'll give you some guidelines for determining

19   the credibility of witnesses at the end of the case.

20           And as you know, this is a criminal case.

21   There are three basic rules about criminal cases that you

22   must keep in mind.

23           First, a defendant is presumed innocent unless

24   and until proven guilty.  An indictment against a

25   defendant brought by the United States is only an

1   accusation and nothing more.  It's not proof of guilt or

2   anything else.  A defendant, therefore, starts out with a

3   clean slate.

4           Second, the burden of proof is on the

5   United States until the very end of the case.  A

6   defendant has no burden to prove his or her innocence or

7   to present any evidence.

8           Likewise, the defendant has no burden to

9   testify.

10          Third, the United States must prove a

11  defendant's guilt beyond a reasonable doubt.  I will give

12  you further instructions on this point later, but bear in

13  mind that in this respect a criminal case is different

14  from a civil case.

15          Now, the indictment contains two counts for

16  your consideration.  The first count charges the

17  defendant with threatening to murder a federal law

18  enforcement officer in violation of Title 18 of the

19  United States Code, Section 115(a)(1)(B).

20          To find the defendant guilty of this charge,

21  you must find that the government has proved the

22  following elements beyond a reasonable doubt.

23          The defendant threatened to murder or assault a

24  federal law enforcement officer.

25          Further, the United States must establish that

64

the threat was a true threat and the defendant intended

the threat either to impede, intimidate, or interfere

with the law enforcement officer while engaging in the

performance of his official duties, or as an act of

retaliation on the count of the federal law enforcement

officer's performance of his official duties.

The second count charges the defendant with

soliciting the murder of a federal law enforcement

officer.

To find the defendant guilty of this charge,

you must find that the government has proved the

following elements beyond a reasonable doubt.  That the

defendant intended that another person engage in conduct

constituting a felony that has as an element the use,

attempted use, or threatened use, of physical force

against the person of another, in violation of the laws

of the United States.

Next, that the defendant solicited, induced, or

otherwise endeavored to persuade another person to engage

in conduct constituting a felony that has as an element

the use, attempted use, or threatened use of physical

force against the person of another in violation of the

laws of the United States, and that the conduct that I

just described occurred under circumstances strongly

corroborative of the defendant's intent.

1           Now, let me mention a few things about your

2    conduct as jurors.

3           First, during the trial you're not to discuss

4    the case with anyone or permit anyone to discuss it with

5    you.  Until you retire to the jury room at the end of the

6    case to deliberate on your verdict, you're simply not to

7    talk about the case.

8           Second, do not read or listen to anything

9    touching on the case in any way.  If anyone should try to

10   talk with you about it, bring it to the Court's attention

11   promptly.

12          Third, do not try to do any research or make

13   any investigation about the case on your own.

14          Fourth, do not form any opinion until all the

15   evidence is in.

16          Remember, keep an open mind until you start

17   your deliberations at the end of the case.

18          The trial will now begin.  First, the

19   United States Attorney will make an opening statement,

20   which is simply an outline to help you understand the

21   evidence as it comes in.

22          Next, the defendant's attorney may make an

23   opening statement.  Opening statements are neither

24   evidence nor arguments.

25          The United States will then present its

66

1  witnesses, and the attorney for the defendant may

2  cross-examine them.

3          Following the United States's case, the

4  defendant may, if he wishes to, present witnesses whom

5  the United States may cross-examine.

6          There may also be some rebuttal testimony or

7  evidence.

8          And after all of the evidence is in, the

9  attorneys will present their closing arguments to

10  summarize and interpret the evidence for you, and the

11  Court will instruct you on the law.

12          Then after that you will retire to deliberate

13  on your verdict.

14          Now, at this time, ladies and gentlemen, we

15  will proceed with the opening statements in the case, and

16  by rule the United States proceeds first.

17          Mr. McKiness, you may proceed.

18          MR. McKINESS:  Thank you, Your Honor.

19          Ladies and gentlemen of the jury, this is a

20  case about revenge, a drug dealer who sought to retaliate

21  against his prosecutor by asking his fellow inmates if

22  they knew someone who would kill the prosecutor for him.

23          In an interview with the FBI, the defendant,

24  Edgar Villa-Castaneda, sitting right there, admitted to

25  offering thousands of dollars to other inmates to kill

1   the prosecutor, and even told them where he had money

2   hidden that he would use to pay them.

3           Mr. Villa is a Mexican national who was being

4   federally prosecuted by Assistant United States Attorney

5   Rob Duncan back in 2015 for a conspiracy to distribute a

6   controlled substance.

7           While in jail waiting for his trial,

8   Mr. Villa-Castaneda repeatedly complained to other

9   inmates how he wanted Mr. Duncan killed and that he would

10  give some -- that he would pay someone to do it.

11          Mr. Villa wanted the prosecutor dead because he

12  hated that both he and his son in his opinion were being

13  treated unfairly and prosecuted unfairly and targeted as

14  big-time drug dealers.

15          Mr. Villa-Castaneda offered to pay

16  approximately $25,000 to have Mr. Duncan killed.

17          Now, as you heard from the Court, Mr. Villa is

18  charged in a two-count indictment.  Count 1 charges him

19  with threatening to kill a federal officer, and Count 2

20  charges him with solicitation to commit the murder of a

21  federal officer.

22          Now, as you'll be told repeatedly, in order to

23  find the defendant guilty, you'll have to find that he's

24  guilty beyond a reasonable doubt.

25          The government will have to prove all of the

68

1    elements of each crime beyond a reasonable doubt.

2              And, again, as you heard, there are three

3    essential elements to the first count of threatening to

4    kill a federal officer, and these are the elements that

5    you'll want to keep in your mind when hearing the

6    testimony.

7              First element for the threat is that the

8    defendant threatened to kill a federal officer,

9    threatened to kill a federal officer.

10             Number two, the second element is that the

11   defendant intended that threat to be used in retaliation

12   against the officer for doing their job for the

13   performance of their official duties.

14             So, number two, the threat was because the

15   federal agent was doing his official duties, and it was a

16   retaliation for that.

17             And the third element is that a reasonable

18   person would foresee the threats be viewed as essentially

19   true threats, threats that weren't just jokes, weren't

20   just idle talk, what some would say BS, that the threats

21   were said in a way that whoever heard them would think

22   that they are actual threats, that a person is actually

23   be threatened.

24             Count 2, again, charges that Mr. Villa was

25   soliciting the murder of a federal official.  Again,

69

1    there are three elements in that.

2            The first being that the defendant intended

3    another person commit the murder, so that's another

4    person commits the act of murder.

5            Second, that the defendant tried to persuade

6    another person to commit the murder.  So doing something

7    to persuade someone else, whether that be payment or

8    favors or even strong-arming someone to do it.

9            Third, would be that the solicitation occurred

10   under circumstances that strongly corroborate the

11   defendant's intent.  And so what that means is that

12   looking at the circumstances surrounding the persuasion

13   to get someone else to commit the murder that it looks as

14   if steps were being taken for that to happen, that it

15   wasn't again just someone made a plan in their head, but

16   they didn't really do anything about it.  They had to do

17   a little bit more.

18           Now, during the trial you'll learn that during

19   the month of September and October and -- of 2015, the

20   defendant, Mr. Edgar Villa-Castaneda, was being held at

21   the Woodford County Detention Center waiting trial on the

22   federal drug charges.

23           And during that time Mr. Villa was upset with

24   the prosecutor, Mr. Rob Duncan, because he believed that

25   he and his son were being treated unfairly, and Mr. Villa

1    repeatedly told his cellmates how upset he was with

2    Mr. Duncan.

3             He told one of his cellmates, Mr. Gill Garrett,

4    that he wanted to kill Mr. Duncan.  He told him that

5    repeatedly, and every time he told him he gave more and

6    more details on how he wanted the murder to happen.

7             He also told another one of his cellmates,

8    Mr. Talbert Marshal, that he wanted Mr. Duncan dead.  He

9    talked about it time after time after time, going into

10   more and more detail each time again.

11            In talking to Mr. Marshal, he went as far as to

12   say that he wanted to get one of Mr. Marshal's friends to

13   do the murder, and he would pay him out of money that he

14   had stashed at his sister's house.

15            Now, after hearing those threats, Mr. Marshal

16   wrote a letter to his lawyer telling him about the

17   threats and asking him what he should do.

18            The letter was then forwarded to the FBI, and

19   then they began their investigation.  Eventually FBI

20   Special Agent John Whitehead, the man sitting there at

21   that table, interviewed Mr. Villa-Castaneda.

22            During that interview Mr. Villa-Castaneda

23   admitted to repeatedly telling inmates that he wanted to

24   kill Assistant United States Attorney Rob Duncan, that he

25   offered to pay to have Mr. Duncan killed, and that he had

1   a plan to get the money to the killer while protecting

2   everyone's identities.

3          After telling all of this to the FBI,

4   Mr. Villa-Castaneda said that despite the repeated

5   threats in conversations that he had about killing

6   Mr. Duncan that he was never really serious about it.

7          Now, the United States intends to show during

8   this trial that the threats and the offers to pay someone

9   to kill Mr. Duncan were real and were taken serious by

10  most everyone that heard them.

11         During the trial you're going to hear from

12  several of the people that I've mentioned in this case.

13         First, you're going to hear from Mr. Talbert

14  Marshal.  Mr. Marshal was one of Mr. Villa's cellmates

15  back in 2015, and he's going to testify regarding the

16  threats that Mr. Villa continually made to him regarding

17  killing Mr. Duncan, and about the letter that he wrote to

18  his lawyer notifying him of the plot.

19         And he will also explain to you why he took the

20  threats so seriously.

21         Next, you'll hear from Assistant United States

22  Attorney Mr. Rob Duncan.  He's going to testify regarding

23  his prosecution of Mr. Villa-Castaneda for the drug

24  charges and how the threats against his life affected

25  both his life and the life of his family.

72

1          Third, you're going to hear from Special Agent

2     Whitehead from the FBI.  He was the lead investigator in

3     the threat case and interviewed Mr. Villa-Castaneda.  He

4     is going to tell you about his investigation and the

5     admissions that Mr. Villa made to him during his

6     interview.

7          Lastly, you're going to hear from Mr. Gill

8     Garrett.  Mr. Garrett was another one of the cellmates

9     that Mr. Villa-Castaneda roomed with back in 2015 and

10    talked to about his desires to kill Mr. Duncan and his

11    desires to have him killed.

12         Unlike Mr. Marshal, Mr. Garrett is testifying

13    because he wants to receive some time off of his current

14    jail sentence.

15         Now, the government does not like to call

16    criminals to the stand to testify, but the charged crimes

17    occurred while the defendant was in jail.  The statements

18    that he made were to other people who were in jail.  So

19    the evidence is going to necessarily have to come from

20    people who were in jail with him.

21         United States doesn't get to choose whom the

22    defendant made his threats to, but the defendant does,

23    and so these were the people whom he talked to and whom

24    he chose to make these statements.

25         Now, after you've heard all the trial

73

1    testimony, seen the exhibits, and essentially taken in

2    all of the evidence, the United States will have shown

3    beyond a reasonable doubt that Mr. Edgar Villa-Castaneda

4    made threats to kill Mr. Rob Duncan, and that he also

5    attempted to hire someone to murder Mr. Duncan.

6            And you will know that the threats were not

7    just idle talk or jokes, that they were serious, and

8    they were taken serious by the FBI, they were taken

9    serious by Mr. Talbert Marshal, they were taken serious

10   by Mr. Gill Garrett, and that they were taken serious by

11   Mr. Rob Duncan.

12           And at the end of the case, after you've heard

13   all the evidence, all the testimony, I'll have another

14   chance to talk to you like this in a closing argument,

15   and I'll speak directly to you like I am now, and at that

16   time I'm going to ask you to return a verdict, the only

17   verdict that you could return, that takes into account

18   your common sense, all the evidence you heard, all the

19   exhibits that you've seen, United States is going to ask

20   for you to return a verdict of guilty on all counts.

21           And as you know from watching TV and the

22   movies, that, you know, in order to find a defendant

23   guilty it's going to have to be beyond a reasonable doubt

24   on all of the elements.  That is a standard the

25   United States embraces and believes that it will greatly

1    surpass.

2            So, again, at the end the United States is

3    going to ask that you take into account everything that

4    you've heard from the witnesses and find a verdict of

5    guilty.

6            Thank you.

7            THE COURT:  All right.  Thank you,

8    Mr. McKiness.

9            Mr. Allen.

10           MR. ALLEN:  Thank you, Your Honor.

11           May it please the Court.

12           THE COURT:  Mr. Allen.

13           MR. ALLEN:  Mr. McKiness.

14           Words, ladies and gentlemen, this case is about

15   words.  You're being asked to convict Mr. Villa not for

16   any specific act that he took, not for narcotics, not for

17   guns, but for his words.

18           Now, I say that, and I don't want to give the

19   impression that this is not a serious case.  What he has

20   been charged are some serious crimes, but -- and they are

21   serious, and they should be serious.

22           It is also serious, however, to punish someone

23   for what they say.  People have a right to say hateful,

24   harmful things.

25           Now, the Judge at the end of this case is going

1    to instruct you on what the law is, but I bring this up

2    only to mention that a very important right is at stake

3    here, and that is my client's right to freedom of speech.

4              That right is so important that the founders

5    of our country, and they're in the painting behind you,

6    most of them, didn't enshrine it in the Fourth Amendment,

7    Fifth Amendment, Second Amendment, it's in the

8    First Amendment.

9              And I bring that up because as you listen to

10   the evidence, and Mr. McKiness talked repeatedly about

11   the standard of proof, and it is a high standard of

12   proof.  And I bring up the fact that these are only

13   words -- that these are words because I ask you to turn a

14   critical ear to what was said, who said it, when did they

15   say it, and why did they say it.

16             Words can also be twisted.  They can either be

17   twisted intentionally or individually.

18             I'm involved in Boy Scouts, and occasionally

19   we'll play a game called telephone where you line up, you

20   know, various people, six or seven people, and you start

21   out with a story, right.  You tell it to the first person

22   in line, you tell the true story to the first person in

23   line.  By the time you get to the end, it's entirely a

24   different story.  Now, they didn't do that intentionally

25   oftentimes, but the story changes.

76

1          And so when we listen to what is said here and

2     the nature of the threat, and there will be a lot of

3     discussion about the seriousness of this threat, a true

4     threat, think about who's saying it, what their

5     motivations are, and why they said it.

6          And you just heard Mr. McKiness explain the

7     proof that the government is going to offer at this

8     trial.  You will hear that Mr. Villa had been charged

9     with a separate federal crime at the time that he

10    allegedly made these statements.

11         You will hear that he ultimately accepted

12    responsibility for that crime and is serving a sentence

13    on that.

14         You will also indeed hear, as you've heard,

15    from Mr. Villa's cellmate, Mr. Marshal and Mr. Garrett.

16    You might find what they said, what Mr. Villa allegedly

17    said to be offensive.  However, consider as you listen to

18    the testimony the nature of the people testifying.  As

19    Mr. McKiness pointed out, they're criminals.

20         Listen to why they may have said what they

21    might have said.  You will hear that at the time

22    Mr. Marshal turned to the FBI, he had not yet been

23    sentenced.  Likewise, for Mr. Garrett.  The evidence will

24    be that each of these individuals had an interest in

25    speaking with the government.

 1             Now, you're also going to hear from

 2   Mr. McKiness, as he told you, that Mr. -- my client sat

 3   down with the FBI and gave a statement.

 4             Now, what you're not going to hear is what he

 5   actually said.  That's because they didn't have him write

 6   down his words.  They didn't have a pre-typed statement

 7   that he signed.  You're going to hear -- and they didn't

 8   record this interview.  What you're going to hear is the

 9   government's characterization of what he told them or

10   allegedly told them.

11             The evidence will further show that my client,

12   as I may have explained to you in voir dire, is not a

13   native English speaker.

14             They'll also show at the time of the interview

15   the agents handed him a written waiver form, waiver of

16   his Miranda forms.  That form is in English.

17             The evidence will also show that at the time he

18   spoke with FBI agents, they didn't use an interpreter,

19   and they didn't record the interview, and that they spent

20   approximately two minutes going over this form with him.

21             So please take that into account when you

22   consider what the government is alleging my client said.

23             Now, while he disputes the characterization of

24   what he told the FBI, as Mr. McKiness pointed out,

25   Mr. Villa told him that he never desired to harm

78

1    Mr. Duncan, and that he felt that Mr. Duncan had treated

2    him fairly.

3            You'll also see no written evidence regarding

4    my client's alleged threats.  That's because there is no

5    such evidence from my client.  All you're going to hear

6    are words.

7            The evidence will also show that the alleged

8    threat never really made it outside the walls of the

9    Woodford County Detention Center.

10           You will hear that they never searched my

11   sister -- my client's sister's apartment.  They never

12   found any of the cash that they allege Mr. Villa claimed

13   he had.

14           Indeed, what the evidence will show is that

15   this case began with two enterprising individuals,

16   cellmates, in the jail who were trying to help

17   themselves.

18           In going back again to the seriousness of the

19   alleged allegations here, you'll also hear that the

20   government waited almost two years before they indicted

21   my client.

22           And with regards to the solicitation charge,

23   again, I ask you, listen to the testimony, consider who

24   is saying it, consider why they are saying it.

25           And we believe the evidence will show that

79

1    Mr. Villa had no true desire to harm Mr. Duncan.  He was

2    trying to resolve his case at the time.

3                 And, ladies and gentlemen, at the end of this

4    case Mr. Villa and I will ask you to return a verdict of

5    not guilty as to both counts.

6                 Thank you.

7                 THE COURT:  All right.  Thank you, Mr. Allen.

8                 Counsel, why don't you-all come up for a

9    moment.  I want to discuss whether we want to proceed

10   with proof now, or if we want to take our early lunch

11   break in just a moment.

12        (Whereupon, a bench conference was had with the

13   Court and counsel out of the hearing of the open court

14   and juror members, as follows.)

15                MR. McKINESS:  Our witness is here.  Direct

16   testimony would probably take about 20 minutes.

17                THE COURT:  Okay.

18                MR. ALLEN:  You're starting with Marshal?

19                MR. McKINESS:  Yes.

20                MR. ALLEN:  Okay.  I'd like to give myself at

21   least 20 minutes for cross.  It probably won't take that

22   long but at least 20 minutes.

23                THE COURT:  Okay.  Well, we'll go ahead and

24   take a lunch break now.

25                MR. ALLEN:  That's probably a good idea.

1          THE COURT:  We'll do that.  We'll start at --

2     I'll give you an hour so it will be 12:35 when we start

3     back.

4          MR. ALLEN:  12:35.  Thank you.

5          THE COURT:  All right.  Thank you.

6       (Whereupon, the bench conference concluded.)

7          THE COURT:  Ladies and gentlemen, we'll go

8     ahead and take our lunch break a little bit early today,

9     and then we'll begin with the proof as soon as you come

10    back.  We'll take about an hour, so we'll start back at

11    12:35 this afternoon.

12         When you come back over, the security

13    officer -- once you're assembled in the jury assembly

14    room, the security officers will be able to bring you

15    back over here, over to the jury deliberation room.

16    We'll wait until everyone is over there before we take

17    everyone back.

18         So, please, if you could, if you could be back

19    in time to get started at 12:35, I would -- I'd certainly

20    appreciate that.

21         Again, let me remind you as we take our break,

22    don't talk to anyone about the case, don't allow anyone

23    to talk with you about the matter, don't read, watch, or

24    listen to any accounts of the case if there should be

25    any.

```
1               Don't do any type of research or investigation.
2               Don't communicate through social media anything
3   about the case or your status as a juror in this matter.
4               And, of course, don't make up your mind about
5   the case until it is finally submitted to you.
6               Again, we'll start back at 12:35.
7               Let's see, you should have some badges.
8               Madam Clerk, do you have the badges for the
9   jury?
10              THE CLERK:  Your Honor, they have them.
11              THE COURT:  You have those?  Okay.
12              If you have any materials you want to leave
13  here, you can leave those in your seat.  The courtroom is
14  secured during the lunch hour.
15              But, otherwise, you'll be excused until 12:35
16  this afternoon.
17              JUROR:  We're free to leave the building?
18              THE COURT:  Yes, ma'am.  Yes, ma'am.  Just take
19  your badge as you go out.
20        (Whereupon, the juror members leave the courtroom.)
21              THE COURT:  Make sure we don't have anything
22  that we need to take up outside the presence of the jury.
23              Mr. McKiness?
24              MR. McKINESS:  No, sir.
25              THE COURT:  Mr. Allen.
```

 1              MR. ALLEN:  No, Your Honor.

 2              THE COURT:  All right.  We'll be in recess

 3  until 12:35 this afternoon.

 4       (Whereupon, a lunch recess was taken at 11:35 a.m.,

 5  and Day 1 of the Jury Trial proceedings continued at

 6  12:35 p.m., on the record in open court, with the juror

 7  members present, as follows.)

 8              THE COURT:  Thank you.

 9              The record will reflect that all members of the

10  jury are present.

11              Defendant and counsel are present in the

12  courtroom.

13              We'll continue at this time with presentation

14  of proof.

15              Mr. McKiness, are you ready to call your first

16  witness?

17              MR. McKINESS:  Yes, sir, I am.

18              United States will call Mr. Talbert Marshal to

19  the stand.

20              THE COURT:  Thank you.

21              THE CLERK:  Raise your right hand, please.

22              Do you swear or affirm that the testimony

23  you're about to give in this matter shall be the truth,

24  the whole truth, and nothing but the truth as you shall

25  swear unto God, or affirm, subject to the penalty of

1  perjury?  Do you so swear or affirm?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  Thank you.

4          Mr. McKiness, you may proceed.

5          MR. McKINESS:  Thank you, Your Honor.

6                    TALBERT MARSHAL,

7  having been first duly placed under oath, was examined

8  and testified as follows:

9                  DIRECT EXAMINATION

10 BY MR. McKINESS:

11 Q.   Good afternoon, Mr. Marshal.

12      Could you please state your name to the jury?

13 A.   Talbert Marshal.

14 Q.   And do you know Mr. Edgar Villa-Castaneda?

15 A.   Yes, sir.

16 Q.   Is he here in the courtroom today?

17 A.   Yes, he is.

18 Q.   Can you point him out to us?

19 A.   (Witness indicates)

20          MR. McKINESS:  The record show he pointed at

21 the defendant.

22          THE COURT:  All right.  Would you identify an

23 article of clothing that he's wearing, sir?

24          THE WITNESS:  The white shirt.

25          THE COURT:  All right.  The record will reflect

TALBERT MARSHAL - DIRECT BY MR. McKINESS 507

1  the witness has identified the defendant.

2  BY MR. McKINESS:

3  Q.    How do you know Mr. Villa-Castaneda?

4  A.    We were cellmates at Woodford County Detention

5  Center.

6  Q.    When?

7  A.    The fall of 2015 I believe.

8  Q.    And why were you incarcerated?

9  A.    For selling oxycodone.

10 Q.    And when did you become incarcerated?

11 A.    The beginning of 2015.

12 Q.    I'm going to ask you some questions about your

13 communications with Mr. Villa-Castaneda.  Okay?

14 A.    Okay.

15 Q.    Did you know Mr. Villa by any other names or

16 nicknames?

17 A.    Just Flaco Villa.

18 Q.    Can you tell us how you met Mr. Villa?

19 A.    He was -- he was my bunkee.

20 Q.    And what do you mean by bunkee?

21 A.    He slept above me at the Woodford County Detention

22 Center.

23 Q.    All right.  Were you in the same cell?

24 A.    Yes, we were.

25 Q.    How many people were in one cell?

TALBERT MARSHAL - DIRECT BY MR. McKINESS

1   A.   There was four of us.

2   Q.   Okay.  And he slept above you?

3   A.   Yes, sir.

4   Q.   Around -- how long were you guys bunkees?

5   A.   Four or five months.

6   Q.   And you said that you were incarcerated on some --

7   what did you say, what kind of charges?

8   A.   Selling oxycodone.

9   Q.   All right.  Were those state charges or federal

10  charges?

11  A.   They were federal.

12  Q.   And who was your prosecutor?

13  A.   Mr. Duncan.

14  Q.   Did you ever talk to Mr. Villa about Mr. Duncan?

15  A.   Yes, on several occasions.

16  Q.   How did you and Mr. Villa begin talking about

17  Mr. Duncan?

18  A.   Well, it started out asking each other who their

19  prosecutor was on their case, and then he proceeded to

20  tell me how bad he disliked Mr. Duncan and how Mr. Duncan

21  had it out to really get him.

22  Q.   And you said that he kind of didn't like Mr. Duncan?

23  A.   No, not at all.

24  Q.   Did he ever explain to you why?

25  A.   Yeah.  He said that Mr. Duncan was always down on

TALBERT MARSHAL - DIRECT BY MR. McKINESS 509

1  him every time he went to court for bringing his

2  18-year-old son over here and getting him into the

3  selling drugs and how his son was sitting in jail on

4  federal charges looking at 10 years as well, and that

5  Mr. Duncan said he was going to do his best to make sure

6  he never set foot on the street again.

7  Q.   And did you ever meet Mr. Villa's son?

8  A.   Yes, I did.

9  Q.   And where did you meet him?

10 A.   In the cell next to that.  I was cellmates with him

11 first.

12 Q.   All right.  So at the Woodford County Detention

13 Center?

14 A.   Yes.

15 Q.   So you were in jail with both of those individuals?

16 A.   Yes, sir.

17 Q.   You just testified that Mr. Villa told you why he

18 didn't like Mr. Duncan?

19 A.   Uh-huh.

20 Q.   Can you tell us whether he made any statements

21 regarding threats to Mr. Duncan?

22 A.   I mean, it -- after, you know, a little while he

23 asked me if I knew someone that would, you know, put a --

24 he would like to put a hit out on Rob.

25 Q.   Okay.  And at any time before that did he ever

TALBERT MARSHAL - DIRECT BY MR. McKINESS

1  mention that he wanted to harm Mr. Duncan or wanted to,

2  you know, have -- have him killed or anything like that?

3  A.   No, not before that, no, just how badly he disliked

4  him.

5  Q.   And how did you respond to Mr. Villa when he told

6  you that he wanted to put a hit out on Mr. Duncan?

7  A.   That I didn't know anybody that would do that, and I

8  didn't even want to know anything about it at the time.

9  Q.   All right.  Did Mr. Villa ever talk to you again

10 about harming Mr. Duncan?

11 A.   Yeah, on several occasions.

12 Q.   What did he say to you?

13 A.   Just that, you know, there would be a lot of money

14 in it for someone if you knew -- I know you have family

15 here in Kentucky, if you know someone that can do it.

16 Q.   Did he try to get you involved in any other way?

17 A.   Meaning?

18 Q.   Did he try to get you involved in the hit of

19 Mr. Duncan in any other way?

20 A.   Just for me to try to find someone to do it.

21 Q.   Okay.  And you said he said there would be a lot of

22 money in it for someone.  Did he say how much money?

23 A.   He said $25,000.

24 Q.   And did he say how he would pay the $25,000?

25 A.   He said he would pay half up front -- well,

TALBERT MARSHAL - DIRECT BY MR. McKINESS    511

1  actually, said 15,000 up front until after it was

2  finished.

3  Q.    Did he say how he would come up with that type of

4  money?

5  A.    He said he already had the money.

6  Q.    Where did he say he had -- did he tell you where he

7  had the money?

8  A.    He just said he had some money stashed at his

9  sister's in some speakers, and he said some other money

10  at a location in the headliner of a truck.  He didn't

11  give me the location or nothing though.

12  Q.    And you said you were bunkees with Mr. Villa.  How

13  often in the time that you were roommates with him, did

14  he talk about harming Mr. Villa -- I mean, harming

15  Mr. Duncan?

16  A.    Once it finally -- after the first time he asked,

17  probably 10, 15 times.

18  Q.    All right.  And how would these conversations come

19  about?

20  A.    Just pretty much about, you know, how badly he hated

21  Mr. Duncan for saying them things, you know, about him

22  when he didn't bring his son over here for that reason,

23  and that, you know, his son, you know, pretty much done

24  it to himself, and, you know, but Rob was putting it all

25  on him.

1  Q.    So after you heard about the -- well, after you were

2  told these things by Mr. Villa, what did you do?

3  A.    I wrote my attorney and told him.

4  Q.    And you wrote your attorney a letter?

5  A.    Yes, sir.

6         MR. McKINESS:  Your Honor, the United States

7  would like permission to approach the witness.

8         THE COURT:  Yes.  You can -- is it an exhibit

9  you would like to show him?

10        MR. McKINESS:  Yes, sir.

11        THE COURT:  You can provide it to the security

12  officer, and he will pass it over.

13        Thank you.

14  BY MR. McKINESS:

15  Q.    Mr. Marshal, do you recognize the document I just

16  handed to you that's been premarked as Government's

17  Exhibit 1?

18  A.    Yes, I do.

19  Q.    And how do you recognize that document?

20  A.    I wrote it.

21  Q.    All right.  And it's two pages.  Will you flip

22  through it and look through all of the pages?  Do you

23  recognize that second page as well?

24  A.    Uh-huh, yes.

25  Q.    And how do you recognize that?

TALBERT MARSHAL - DIRECT BY MR. McKINESS 513

```
 1  A.    That's my attorney and his address.  And my name and

 2  address at the other corner.

 3  Q.    And you said that it's a letter that you wrote.  Do

 4  you know when you wrote that letter?

 5  A.    I don't exactly.  It was mailed on September 31st,

 6  so, I mean, I gave it to the officer the day I wrote it.

 7  So I'm guessing around the 25th or something.

 8          MR. McKINESS:  All right.  United States would

 9  like to -- would move to admit Government's Exhibit 1

10  into evidence.

11          THE COURT:  All right.  Any objection to --

12          MR. ALLEN:  No objection, Your Honor.

13          THE COURT:  -- Exhibit 1?  Exhibit 1 will be

14  admitted at this time, and if you wish, you may display

15  it to the jury.

16          MR. McKINESS:  Thank you, Your Honor.

17      (Whereupon, Government's Exhibit Number 1 was

18  admitted into the record.)

19  BY MR. McKINESS:

20  Q.    Mr. Marshal, could you please explain to the jury

21  what Government's Exhibit 1 is?

22  A.    It's the letter that I wrote to my attorney.

23  Q.    Regarding?

24  A.    It starts out as just asking if everything is still

25  going as planned with my case.  I already had a plea
```

TALBERT MARSHAL - DIRECT BY MR. McKINESS  514

1  bargain set, and we were just waiting to get into court.

2       And then that's when I proceeded to tell him that

3  Mr. Duncan approached me -- or, I'm sorry, that Mr. Villa

4  approached me with -- about the $25,000.

5  Q.    Okay.  Could you please -- and you wrote this letter

6  in cursive?

7  A.    Yes.

8  Q.    And whose signature is at the bottom of the

9  document?

10  A.    That's mine.

11  Q.    All right.  Could you read this document to the

12  jury?

13  A.    "Hi Tom.  Just wanted to check in to make sure

14  everything is still going as planned.  I have been

15  wanting to call, but the phones are always off in the

16  daytime."

17  Q.    Could you read a little bit slower, please?

18  A.    Sure.  "I'm in here with a guy named Flaco Villa

19  that has a lot of charges.  He told me that he would give

20  $25,000 if somebody would kill Mr. Duncan.  He said he

21  would pay 15,000 up front and 10 more after it was done.

22  He says that Mr. Duncan is trying to frame him and his

23  son, but he has the money, just needs to find someone to

24  do it.  I'm not sure what you want to do about it, but I

25  haven't told anybody but you.  So if you could get back

1    with me and let me know what -- what I should do.  Thank

2    you."

3    Q.    Would you flip to the second page, please?  And the

4    second page of Government's Exhibit 1, is that the

5    envelope the letter was in?

6    A.    Yes, sir.

7    Q.    Or copy of the envelope?

8    A.    Copy of it, yes.

9    Q.    And who was -- who's in the top left corner as who

10   it's from?

11   A.    Myself.

12   Q.    And who is the letter to?

13   A.    Thomas Lyons.

14   Q.    And who was that?

15   A.    He was my federal attorney.

16   Q.    All right.  And you talked about -- or you just read

17   us this letter.  Why did you write this letter?

18   A.    Well, I mean, I figured if I knew something about it

19   and I didn't tell someone about it and he done it, I

20   might as well been involved in it.

21   Q.    And when you say "it," what are you referring to?

22   A.    Him being killed.

23   Q.    Him being who?

24   A.    Mr. Duncan.

25   Q.    By?

1   A.   Someone that Mr. Villa would hire.

2   Q.   After you wrote that letter to your attorney, did

3   you have any other conversations with Mr. Villa?

4   A.   Not -- I mean, not very much at all.

5   Q.   Did you have -- well, let me ask you this.  After

6   you wrote that letter, did you meet with the FBI?

7   A.   After my attorney came and met with me first.

8   Q.   All right.  And did they give you any type of

9   instructions?

10  A.   He just asked me the details, what -- what was in

11  the letter, and that, you know, if I would care trying to

12  get that on tape for him.

13  Q.   Okay.  And did you continue talking with Mr. Villa

14  about his plan to have Mr. Duncan killed?

15  A.   Yes, I did.

16  Q.   Now, you've testified that Mr. Villa repeatedly

17  brought up killing Mr. Duncan.

18  A.   Yes, sir.

19  Q.   Which -- now, and you also testified that you spoke

20  with the FBI about talking to Mr. Duncan -- I mean, to

21  Mr. Villa more.  So what I want to know is how many

22  times -- well, let me go back.

23       Did you ever start the conversations regarding

24  killing Mr. Duncan with Mr. Villa?

25  A.   I think on a couple of occasions when they -- I knew

 1  they were -- they wanted me to like get the conversation

 2  going to -- because they were taping it, or whatever.

 3  Q.    Okay.  And outside of an attempt to record the

 4  conversation, did you ever bring up Mr. Duncan, or was it

 5  Mr. Villa that brought him up?

 6  A.    I'm sorry, I don't understand what you mean.

 7  Q.    So before the recording, or the attempted recording,

 8  when you said you would have brought it up, did you bring

 9  up the plot to kill Mr. Duncan --

10  A.    No.

11  Q.    -- at any other times?

12  A.    No.

13  Q.    Did you take the threats that Mr. Villa made on

14  Mr. Duncan's life seriously?

15  A.    Well, after he kept repeatedly asking and saying how

16  bad that he hated him, yes, I took him serious.

17        And then when it went as far as giving me phone

18  numbers to his sister to -- that we drop the money off,

19  he said she knew nothing about it.  She would just drop

20  the money off into an empty car in Winchester, Kentucky,

21  and then she would lock the car after she put half the

22  money in there.

23  Q.    All right.  So it sounds like you're describing a

24  plan to get payment.  Can you tell us from the beginning

25  what the plan was and what the plan was for?

1  A.    Yeah.   The plan was if I could find someone, that he

2  would -- he had money, plenty of money put back for it,

3  that his sister would deliver $15,000 to a car in the

4  Kroger's parking lot at Winchester, Kentucky.   I just had

5  to call and tell her what color the car was and the

6  license plate number.   And she would put it in there.

7  There would be no one in the car, and she would put the

8  money in there and lock the door when she left.

9  Q.    And what was the purpose of doing that?

10 A.    To pay for the first half of the killing.

11 Q.    All right.   And why would money be dropped off in

12 the car with no one in it?   Why were you doing it?

13 A.    So that way he wouldn't have to see her or whoever

14 was do the killing, and, you know, she didn't have to see

15 him or anything like that.

16 Q.    All right.

17 A.    Because he said she knew nothing about it, she would

18 just deliver the money.

19 Q.    And where was this money supposed to come from?

20 A.    From her.   It was his, but, I mean, she had control

21 of it, or, I don't know, control, access to it I should

22 say.

23 Q.    Okay.   And what do you mean by access to it?

24 A.    Well --

25 Q.    What did he tell you about the money?

TALBERT MARSHAL - DIRECT BY MR. McKINESS                96

1   A.   He said that he had some hidden in the speakers of

2   her house, and then he had the other in the headliner of

3   a pick-up, and I'm assuming she knew where that was as

4   well.

5   Q.   So how were you supposed to contact his sister, or

6   how was the sister supposed to get involved?

7   A.   He gave me her phone number.

8   Q.   Did he tell you why he gave you her phone number?

9   A.   To call her whenever I could get someone to do it,

10  to call her and she would deliver the money.

11  Q.   Did he give you her phone number for any other

12  purpose?

13  A.   No.

14  Q.   When you spoke to Mr. Villa, what language did you

15  speak?

16  A.   English.  It's the only language I know.

17  Q.   You don't speak Spanish?

18  A.   None.

19  Q.   Did Mr. Villa speak Spanish to you?

20  A.   No.  I couldn't understand him if he did.

21  Q.   When you wrote your letter and sent it to your

22  lawyer, you said you met with the FBI?

23  A.   Yes, sir.

24  Q.   Did you ask the FBI for any assistance with your

25  sentence or --

TALBERT MARSHAL - DIRECT BY MR. McKINESS                      97

1   A.    Absolutely none.

2   Q.    -- did you ask for any time off?

3   A.    No, sir.  My plea bargain was already set before

4   this ever -- any of this ever happened.  I knew how much

5   time I was getting, and we were just -- actually, we had

6   a court date before that, and the Judge had an emergency,

7   and they postponed it.  And that's exactly what I got is

8   what we had already had planned before that.

9   Q.    So you're saying the -- your deal was worked out

10  before any of this happened?

11  A.    Before any of this happened.

12  Q.    And did your deal change at all after any of this

13  happened?

14  A.    None whatsoever.

15  Q.    So have you received any benefits whatsoever for an

16  exchange for your testimony today?

17  A.    Absolutely none.

18  Q.    Did you receive anything in exchange for writing the

19  letter to your lawyer?

20  A.    No.

21  Q.    Did you want to testify here today?

22  A.    Not at all.  I -- I was hoping by telling my

23  attorney that it would just, you know, that he would know

24  that they would know what he was trying to do, and it

25  would go away.  I went on to prison, done my time, and

1 thought this was all gone.  And when I get out, I get a

2 subpoena to come to court on this.

3 Q.   And were you upset to have to testify?

4 A.   Yes.  I've -- I mean, I've done my time.  I paid my

5 price for what I done.  I just want to move on with my

6 life.

7 Q.   And why were you upset about having to testify?

8 A.   I mean, I just didn't want anything to do with it.

9 I was doing it to begin to, you know, maybe save a man's

10 life, and that's all I wanted in it, you know.  I didn't

11 ask for anything in return for it.  I just wanted to put

12 a stop to it, and then that would be -- I was hoping that

13 would be it.

14 Q.   Were you nervous or scared about testifying today?

15 A.   I'm nervous.  I mean, I'm not scared.  No reason --

16 I mean, I'm telling the truth, so I have no reason to be

17 scared.

18 Q.   And around what time of year was it when you were

19 talking with Mr. Villa about the threats against

20 Mr. Duncan?

21 A.   It was in the fall, I believe.

22 Q.   September?

23 A.   Yeah, September, October.  Well, I'm -- the letter

24 was mailed on September 31st, so it was a couple weeks

25 before that.

TALBERT MARSHAL - CROSS BY MR. ALLEN                        99

1              MR. McKINESS:  Okay.  United States has no

2    further questions for this witness.

3              THE COURT:  All right.  Thank you.

4              Mr. Allen.

5              MR. ALLEN:  Your Honor, I would move just for

6    any statements that haven't previously been provided by

7    the United States.

8              THE COURT:  All right.  Any additional

9    statements of the witness?

10             MR. McKINESS:  There are no additional

11   statements.

12             THE COURT:  All right.  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. ALLEN:

15   Q.    Good afternoon, Mr. Marshal.

16   A.    Good afternoon.

17   Q.    You testified that you were an inmate at the

18   Woodford County Detention Center on a federal charge;

19   correct?

20   A.    Yes, sir.

21   Q.    And so would you say you're familiar with the

22   charges against you in that case?

23   A.    Yes.

24   Q.    Okay.  So it's true that on June 11, 2013, you sold

25   approximately 60 oxycodone pills to a confidential

1   informant?

2   A.   Yes, sir.

3   Q.   And it's also true that on June 12th, 2013, police

4   found you with 180 oxycodone pills?

5   A.   Yes, sir.

6   Q.   Okay.  And it's true, sir, isn't it, that the

7   charges carried a maximum sentence of 20 years?

8   A.   I don't know.  I'm not sure.  I mean, I think if it

9   was conspiracy or something, it could have.

10  Q.   Okay.  So you were facing a pretty hefty sentence.

11  You would agree with that, wouldn't you?

12  A.   Yeah.  I mean, until I seen my guidelines and

13  then --

14  Q.   And you pleaded guilty, did you not, to those

15  charges, I think, in 2014?

16  A.   Yes.

17  Q.   Does that sound right?

18  A.   Somewhere around there.

19  Q.   And the Court they let you out pending sentencing;

20  isn't that correct?

21  A.   I'm sorry?

22  Q.   You were released from incarceration briefly prior

23  to -- during the course of your --

24  A.   Once they indicted me I was, yes.

25  Q.   Once you were indicted, and you were a fugitive at

1  one point, were you not?

2  A.   Yes, sir.

3  Q.   Okay.  So you purposefully failed to appear for

4  court?

5  A.   Yes, sir, I did.

6  Q.   Okay.  But eventually the marshals found you and

7  brought you back?

8  A.   Yes, sir.

9  Q.   Okay.  Now, you've testified as to your plea

10 agreement.  You mentioned that was a binding plea

11 agreement?

12 A.   Yes, sir.

13 Q.   Okay.  That was for three years?

14 A.   Yes, sir.

15 Q.   Okay.  Now, you were sentenced, am I right, in

16 October 2015?

17 A.   Yes.

18 Q.   Okay.  But the -- the statements you've testified by

19 Mr. Villa came before that; correct?

20 A.   Before I -- yeah, before I was actually sentenced,

21 yes.

22 Q.   Correct, correct.  So -- and I'm sure your attorney

23 explained this to you, that the Judge still has to accept

24 that plea agreement?

25 A.   Correct.

1  Q.    She had not yet accepted that plea agreement;

2  correct?

3  A.    Correct.

4  Q.    So she could have rejected it, and you would have

5  faced a different sentence; correct?

6  A.    I'm assuming, yes.

7  Q.    Okay.

8  A.    I mean, he worked on the deal for months so, I mean,

9  if the prosecutor agreed to it, I pretty much assumed the

10 Judge would have agreed to it as well.

11 Q.    But my question is the Judge had not yet accepted --

12 A.    No.

13 Q.    -- the plea agreement?

14 A.    No.

15 Q.    And you were incarcerated for a good deal of time.

16 It's not uncommon, is it, for inmates to complain about

17 their prosecutors; is that correct?

18 A.    No.  No, I wouldn't say.  No, I've heard plenty of

19 them say they don't like their prosecutor.

20 Q.    You weren't particularly happy with your prosecutor,

21 were you?

22 A.    Absolutely not.

23 Q.    Okay.

24 A.    No.

25 Q.    And you testified that you finished your sentence,

1   but you are currently on supervised release; is that

2   correct?

3   A.   Yes, sir, I am.

4   Q.   All right.  So -- and I'm sure your attorney has

5   explained that to you as well, if you're found to be in

6   violation of that in any way, you could end up back in

7   jail; correct?

8   A.   Correct.

9   Q.   Okay.  Likewise, the government could do you favors

10  in that case, you know, if you were to talk to them, if

11  you were to be in violation; is that correct?  You would

12  want to negotiate with the government if you were to be

13  found in violation of the terms of your supervised

14  release; correct?

15  A.   What do you mean?

16  Q.   I'll rephrase that.  Since you are still -- you

17  could still possibly face incarceration?

18  A.   Uh-huh.

19  Q.   You have an incentive here, do you not, to remain in

20  the government's good graces?

21  A.   No.  I do -- I follow the rules of my probation.

22  I've took a drug test every week since December.  I've

23  held a job, and I'm back with my family and --

24  Q.   Okay.  And you testified that you and Mr. Villa were

25  not the only individuals in your cell; correct?

1   A.   Correct.

2   Q.   Okay.  And you testified that there were four people

3   in your cell, but that's not entirely true, is it?  The

4   number fluctuates, am I right?  You have some people in

5   there and some people -- sometimes you were --

6   A.   Well, we were actually in a -- it was like two

7   little cells in one room, and then the day room was here.

8   But their cell is open and so is ours.  There's two on

9   this side, and two on this side.  The other cells -- no,

10  the other cells they held 10, 15 inmates in each cell.

11  Q.   Okay.

12  A.   And I think once we had five in our cell.  One guy

13  slept on the floor for a weekend or something.

14  Q.   Okay.  So you -- sometimes you would have four

15  people, sometimes you would have more; correct?

16  A.   Yeah.

17  Q.   Okay.

18  A.   Yes.

19  Q.   And am I right, sir, that you testified that

20  Mr. Villa told you that he had hidden some money in a

21  truck?

22  A.   In a truck and a speaker, yes.

23  Q.   Okay.  Now, you've testified before a grand jury,

24  have you not?

25  A.   Yes, I did.

 1   Q.   You didn't mention to the grand jury that he was

 2   hiding money in a truck, did you?

 3   A.   I don't remember if I did or not.

 4           MR. ALLEN:  Your Honor, if I may have the court

 5   security officer -- I have his grand jury transcript, if

 6   he may --

 7           THE COURT:  If you would like to show it --

 8           MR. ALLEN:  -- refresh his memory.

 9           THE COURT:  -- to him -- if you would like to

10   show it to him, certainly.

11           THE WITNESS:  It should be in FBI's report

12   because I -- I mean, I told him right off the bat about

13   it, so...

14   BY MR. ALLEN:

15   Q.   And I'll give you as much time as you need to

16   refresh your memory, sir.

17   A.   No, it just says the speaker.

18   Q.   Okay.  So you never told the grand jury what you

19   told the Court here today; is that correct?

20   A.   I told the FBI agent that to begin with.

21           MR. ALLEN:  If I could get my transcript back.

22           Thank you.

23           Your Honor, if I may have one moment.

24           THE COURT:  Yes, sir, certainly.

25   BY MR. ALLEN:

1  Q.   Mr. Marshal, just a couple more questions.

2  A.   Okay.

3  Q.   You had testified that you were in the cell with

4  Mr. Villa for four or five months?

5  A.   It could have been longer, it could have been

6  shorter.

7  Q.   You don't know?

8  A.   No.  I was in -- I mean, I know it was a few months.

9  Q.   Right.

10  A.   I was in there -- every day is just another day in

11  there, you know.

12  Q.   I understand that.  But it could have been two

13  months, it could have been --

14  A.   No, it was at least three months, three to four

15  months, yes.  Because I was only in the first cell for

16  around a month-and-a-half to two months, and I stayed in

17  Woodford County Detention Center for almost six months.

18  Q.   But my question is you don't know for a fact?

19  A.   No, I don't know for a fact, no.  I mean, I'm sure

20  the jail has a record of it.

21          MR. ALLEN:  No further questions, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Any redirect?

24          MR. McKINESS:  Yes, sir.

25          THE COURT:  Yes, sir, Mr. McKiness.

1                      REDIRECT EXAMINATION

2  BY MR. McKINESS:

3  Q.    You mentioned that you had heard other people

4  complain about their prosecutors before?

5  A.    Yes.

6  Q.    What was different about Mr. Villa's threats or

7  complaints from every other complaint you heard?

8  A.    Well, the other complaints would just be, you know,

9  name calling, don't like him, and -- or whatever.  None

10 of them said I want to kill him or have him killed.  I

11 mean, I didn't like my prosecutor, but I didn't want to

12 kill the guy for doing his job.

13 Q.    Did any other --

14 A.    I broke the law.

15 Q.    Were any of the other inmates that you were around

16 offer money to have their prosecutors killed?

17 A.    Never.

18          MR. McKINESS:  And -- that's all I have,

19 Your Honor.

20              THE COURT:  All right.  Thank you.

21              Anything on this line of questions?

22          MR. ALLEN:  Nothing further, Your Honor.

23              THE COURT:  All right.  Thank you, Mr. Marshal.

24 You may step down, sir.

25          MR. McKINESS:  Your Honor, may the witness be

1   excused?

2          THE COURT:  Yes, he may be excused at this

3   time.

4          Thank you.

5          Mr. McKiness, you may call your next witness.

6          MR. McKINESS:  The United States would like to

7   call Mr. Rob Duncan to the stand.

8          THE COURT:  Thank you.

9          THE CLERK:  Raise your right hand, please.

10         Do you swear or affirm that the testimony

11  you're about to give in this matter shall be the truth,

12  the whole truth, and nothing but the truth as you shall

13  swear unto God, or affirm, subject to the penalty of

14  perjury?  Do you so swear or affirm?

15         THE WITNESS:  Yes, ma'am, I do.

16         THE COURT:  All right.  Thank you.

17         And you may proceed.

18         MR. McKINESS:  Thank you, Your Honor.

19            ROBERT MICHAEL DUNCAN, JR.,

20  having been first duly placed under oath, was examined

21  and testified as follows:

22                  DIRECT EXAMINATION

23  BY MR. McKINESS:

24  Q.   Good afternoon, Mr. Duncan.

25  A.   Good afternoon, sir.

ROBERT M. DUNCAN, JR. - DIRECT BY MR. McKINESS                    109

1   Q.    Could you please state your name for the jurors?

2   A.    Yes.  My name is Robert Michael Duncan, Jr.

3   Q.    And what is your current occupation?

4   A.    I'm currently an Assistant U.S. Attorney here in

5   U.S. Attorney's office for the Eastern District of

6   Kentucky.

7   Q.    All right.  And what is an Assistant United States

8   Attorney?

9   A.    An Assistant U.S. Attorney is a federal prosecutor.

10  We prosecute violations of federal criminal laws.  We

11  also have attorneys who handle civil matters in our

12  office.

13  Q.    And are you currently looking at getting another job

14  at the U.S. Attorney's job?

15  A.    Yes, sir, I am.  I'm currently nominated to be the

16  U.S. Attorney for the Eastern District of Kentucky.

17  Q.    And who nominated you?

18  A.    President Trump.

19  Q.    And who employs you currently?

20  A.    As an Assistant U.S. Attorney, I'm employed by the

21  U.S. Department of Justice.

22  Q.    And is that a federal agency?

23  A.    It is.  It's a federal agency.  We're part of the

24  federal government.

25  Q.    And how long have you worked at the United States

1  Attorney's office?

2  A.    I have been an Assistant U.S. Attorney for almost

3  13 years.  I started in January of 2005, so it will be

4  13 years in January of next year.

5  Q.    And what are some of your current responsibilities

6  as an Assistant United States Attorney?

7  A.    Currently I'm assigned to prosecute cases in our

8  general crime unit.  I'm assigned as an OCTF attorney,

9  organized crime, drug enforcement task force attorney.  I

10 focus, the past probably five or six years of my career,

11 prosecuting drug trafficking and money laundering cases.

12 Q.    And back in 2015 what kind of cases were you

13 prosecuting?

14 A.    Then I was prosecuting the same, mainly drug

15 trafficking, money laundering cases.

16 Q.    And are you familiar with Mr. Edgar Villa-Castaneda?

17 A.    I am.

18 Q.    How are you familiar with him?

19 A.    He was a defendant in a large drug trafficking and

20 money laundering case that I prosecuted, along with

21 another AUSA beginning in 2014, carrying over into 2015.

22 Q.    Can you tell us about your prosecution of Mr. Villa?

23 A.    Yes.  The case was against Mr. Villa-Castaneda, was

24 prosecuted, like I said, as part of a larger

25 investigation into a drug trafficking and money

1  laundering organization that was operating here in

2  Central Kentucky that also had ties to a larger

3  organization that was nationwide and also international

4  in scope.

5      We prosecuted several individuals, I believe over

6  20, with various violations of the federal drug laws,

7  conspiracy to distribute marijuana, cocaine.

8      We also prosecuted as part of that money laundering

9  violations, and also I believe firearms violations as

10 well.

11 Q.   And what specific crimes did you charge

12 Mr. Villa-Castaneda with?

13 A.   He was charged in both the marijuana conspiracy, the

14 cocaine conspiracy.  He was also charged in the money

15 laundering conspiracy.  I believe there may have been a

16 firearms count charged as well.

17 Q.   And these charges were they brought in your official

18 capacity as an Assistant United States Attorney?

19 A.   Yes, they were.

20 Q.   And were there other defendants charged in

21 connection with Mr. Villa-Castaneda?

22 A.   There were.  There were, I believe, between 20 and

23 25 defendants that were charged as part of the -- in our

24 district as part of the overall investigation that we

25 had.

ROBERT M. DUNCAN, JR. - DIRECT BY MR. McKINESS    535    112

1   Q.   All right.  Did you charge anyone related to

2   Mr. Villa?

3   A.   We did.  Mr. Villa-Castaneda's son Julio Cesar

4   Villa Arono was also charged as a defendant.  I believe

5   he was charged in the marijuana conspiracy, as well as

6   possibly a money laundering conspiracy.  But I'm certain

7   he was charged in the marijuana conspiracy.

8   Q.   All right.  And during the prosecution of Mr. Villa,

9   did you learn that he threatened your life?

10  A.   I did.  I learned -- it wasn't a direct threat

11  communicated to me, but I learned from speaking with

12  another attorney here in Lexington he had passed that

13  information to me.

14  Q.   And do you recall who that attorney was?

15  A.   Yes, it was Tom Lyons.

16  Q.   Did these threats affect your life at all?

17  A.   They did.  Obviously, when you have a threat

18  communicated, it's very jarring.  It's very

19  disconcerting.  Obviously, you know -- you're fearful and

20  apprehensive of not knowing what is going to happen.  So

21  it did have -- did have an impact.  We certainly had

22  extra -- took extra precautions because of the threats.

23  Q.   What kind of precautions were taken?

24  A.   I was with a security detail for approximately one

25  month, 24/7 security provided by the U.S. Marshal

1   Service.

2   Q.   Did any other agencies ever provide you with

3   security?

4   A.   Yes.  Before the marshal service could get fully in

5   place, other agencies did, yes.

6   Q.   All right.  Can you explain what kind of affect

7   these threats had on your life?

8   A.   Yes, sir.  Obviously, other than what I said a

9   moment ago about being very disconcerting and very --

10  very jarring, it was an impact not only to me by but also

11  my family, just the affect of -- over that.

12  Q.   I know it's not easy.  Can you tell us how this

13  affected your family and how you had to deal with this?

14  A.   It was.  It was difficult telling my daughters,

15  explaining why the marshals were there.

16  Q.   And had you had marshals 24/7 protection at any

17  other point in your career?

18  A.   No, sir.

19  Q.   And I know this sounds like a stupid question, but

20  did you take these threats seriously?

21  A.   I did.  Given the nature of the case that I was

22  involved in, prosecuting the organization that we were

23  investigating, I took the threats seriously.

24  Q.   Have you ever been threatened before in your

25  official capacity as a prosecutor?

ROBERT M. DUNCAN, JR. - DIRECT BY MR. McKINESS          114

1    A.   I have.  Early on in my career I received

2    information that a threat had been made, and -- you know,

3    it's part of -- unfortunately, it's part of the job

4    sometimes that we -- that we have as federal prosecutors.

5    Being in law enforcement you come to -- sometimes it will

6    come with the territory.

7    Q.   All right.  And how seriously was that other threat

8    taken?

9    A.   It was taken seriously as well.  I mean, it was

10   reported along the proper channels like we would any

11   other threat, but ultimately it was determined that --

12   that it wasn't a valid threat.

13   Q.   All right.  And you said it wasn't determined to be

14   a valid threat.  Did you in connection with that threat

15   have any type of 24-hour protection from any federal

16   agencies?

17   A.   No, sir, I did not.

18   Q.   Why was Mr. Villa's threat taken more seriously than

19   the prior threat?

20   A.   Again, because of the nature of the organization

21   that we were investigating, which Mr. Villa-Castaneda was

22   a part of, the amount of drugs that were involved in that

23   investigation, the potential for violence that the

24   organization could commit.  It was -- it was taken very

25   seriously.

1   Q.    And do you recognize Mr. Villa-Castaneda anywhere in

2   this courtroom?

3   A.    Yes, sir, I do.

4   Q.    And where do you recognize him at?

5   A.    He is seated at defense counsel table.  He's

6   partially blocked by the monitor, wearing a white shirt.

7             THE COURT:  The witness has identified the

8   defendant.

9             MR. McKINESS:  United States has no further

10  questions, Your Honor.

11            THE COURT:  All right.  Thank you.

12            MR. McKINESS:  Thank you.

13            THE COURT:  Thank you.

14            Mr. Allen, you may question the witness.

15                    CROSS-EXAMINATION

16  BY MR. ALLEN:

17  Q.    Good afternoon, Mr. Duncan.

18  A.    Good afternoon, Mr. Allen.

19  Q.    Mr. Villa ultimately pled guilty in the case we're

20  talking about; correct?

21  A.    He did.

22  Q.    And there was a written plea agreement in that;

23  correct?

24  A.    There was a plea agreement, yes.

25  Q.    And that was entered into after the alleged threats

1  were made; correct?

2  A.   That's correct.

3  Q.   Okay.  And as you know, in plea agreements there's a

4  fair deal of negotiations, and those took place between

5  you and Mr. Villa through his attorney; correct?

6  A.   Yes, they did.

7  Q.   Okay.  Was the government interested in Mr. Villa's

8  cooperation in that case?

9  A.   Yes, absolutely, the government was interested in

10 Mr. Villa's cooperation.  It started out, I think, things

11 were -- things were progressing well along -- along those

12 lines, and then when the threat was communicated, you

13 know, that obviously made a change.

14 Q.   Okay.  So he did cooperate initially with the

15 government; correct?

16 A.   Yes, sir, he did.

17 Q.   And I'm sure you understand that comes -- that puts

18 his life at risk, does it not?

19 A.   Potentially.  There's always a risk unfortunately

20 when folks do decide to cooperate.  That is there's a

21 potential for retribution or retaliation, but, you know,

22 there are risks involved.

23 Q.   And just to confirm, Mr. Villa never -- you never

24 received this threat directly from Mr. Villa; correct?

25 A.   No, sir, I did not.

 1              MR. McKINESS:  No further questions.

 2  Thank you, Mr. Duncan.

 3              THE WITNESS:  Thank you, Mr. Allen.

 4              THE COURT:  Any additional questions,

 5  Mr. McKiness?

 6              MR. McKINESS:  Yes, sir.

 7              THE COURT:  Yes, sir.

 8                    REDIRECT EXAMINATION

 9  BY MR. McKINESS:

10  Q.   I don't know if this was made clear, but after the

11  threats were communicated to you, what involvement did

12  you have regarding Mr. Villa's prosecution after that?

13  A.   I stayed involved in the investigation.  There was

14  also a -- another Assistant U.S. Attorney that was

15  assigned to the case, Todd Bradbury.  Mr. Bradbury became

16  more involved, particularly as it related to

17  Mr. Villa-Castaneda.  And, you know, I still stayed

18  involved with the investigation but tried to shift focus

19  to other defendants.

20  Q.   So essentially you were kind of hands off with

21  regards to Mr. Villa, but everyone else in the

22  organization you still were a full part of the

23  investigation?

24  A.   Yes, that is correct, to the extent that I could

25  be -- let Mr. Bradbury handle things regarding

1  Mr. Villa-Castaneda, that's what we tried to do.

2  Q.   All right.  And this may be a hard question to

3  answer, but what kind of percentage of defendants

4  cooperate in, you know, throughout the course of your

5  prosecutions?

6  A.   It's hard to put a percentage on it.  I would say

7  the majority of the defendants that I prosecute end up

8  cooperating on some level, whether or not they receive

9  any formal benefit through a substantial assistance

10 motion.  Most often defendants will try to help

11 themselves by providing information.  Some defendants

12 choose not to, but my experience the vast majority will

13 at least make an attempt.

14 Q.   And of all of the defendants that you've had that

15 were cooperating, how many of them have ever made threats

16 on your life?

17 A.   This would be the only one case that I'm aware of.

18 Q.   And how long have you been in the Assistant United

19 States Attorney?

20 A.   Almost 13 years.

21           MR. McKINESS:  Thank you.

22           No further questions, Your Honor.

23           THE COURT:  All right.  Thank you.  Any --

24           MR. ALLEN:  No further questions, Judge.

25           THE COURT:  -- recross?

1            All right.  Thank you, Mr. Duncan.  You may

2  step down.

3            THE WITNESS:  Thank you, Your Honor.

4            THE COURT:  All right.  Thank you.

5            And you may call your next witness.

6            MR. McKINESS:  Thank you, Your Honor.

7            The United States would call Special Agent

8  John Whitehead to the stand.

9            THE COURT:  Thank you.

10            THE CLERK:  Raise your right hand, please.

11            Do you swear or affirm that the testimony

12  you're about to give in this matter shall be the truth,

13  the whole truth, and nothing but the truth as you shall

14  swear unto God, or affirm, subject to the penalty of

15  perjury?  Do you so swear or affirm?

16            THE WITNESS:  Yes, I do.

17            THE COURT:  Thank you.

18            Mr. McKiness, you may proceed.

19            MR. McKINESS:  Thank you, Your Honor.

20                      JOHN WHITEHEAD,

21  having been first duly placed under oath, was examined

22  and testified as follows:

23                      DIRECT EXAMINATION

24  BY MR. McKINESS:

25  Q.   Special Agent Whitehead, good afternoon.

1   A.    Good afternoon.

2   Q.    Could you please introduce yourself to the jurors?

3   A.    Special Agent John Whitehead with the FBI.

4   Q.    And what is your position with the FBI?

5   A.    I'm a special agent.  I work various violations.

6   Most of them what's called the violent crime major

7   offenders.  It could be threats, drugs, gangs,

8   kidnapping, bank robberies.

9   Q.    And how long have you been a special agent with the

10  FBI?

11  A.    20 years.

12  Q.    And before you were a special agent with the FBI,

13  what was your occupation?

14  A.    I was a police officer and a detective with the

15  Atlanta Police Department.

16  Q.    And how long were you a detective?

17  A.    Five years.

18  Q.    And you're a special agent with the FBI.  Which

19  office do you work out of?

20  A.    Lexington, Kentucky.

21  Q.    And as a special agent with the FBI, have you

22  received any type of recognitions or awards or anything

23  like that?

24  A.    Yes, I have.

25  Q.    I'm not going to get into all of that stuff.

1  A.   Okay.

2  Q.   I'm going to ask you about an investigation into

3  Mr. Villa-Castaneda.  Were you involved in the

4  investigation into Mr. Edgar Villa-Castaneda?

5  A.   Yes, I was.

6  Q.   And what were your responsibilities regarding the

7  investigation?

8  A.   I was assigned the case, so I was the primary case

9  agent, conducted interviews, wired up cooperators.  That

10  was essentially it.

11  Q.   And when you say the case, which case are you

12  referring to?

13  A.   The threat on AUSA Duncan's life.

14  Q.   When did your investigation into Mr. Villa-Castaneda

15  begin?

16  A.   It was back in September whenever we first received

17  the letter.

18  Q.   Of what year?

19  A.   I believe it was 2015 when we first received the

20  letter from Tom Lyons.

21  Q.   And who is Tom Lyons?

22  A.   He was a -- he was a defense attorney, but at the

23  time he was a defense attorney for Talbert Marshal.

24  Q.   And did you say who had sent the letter?  Actually

25  let me --

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    122

1            MR. McKINESS:  May I go to the --

2            THE COURT:  Yes, sir.

3  BY MR. McKINESS:

4  Q.   And -- and when you're referencing a letter, are you

5  talking about Government's Exhibit 1?

6  A.   Yes, sir, I am.

7  Q.   Okay.  And did you ever speak with Mr. Talbert

8  Marshal?

9  A.   Yes.

10  Q.   How did your investigation progress after you spoke

11  with Mr. Marshal?

12  A.   Well, after I spoke to Mr. Marshal, we also

13  interviewed other inmates that were in the same vicinity

14  as Mr. Villa.  So we conducted more interviews, and then

15  we got permission to do a consensually monitored

16  conversation between Mr. Marshal and Mr. Villa.

17  Q.   Okay.  And you said you did several interviews.  Did

18  you record any of the interviews that you were involved

19  in?

20  A.   No.

21  Q.   Did -- were any of the interviews conducted by other

22  agents?

23  A.   Yes, they were.

24  Q.   Were any of those interviews recorded?

25  A.   No.

1   Q.    Were any of the -- were you able to corroborate the

2   threat allegation that was first brought to your

3   attention in the Talbert Marshal letter in Government's

4   Exhibit 1?

5   A.    Yes.  There was at least one other inmate that

6   corroborated the information that Mr. Marshal provided.

7   Q.    What other investigative techniques did you use in

8   this case outside of the interviews?

9   A.    Okay.  Besides the interviews we attempted to

10  consensually monitor conversations between Mr. Marshal

11  and Mr. Villa, and reviewed records of the jail to see

12  who actually was inside the jail.  That's pretty much it.

13  Q.    All right.  Let's talk about the consensual

14  monitored conversations.  Can you tell the jury more

15  about that?

16  A.    Yes.  We wanted to see if we could capture a

17  recording of the conversation between Mr. Marshal and

18  Mr. Villa, so we arranged for them to be in the same

19  transport van to go from the Woodford County jail to this

20  courthouse actually for one of their court appearances.

21        And then -- so we placed a device inside the van,

22  actually two devices, and we also placed two devices in

23  the holding cells, which is where the inmates are kept in

24  between their court appearances.  In the back the

25  marshals have holding cells.

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    124

1  Q.   And how did those recordings turn out?

2  A.   Not too well.  Unfortunately, the ones that were

3  placed in the holding cell here is when the construction

4  was going on behind the building so throughout the

5  entire, both recordings, were jack hammers going on in

6  the background.  So you could hear intermittently -- you

7  could hear intermittently words of what they were talking

8  about, but you couldn't catch the free-flowing

9  conversation, and unfortunately the one inside the van

10  you only heard engine and road noise.

11  Q.   So it didn't work out well?

12  A.   No.

13  Q.   Up until that point what did you learn from your

14  investigation?

15  A.   Prior to that based on the interviews we

16  corroborated that Mr. Villa was attempting to hire

17  someone to kill Mr. Duncan.  He was wanting to pay a

18  large amount of money.  He provided some ideas.  One of

19  the -- one of the cooperators had said that -- Mr. Villa

20  then asked him if his girlfriend could do it since he was

21  still incarcerated, and he said his girlfriend didn't

22  have a gun.  Well, he said, you could buy some clear

23  acid, shake it with water in a bottle, and then throw it

24  at him, and it would cause an explosion of approximately

25  25-foot radius.

1        He also said if he could do it himself he would do

2   it with a .22 rifle while hidden inside a pickup truck.

3        He talked about how the -- at least some of the

4   money that he would utilize was hidden in some stereo

5   speakers at his sister's house.

6        He also talked about where.  He suggested to do the

7   meet between whoever it was that would carry out the hit

8   to harm Mr. Duncan, he could have his sister meet that

9   person in either the Kroger or the Walmart parking lot in

10  Winchester, park the cars next to each other.  The --

11  whoever the hit man would be would actually be away from

12  the vehicle so he couldn't see the sister, and the sister

13  wouldn't see him, and she would just put it inside the --

14  an unlocked -- in the unlocked vehicle of the hit man.

15            MR. ALLEN:  Your Honor, might we approach?

16            THE COURT:  Yes, sir, you may.

17       (Whereupon, a bench conference was had with the

18  Court and counsel out of the hearing of the open court

19  and juror members, as follows.)

20            MR. ALLEN:  Your Honor, I was confused where he

21  was getting much of his information, but I believe he's

22  talking about statements made by Gill Garrett who is

23  going to testify and by Mr. Marshal, which are hearsay.

24  They're not co-conspirators.  He's relaying what

25  Mr. Villa told that witness who then told him.  I would

1  object on hearsay grounds.

2          MR. McKINESS:  The way the question was asked

3  was to tell us the information that he had that

4  corroborated the statements.

5          THE COURT:  Which is one the factors that has

6  to be considered in determining whether it was a true

7  threat.

8          MR. McKINESS:  Yes, sir.

9          THE COURT:  So it's the result of the

10  investigation.

11          MR. McKINESS:  And that's the way I asked the

12  question.

13          THE COURT:  All right.

14          MR. ALLEN:  I understand that.  I was going on

15  hearsay, Mr. Villa's statements through another witness

16  made to him.  That was my concern.

17          THE COURT:  Okay.

18          MR. McKINESS:  I think -- I think if we

19  admonish the witness not to say what any particular

20  witness told him anything, just to say the information

21  that he obtained, I think that would take care of it.

22          MR. ALLEN:  I think that's fine.

23          THE COURT:  All right.  Very well.

24          You can just limit his questions, if you will.

25          MR. McKINESS:  Yes, sir.

1              THE COURT:  All right.

2         (Whereupon, the bench conference concluded.)

3              THE COURT:  Thank you, and you may proceed.

4              MR. McKINESS:  Thank you, Your Honor.

5    BY MR. McKINESS:

6    Q.   Special Agent Whitehead -- and I just want to make

7    this clear that when you're answering the questions to

8    make sure that you're just telling us about the

9    information that you obtained and not what anyone else

10   specifically told you.

11   A.   Okay.

12   Q.   All right.  Was there anything additional that you

13   had to add before the break?

14   A.   I think that pretty much covers it.

15   Q.   On or about November the 6th, 2015, did you have a

16   chance to interview Mr. Villa-Castaneda?

17   A.   Yes.

18   Q.   Where did that interview take place?

19   A.   In the Grayson County Detention Center.

20   Q.   Now, I thought you had earlier testified that

21   Mr. Villa-Castaneda was in the Woodford County Detention

22   Center.

23   A.   He was, but at some course during the investigation

24   he was transferred to Grayson County.

25   Q.   And do you know why he was transferred?

1    A.    Actually, no, I don't know what the exact reason

2    was.

3    Q.    When you interviewed Mr. Villa-Castaneda, did you

4    read him his Miranda rights?

5    A.    Yes.

6    Q.    In what language?

7    A.    English.

8    Q.    Why?

9    A.    Because everyone I had spoken to at the jail and the

10   cooperating people and even everyone in the prison,

11   whether they knew something about him trying to hire

12   someone or not, everyone we talked to said all their

13   conversations with him were solely in English, and none

14   of them spoke Spanish.  So I assumed he spoke English.

15   Q.    Did Mr. Villa-Castaneda sign an English language

16   Miranda waiver indicating that he understood his Miranda

17   rights?

18   A.    Yes, he did.

19             MR. McKINESS:  Your Honor, the United States

20   would like to give the witness a --

21             THE COURT:  Yes, yes, sir.

22             THE WITNESS:  Thank you.

23   BY MR. McKINESS:

24   Q.    Special Agent Whitehead, do you recognize the

25   document that's just been handed to you, premarked as

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    129

1   Government's Exhibit 2?

2   A.    Yes, sir, it's the advice of rights form that

3   Mr. Villa signed.

4            MR. McKINESS:  The United States moves to admit

5   Government's Exhibit 2 into evidence.

6            THE COURT:  Any objection?

7            MR. ALLEN:  No objection, Your Honor.

8            THE COURT:  Exhibit 2 will be admitted, and it

9   may be displayed to the jury if you wish.

10           MR. McKINESS:  Thank you, Your Honor.

11      (Whereupon, Government's Exhibit Number 2 was

12   admitted into the record.)

13   BY MR. McKINESS:

14   Q.    Special Agent Whitehead, can you explain to the

15   Court what this Government's Exhibit 2 is?

16   A.    This is a -- this is an advice of rights form.

17   Before we do an interview of a potential subject, make

18   sure they're aware of their rights.  And when they sign

19   this, it's acknowledging -- they're just acknowledging

20   they know what their rights are, and they're willing to

21   talk to us.

22   Q.    All right.  And can you tell us whose signature

23   appears under consent?

24   A.    It's Mr. Villa's signature.

25   Q.    All right.  And what does that signature tell you?

1  A.    That he understood the rights that we just read him

2  and that he's also willing to talk to us.

3  Q.    And can you read what it says under consent?

4  A.    I'll just read it from here.  "I have read this

5  statement of my rights, and I understand what my rights

6  are.  At this time I'm willing to answer questions

7  without a lawyer present."

8  Q.    And there are two other signatures below where it

9  says witness.  Who signed there?

10 A.    The top signature is my signature, and the next one

11 is the other agent that was with me during the interview,

12 Mike VanAelstyn.

13 Q.    All right.  And what do your signatures there

14 represent?

15 A.    That we witnessed him actually signing this

16 document.

17 Q.    All right.  And there's some handwritten stuff at

18 the top of Government's Exhibit 2 where it says location.

19 What does that say?

20 A.    Grayson County Detective Center, 11/6/15, meaning

21 November 6, 2015, and at the time that I started reading

22 the rights, 1:57 p.m.

23 Q.    There's also a time at the bottom.  What is that

24 time?

25 A.    That's 2 o'clock p.m.  That's how long -- it took

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                     131

1   approximately three minutes to read the rights, but, of

2   course, we went over what we were getting ready to

3   present to him for several minutes before we actually

4   started reading it to him.

5   Q.   And what again did you say you were witnessing?

6   A.   Witnessing that he agreed that he knew what his

7   rights were and that he's willing to talk to us.

8   Q.   During your interview of Mr. Villa, did he ever

9   indicate to you that he didn't understand you?

10  A.   No.

11  Q.   Could you understand Mr. Villa's answers?

12  A.   Yes.

13  Q.   And what language did he respond to you?

14  A.   English the entire time.

15  Q.   Do you speak Spanish?

16  A.   Not at all.

17  Q.   Did you experience any issues communicating with

18  Mr. Villa at the time that this advice of rights waiver

19  was signed?

20  A.   None whatsoever.

21  Q.   So during your interview of Mr. Villa-Castaneda on

22  November 6th, 2015, did you ask him questions?

23  A.   Yes, open-ended questions.

24  Q.   And what do you mean by open-ended questions?

25  A.   I didn't want to like, did you do this, did you do

1   that, like yes/no questions.  I wanted him to actually

2   provide the details and make sure he knew what I was

3   asking him, and he could provide details.

4   Q.    Why -- and why again did you ask your questions that

5   way?

6   A.    Well, it's just going to show me that -- because all

7   the information I received from other people I

8   interviewed, I wanted to corroborate it and make sure he

9   knew exactly -- I guess what he had planned to do,

10  because I was trying ultimately to elicit a conversation

11  from him, and I don't want to just have the yes/no

12  questions.  I wanted him to be able to provide details

13  showing that he actually did do the things that I thought

14  he did.

15  Q.    Did you record the interview?

16  A.    No.

17  Q.    Why not?

18  A.    The -- there's a couple different reasons.  Normally

19  we record subject interviews if they're like in our

20  custody.  One, he wasn't in custody.  He was actually in

21  DA's custody.

22        Also -- excuse me.  Also, at the last minute

23  normally there's like a place to do interviews within the

24  jail.  The jail notified us that they were going to be

25  putting us into someone's office, and they hadn't had a

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    133

1   chance yet to notify them that we're going to be in that

2   office.  So there was a chance that they may be coming in

3   during the interview so I chose not to record the

4   interview because I didn't want that to be captured on

5   there.

6   Q.    All right.  And you spoke about this interview

7   before at a separate hearing, didn't you?

8   A.    Yes, I did.

9   Q.    In that hearing did you talk about the fact that the

10  interview was in an office and the ramifications of that?

11  A.    Yes.  It was actually -- I can't remember if it was

12  a sergeant or lieutenant's office, but it was in

13  somebody's office as opposed to a regular interview room.

14  Q.    Does the FBI have any policies regarding recording

15  interviews?

16  A.    Yes.  They have -- it's -- they have a policy that

17  if we're doing interviews of a person that's in our

18  custody and prior to their initial appearance, we record

19  that.  Now, there's several different exceptions, but

20  that's what we're supposed to do.

21  Q.    Did any of those exceptions apply in this situation?

22  A.    Yes, there's one exception.  I know it's subsection

23  (c) or whatever, but it has to do if it's not reasonably

24  practical to record that interview.  And in that section

25  it talks about if there's a change of venue, unexpected

1   change of venue, which there was, because we were

2   supposed to be in an interview room, and we had to do

3   this in somebody's office.

4   Q.   All right.  And did you make that clear in your

5   prior statement in other hearings?

6   A.   Yes.

7   Q.   Did Mr. Villa make any admissions during your

8   interview of him?

9   A.   Yes, he did.

10  Q.   What admissions did he make?

11  A.   He admitted to having several different

12  conversations with a few different inmates, complaining

13  to them about Mr. Duncan, wanting to harm Mr. Duncan, and

14  offering to pay money.  He didn't provide exact amount of

15  money, just that he's willing to pay money to have him

16  harmed.

17       He also mentioned how it was going to be done, and

18  the initial -- that meeting I was talking about earlier

19  about in Walmart or Kroger parking lot in Winchester, and

20  that he had money hidden in the speakers of his sister's

21  house.  He actually mentioned an amount that he didn't

22  know how much was in there, but he said -- he mentioned

23  at one point that there was $5,000 in there at one point

24  in those speakers.  So he used to hide money in there.

25  Q.   And these are the things that he told you directly?

1 A.    Directly, yes, sir.

2 Q.    And you mentioned that he talked about harming

3 Mr. Duncan.  To the best of your memory, can you tell us

4 what he said about harming Mr. Duncan?

5 A.    Well, he said about killing Mr. Duncan.  I don't

6 recall offhand if he said how he wanted it done in the

7 interview with me, but he did admit that he talked about

8 killing -- having Mr. Duncan killed.

9 Q.    So it wasn't just harming, but he actually said the

10 words kill him?

11 A.    Yes.

12 Q.    Did Mr. Villa mention whether he made those threats

13 on more than one occasion?

14 A.    Yes.  He admitted that it was on several occasions

15 that they talked about that, he and other inmates, and he

16 did mention one inmate in particular.  He said he had the

17 conversation with several inmates, but there's one in

18 particular.  He couldn't remember his first name, but his

19 last name was Marshal.

20 Q.    And were all those admissions -- what language were

21 they made in?

22 A.    All in English.

23 Q.    Did you believe most of Mr. Villa's admissions to

24 you?

25 A.    Yes.

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    136

1  Q.   Why?

2  A.   Because everything he was telling me was something I

3  had already heard before from the other people that were

4  cooperating with the investigation, you know, yeah,

5  that's why.

6  Q.   Now, when you first took the stand, you talked

7  about your background and experience as an FBI agent.

8  Can you tell us if you've ever been suspended or

9  reprimanded?

10  A.   Yes.

11  Q.   And how long were you suspended?

12  A.   Five days, a week, one work week.

13  Q.   All right.  And why were you suspended?

14  A.   Misuse of a government vehicle.  You want me to

15  elaborate or --

16  Q.   Yeah.  Is that the only thing that was said?

17  A.   No, it was lack of candor not under oath.

18  Q.   And can you explain what happened and how you got

19  this five --

20  A.   Yeah.

21  Q.   -- this week-long suspension?

22  A.   Back in 2009 -- well, let me explain the policy.

23  FBI vehicles you're only supposed to have yourself in it,

24  other law enforcement, or prisoners that you're

25  transporting.  You're not allowed to have friends or

1    family inside your car for any reason.

2           Back in 2009 I was going through a divorce, and my

3    one -- I have three boys.  And at the time only one of

4    them drove, and he had my car at his work.

5    Q.   And when you say your work, you mean your personal

6    vehicle or your government vehicle?

7    A.   No, I'm sorry, my personal vehicle.

8    Q.   Okay.

9    A.   And because was at -- and he was at work.  My two

10   smaller children, who I believe were 5 and 9 at the time,

11   they were at school, and I could not find a ride for them

12   to get back from that school, and I couldn't get the

13   vehicle because my son had it at work.

14          And I was on my way home from work, so they were in

15   Versailles, and that's where I live.

16          So I went ahead and picked them up in my vehicle

17   because it's only one mile from my house, and I proceeded

18   to take them home.  Unfortunately, right on Main Street I

19   got in a car accident, and that was --

20   Q.   What kind of car accident?

21   A.   It was a fender bender.  Nobody was hurt.  It

22   was just -- when I was backing in to a parking spot to

23   get a pizza for dinner, and there was a car, a low rider

24   car.  I was in a big SUV is what I had as a vehicle at

25   the time.  And it was a low rider car, and I didn't see

1   it behind me, and it was just a fender bender.  It didn't

2   even really have any damage to it.

3   Q.    Okay.  You can continue.

4   A.    Well, then after that what the normal thing is after

5   you have a car accident, we called the police.  The

6   police department showed up.  They did a police report.

7   And per policy the next -- within the next business day I

8   tell my supervisor what happened.  So I told my

9   supervisor the next day that I was in a car accident, she

10  then -- the normal policy is have another FBI agent

11  interview all the witnesses to that because we have to do

12  our own report.

13       And so he interviewed the victim.  There were no

14  other witnesses, but then it was discovered that I had --

15  I did have my two children in the car, and so I was in

16  violation of the policy, first of all, having my kids in

17  the car.  But when I told my supervisor that I was in a

18  car accident, I guess -- I just wasn't even thinking

19  about it.  I just said I was in a car accident, but I

20  should have revealed the two kids were in the car.  So

21  that's it.

22  Q.    And so were -- you say you were cited for lack of

23  candor.  What was the lack of candor not under oath?

24  A.    Being that -- because I never lied about anything.

25  In their eyes I omitted the fact that I had the kids in

JOHN WHITEHEAD - DIRECT BY MR. McKINESS

1   the car, my children in the car.

2   Q.   Have you ever been suspended for anything else?

3   A.   No.

4   Q.   And when did you say this happened?

5   A.   2009.

6   Q.   And how long did you say you have been an FBI agent?

7   A.   20 years.

8   Q.   All right.  I want to get back to

9   Mr. Villa-Castaneda's admissions to you.  After he told

10  you corroborating statements, did he tell you anything

11  else?

12  A.   Well, yeah.  He gave me the -- he wanted to provide

13  a reason for saying everything he told me.  Is that what

14  you're referring to?

15  Q.   Sorry, say that again.

16  A.   You mean in addition to him being -- him providing a

17  reason, like was he serious about it or not?

18  Q.   Sure.

19  A.   Yeah, okay.  After he commented on everything, he

20  had all these several conversations about wanting to kill

21  Mr. Duncan and how to do it and involving exchange of

22  money for it.  He then said he was just joking.  He had

23  no intention of harming Mr. Duncan.

24  Q.   And did you believe him?

25  A.   No.

JOHN WHITEHEAD - DIRECT BY MR. McKINESS                    140

1   Q.    Why not?

2   A.    The reason I didn't believe him is, you know, it's

3   one thing to say, you know, you're really upset with

4   someone, say I would like to kill that person, but to go

5   into that much details not once but on several, several,

6   several occasions, that's why I didn't believe him.

7   Q.    And when you say that much detail, what specific

8   things are you referencing?

9   A.    When you're providing details as far as how to do

10  it, that you want him killed, to use acid, to use a gun,

11  to arrange -- to provide the place, the idea of the place

12  to the exchange of the money with the sister, where the

13  money was hidden in the speakers, and wanted him -- also

14  the detailed amount, $15,000 beforehand and 10,000 after

15  the deal was done.  That's a lot of details.

16        And, oh, and one other thing.  Also providing his

17  sister's telephone number, not just mentioning --

18  Q.    To who?

19  A.    To Mr. Marshal, but actually providing a way to

20  contact the sister.

21             MR. McKINESS:  No further questions,

22  Your Honor.

23             THE COURT:  All right.  Thank you.

24             Okay.  Ladies and gentlemen, we'll take our

25  break after the completion of this witness's testimony.

1                    CROSS-EXAMINATION

2    BY MR. ALLEN:

3    Q.    Good afternoon, Agent Whitehead.

4    A.    Good afternoon.

5    Q.    So when you interviewed Mr. Villa at the Woodford --

6    I'm sorry, the Grayson County Detention Center --

7    A.    Yes, sir.

8    Q.    -- he was still awaiting trial in his federal case;

9    correct?

10   A.    Yes.

11   Q.    Okay.  So he was in federal custody at the time?

12   A.    Yes.

13   Q.    And that would have been, I think, in the custody of

14   the United States Marshal Service; correct?

15   A.    Yes.

16   Q.    I mean, that's a state facility, but he was in

17   federal custody; correct?

18   A.    Yes.

19   Q.    Okay.

20   A.    Yeah, I was just thinking DA was the investigating

21   agency.

22   Q.    Right.

23   A.    Yes, sir.

24   Q.    And to your knowledge he had had -- he had retained

25   an attorney for his drug case; correct?

1   A.   Yes.

2   Q.   Okay.  And his attorney was not there for the

3   interview; correct?

4   A.   No.

5   Q.   And it is true, I know you've spoken about who spoke

6   English or what, but Mr. Villa is not a native English

7   speaker; correct?

8   A.   From what I understand, yes.

9   Q.   Let me say it a different way.  His native language

10  is Spanish.  He would be more comfortable speaking

11  Spanish; correct?

12  A.   Yeah, that's what I've been told.  I just -- I've

13  never heard him speak Spanish, so that's why I'm

14  answering it that way.

15  Q.   And the document that's been marked as Government's

16  Exhibit 2, I believe, the Miranda rights, when you -- the

17  FBI has a Spanish version of that form; correct?

18  A.   Yes, they do.

19  Q.   And you did not provide him with a Spanish version

20  of that form?

21  A.   That's correct.

22  Q.   And also the FBI employs interpreters?

23  A.   Yes.

24  Q.   Okay.  But you did not use an interpreter at the --

25  A.   No.

```
 1  Q.    -- time; correct?

 2  A.    No.

 3           MR. ALLEN:  Your Honor, if I may approach the

 4  Elmo.

 5           THE COURT:  Yes, sir.

 6  BY MR. ALLEN:

 7  Q.    Agent Whitehead, you've discussed this form, the

 8  rights form, in some detail here.  Who wrote the

 9  statement at the top here?

10  A.    Grayson County Detention Center?

11  Q.    Right.

12  A.    I did.

13  Q.    Okay.

14  A.    Yes, sir.

15  Q.    So you noted the time of 1:57?

16  A.    Yes.

17  Q.    Okay.  And scrolling to the bottom, and you

18  testified that the time that you signed this, the

19  witnesses signed this, was 2:00 p.m.?

20  A.    That's correct.

21  Q.    So approximately three minutes if you factor in

22  scribbling time, maybe --

23  A.    Yes.

24  Q.    -- two-and-a-half?

25  A.    Yes.
```

1   Q.   And you testified that your interview was not

2   recorded; correct?

3   A.   Correct.

4   Q.   And you've also testified; correct, the FBI does

5   have a policy about recording interviews to --

6   A.   Yes.

7   Q.   -- certain exceptions?

8   A.   Yes.

9   Q.   And that policy was in place at the time you

10  interviewed Mr. Villa; correct?

11  A.   Yes.

12  Q.   All right.  Are you familiar with the memorandum

13  that sets forth that policy?

14  A.   Yes, sir.

15            MR. ALLEN:  Your Honor, if I may have the Court

16  security officer -- I'm going to hand you what's marked

17  as Defendant's Exhibit 1.

18            THE WITNESS:  Yes.

19            THE COURT:  Yes, sir.

20  BY MR. ALLEN:

21  Q.   Are you familiar with that document, sir?

22  A.   Yes.

23  Q.   Okay.  What is it?

24  A.   It's the policy to record statements you were just

25  referring to.

 1  Q.    Okay.  Who issued that policy?

 2  A.    James Cole, the Deputy Attorney General.

 3  Q.    Okay.  And it lists a variety of different federal

 4  agencies, but one of those is the director of the Federal

 5  Bureau of Investigation; correct?

 6  A.    Yes.

 7  Q.    That would ultimately be your employer; right?

 8  A.    Yes.

 9  Q.    Okay.  And in the course of your employment with the

10  FBI, you have seen this memorandum; correct?

11  A.    Yes.

12  Q.    Okay.  Does this memo -- does this accurately set

13  forth the memorandum put forth by the DOJ to the best of

14  your knowledge?

15  A.    Yes.

16          MR. ALLEN:  Okay.  Your Honor, I move for the

17  admission of this document.

18          THE COURT:  All right.  Any objection?

19          MR. McKINESS:  No objection.

20          THE COURT:  Defendant's Exhibit 1 will be

21  admitted.

22          MR. ALLEN:  Your Honor, may I publish this

23  document?

24          THE COURT:  Yes, sir, you may.

25      (Whereupon, Defendant's Exhibit Number 1 was

 1  admitted into the record.)

 2              MR. ALLEN:  I apologize ahead of time.  I have

 3  some highlights on my copy here but...

 4  BY MR. ALLEN:

 5  Q.    Now, Agent Whitehead, if you turn to paragraph 1, it

 6  says presumption of recording; correct?

 7  A.    That's correct.

 8  Q.    That says, "There is a presumption that the

 9  custodial statement of an individual in a place of

10  detention will be electronically recorded, subject to

11  certain exceptions."

12        Correct?

13  A.    Yes.

14  Q.    Okay.  And if you go down to paragraph (b), "This

15  presumption applies only to interviews of persons in FBI,

16  DEA, ATF, or USMS custody."  What does USMS mean?

17  A.    United States Marshal Service.

18  Q.    So you have testified that Mr. Villa was in the

19  custody of the United States Marshal at the time you

20  interviewed him; correct?

21  A.    That's correct.

22  Q.    So this policy would otherwise apply subject to

23  certain other exceptions; correct?

24  A.    Yes.

25  Q.    Okay.  And you discussed -- you testified about

1   exceptions.  If you would turn to page 3 real quick.

2   A.    Okay.

3   Q.    And you testified that one exception may be the

4   change of venue; in other words, the changing from an

5   interview room to say the office; correct?

6   A.    Yes.

7   Q.    Okay.  Now, paragraph 2 would you just read that --

8   you don't have to go down to sub-paragraph (a), but just

9   read that paragraph 2, please.

10  A.    Where it says exemptions to the presumption.

11  Q.    Exceptions to the presumption.

12  A.    That paragraph?

13  Q.    Yes, sir, if you will.

14  A.    Okay.  "A decision not to record any interview that

15  would otherwise presumptively be recorded under this

16  policy must be documented by the agent as soon as

17  practical.  Such documentation shall be made available to

18  the United States Attorney and should be reviewed in

19  connection with periodic assessment of this policy by the

20  United States Attorney and the Special Agent in charge or

21  Designees."

22  Q.    Or.  So that clearly says, there are exceptions

23  I understand --

24              THE COURT:  I'm sorry?

25              THE INTERPRETER:  I'm sorry, Your Honor.  For

1   the interpreter, could that be read again, and I would

2   sit over here?

3          THE COURT:  Yes.  That's fine.

4          THE WITNESS:  "A decision not to record any

5   interview that would otherwise presumptively be recorded

6   under this policy must be documented by the agent as soon

7   as practical.  Such documentation shall be made available

8   to the U.S. Attorney and should be reviewed in connection

9   with a periodic assessment of this policy by the

10  United States Attorney and the Special Agent in charge or

11  their designees."

12         THE INTERPRETER:  Thank you.

13  BY MR. ALLEN:

14  Q.   So this requires, doesn't it, sir, that if an

15  exception were to be applied, that you would have to

16  document that; correct?

17  A.   Yes, according to this, that paragraph, yes.

18  Q.   Okay.  And you did not document any exception here;

19  correct?

20  A.   No.

21  Q.   Okay.  Now, let's read on through the exceptions,

22  paragraph (a), "refusal by interviewee."  Mr. Villa did

23  not refuse to have his interview recorded; correct?

24  A.   Correct.

25  Q.   That's because you never told him he had the right

1    to have it interviewed; correct -- to record it; correct?

2    A.    That's correct.

3    Q.    "Public safety, national security exception," you

4    haven't testified that that's an exception that would

5    apply here; correct?

6    A.    Correct.

7    Q.    "Recording not reasonably practical."  I assume

8    that's what you mean by change of venue; correct?

9    A.    Yes.

10   Q.    Okay.  But again that was not documented to the

11   United States Attorney?

12   A.    No, just verbal with my CDC.

13   Q.    And residual exception.  But this says, if I'm

14   correct, "This exception is to be used sparingly;"

15   correct?

16   A.    Correct.

17   Q.    All right.  And so since you didn't record it, in

18   your practice you have at times, I assume, had defendants

19   write their own statements or sign a statement at points;

20   correct?

21   A.    No.  We've never done a written statement before.

22   Q.    That would be opposed to a confession?

23   A.    Correct.

24   Q.    Okay.  So there's no -- the only written statement

25   here about what Mr. Villa said would be your memo to the

1   file; is that correct?

2   A.    That's correct.

3   Q.    Okay.  And you recall that -- do you recall the date

4   that you drafted your memo, or be more specific, the

5   FD-302 form?

6   A.    No, it would be on my 302.

7          MR. ALLEN:  Your Honor, if I may have the Court

8   security officer hand -- not for an exhibit but to

9   refresh his memory?

10          THE COURT:  Yes, sir, you may.

11          MR. ALLEN:  Thank you.

12  BY MR. ALLEN:

13  Q.    Agent Whitehead, does that refresh your memory as to

14  when you drafted your memo?

15  A.    Yes, it was November 18th.

16  Q.    Okay.  So his interview took place on November 6th;

17  correct?

18  A.    Uh-huh.

19  Q.    And you drafted your memo on November 18th?

20  A.    Yes, sir.

21  Q.    Okay.  It's about 12 days --

22  A.    Yes.

23  Q.    -- after that?  And you also testified, did you not,

24  before a grand jury in this matter?

25  A.    Yes.

1  Q.   Do you recall when that was?

2  A.   When that was, no, I don't.

3  Q.   Okay.  Would that have been about February of 2017

4  of this year?

5  A.   That seems accurate.

6  Q.   Okay.  You've mentioned my client's sister

7  Elizabeth's phone number being handed out.

8       Did you ever -- did the government ever search her

9  apartment?

10 A.   No.

11 Q.   Did you ever speak with Ms. Villa?

12 A.   No.

13 Q.   In fact, you'd agree Ms. Villa took no real pot --

14 part in any plot, wouldn't you say?

15 A.   I'm sorry, say that again.

16 Q.   I'm sorry, I mumbled my words.  You would say

17 Ms. Villa took no real part in any of this?

18 A.   No, she did not.

19 Q.   Now, you testified before about being cited.  Is

20 that call the FBI offense code?

21 A.   What are we talking about now?

22 Q.   You previously had been cited in your employment for

23 lack of candor; is that correct?

24 A.   Yes.

25 Q.   And so you had testified that there really were two

1  violations; the use of the car by family members, and

2  also the lack of candor; correct?

3  A.   Yes.

4  Q.   Okay.  And the lack of candor would have been

5  omitting the truth from your employer.  That would be the

6  truth that somebody who wasn't supposed to be in the car

7  was in the car; correct, is that accurate?

8  A.   That's correct.

9  Q.   Just a few more questions, Mr. -- Agent Whitehead.

10 But you had testified that Mr. Villa, in fact, told you

11 that he did not really want Mr. Duncan killed; is that

12 correct, those were his statements to you?

13 A.   Yes, sir.

14            MR. ALLEN:  Your Honor, I have no further

15 questions.

16            THE COURT:  Thank you, Mr. Allen.

17            See if there is any redirect.

18            Mr. McKiness.

19            MR. McKINESS:  Briefly, Your Honor.

20                       REDIRECT EXAMINATION

21 BY MR. McKINESS:

22 Q.   There was some discussion about Mr. Villa's sister.

23 Did you attempt to contact Mr. Villa's sister at any

24 point?

25 A.   Yes.

JOHN WHITEHEAD - REDIRECT BY MR. McKINESS          153

1  Q.   And did you plan on searching her home?

2  A.   Yes.

3  Q.   Did you actually do those things?

4  A.   No, I did not.

5  Q.   And why not?

6  A.   The reason is the -- this is getting into, you know,

7  the number being provided to Mr. Marshal.  When he called

8  her and she didn't know what he was talking about, my

9  whole goal was that if she did -- if she was a willing

10 participant, we were going to be there waiting at the

11 Kroger in Winchester, we were going to arrest her for

12 being involved in it, and then they were going to serve

13 a search warrant on her house, mainly looking for the

14 money inside the speakers, but that never materialized.

15 Q.   And that's because she was not a willing

16 participant?

17 A.   That's correct.

18 Q.   And I believe we may have neglected to do this.

19           MR. McKINESS:  Your Honor, may the

20 United States approach the lectern?

21           THE COURT:  Yes, sir.

22 BY MR. ALLEN:

23 Q.   I put Government's Exhibit 2 back on the Elmo there.

24 Can you read to the jurors the rights that are being

25 waived there or the information given to the -- Mr. Villa

1  in his Miranda Advice of Rights?

2  A.   Yes, sir.   "Before we ask you any questions, you

3  must understand your rights.

4       "You have the right to remain silent.  Anything you

5  say can be used against you in court.

6       "You have the right to talk to a lawyer for advice

7  before we ask you any questions.

8       "You have the right to have a lawyer with you during

9  questioning.

10      "If you cannot afford a lawyer, one will be

11 appointed for you before any questioning, if you wish.

12      "If you decide to answer questions now without a

13 lawyer present, you have the right to stop answering at

14 any time."

15 Q.   And what's the consent portion of that say?

16 A.   "I have read this statement of my rights, and I

17 understand what my rights are.  At this time I am willing

18 to answer questions without a lawyer present."

19 Q.   And you were asked about the interview taking place

20 on the 6th and your report being drafted on the 18th.  I

21 guess that's a 12-day difference?

22 A.   Uh-huh.

23 Q.   Would you -- can you explain if or why there was a

24 12-day difference?

25 A.   We had -- during that time frame, obviously, this

1    case took priority over everything else, and so there

2    were several different interviews.  Of course, we do have

3    other cases going on, and just being busy with everything

4    else going on with this case to actually sit down and

5    type this up, we already -- I already had the information

6    in my notes, or whatever, so it wasn't going anywhere.

7    So just when I finally had time to sit down and type it

8    up is when I did.

9    Q.   And is the type of information that is in your

10   report the type of information you think you might have

11   forgotten over the course of 12 days?

12   A.   Would I --

13   Q.   Is that something you think you would have forgotten

14   the information that's in your report?

15   A.   Oh, no.  Anything that was in the details of the

16   interview?

17   Q.   Right.

18   A.   No.  No, sir.

19            MR. McKINESS:  Nothing further, Your Honor.

20            THE COURT:  Thank you.

21            Any recross, Mr. Allen?

22            MR. ALLEN:  Maybe a few questions, Your Honor.

23   Thank you.

24            I'm sorry, could I have one second, Your Honor?

25            THE COURT:  Yes, sir.

                          RECROSS-EXAMINATION

BY MR. ALLEN:

Q.   Agent Whitehead, you testified that you prepared

notes from your interview with Mr. Villa-Castaneda?

A.   Yes.

Q.   Did you provide those to the United States

Attorney's office?

A.   No, I did not.

Q.   Okay.  So those have not been provided to me, is

that -- are you aware of whether those have been provided

to my office or not?

A.   I -- probably not.

Q.   Do you have those notes with you today?

A.   No, I do not.

Q.   Okay.  Let's get back to just a couple questions

about Spanish-speaking.  Neither you nor I speak Spanish;

would that be fair?

A.   I have no idea if you do or you don't.

Q.   Okay.  You would agree though someone's level of

understanding of a language might vary; correct?

A.   Correct.

Q.   Okay.  So one might know a little bit of Spanish, a

little bit of English.  That doesn't mean; correct, that

they would know, you know, significant amount of Spanish

or English to be able to understand what is being told to

 1  them; correct?

 2  A.    Correct.

 3              MR. ALLEN:  Your Honor, I have no questions.

 4              I would like to recover -- have the Court

 5  security officer recover my exhibits.

 6              And if we could approach after this witness,

 7  Your Honor.

 8              THE COURT:  All right.  What we'll do is we're

 9  going to take a break for the jury, and we'll do that

10  during the recess.

11              MR. ALLEN:  Yes.

12              THE COURT:  Ladies and gentlemen, we'll take

13  about a 20-minute recess at this time.

14              Please keep in mind the admonitions that you

15  were given previously.  Please don't discuss the case

16  among yourselves while we are in recess.

17              The jury will be excused for 20 minutes.

18       (Whereupon, the juror members leave the courtroom.)

19              THE COURT:  All right.  Thank you.

20              The record will reflect that the jury is not

21  present.

22              And if you-all could please be seated.

23              Let's recover those notes.  I think the FBI 302

24  that is highlighted, I believe, is Mr. Allen's copy.

25  It's not an exhibit.  There may also be an exhibit on the

JOHN WHITEHEAD - RECROSS BY MR. ALLEN                    158

1   Elmo.

2              Is that your copy?

3              MR. McKINESS:  It's for the Court.

4              THE COURT:  All right.

5              MR. McKINESS:  I think we may have already

6   given the Court a copy.

7              THE COURT:  All right.

8              MR. ALLEN:  And that's my exhibit there,

9   Your Honor.

10             THE COURT:  All right.  Thank you.

11             MR. ALLEN:  I think there's another one on the

12  Elmo too.

13             THE COURT:  Why don't you-all come up and get

14  your materials?

15             Mr. Dearborn may not know who's on first or

16  what's on second.

17             MR. McKINESS:  I believe you've got that one.

18             THE CLERK:  I have that one.  So that's your

19  copy.

20             MR. McKINESS:  You want us to approach now?

21             THE COURT:  I'm not sure that you need to

22  inasmuch as the jury is not present.  That's why I was

23  going to go ahead and send them out before we took our

24  break.

25             All right.  Mr. Allen?

1          MR. ALLEN:  Your Honor, I feel obliged to at

2     least note my objection to the record.  Mr. Whitehead

3     testified that he has notes from his interview with

4     Mr. Villa-Castaneda.

5          THE COURT:  Well, he said he had notes.  I

6     don't know that he still has them or not.  I suppose

7     that's the question.

8          MR. ALLEN:  Yeah.  I mean, if he still has

9     those notes, I think obviously we would be entitled to

10    them.

11         SPECIAL AGENT WHITEHEAD:  Honestly I don't

12    think I have them.  I never submitted notes in 20 years.

13    It's always been the 302 because that's the summary of

14    the notes.

15         THE COURT:  I understand.  I never had the

16    issue come up so I'm not sure what the answer is going to

17    be.  So I'm going to have the parties brief it if it's an

18    issue here.

19         MR. ALLEN:  If it's -- I'll be happy to submit

20    a brief, Your Honor.  I just in --

21         THE COURT:  Well, we'll have to recess for the

22    night so you can submit your brief, and then we can

23    continue in the morning is the issue.

24         MR. McKINESS:  Your Honor, if I may.

25         THE COURT:  Yes, sir.

1             MR. McKINESS:  I believe that if the notes

2  exist, then the defense is entitled to them, but if they

3  don't then --

4             MR. ALLEN:  If they no longer exists, I mean, I

5  don't think there's --

6             SPECIAL AGENT WHITEHEAD:  I really don't think

7  I do.  I'm not --

8             THE COURT:  We can -- I'm sure maybe he'll

9  place a call or something and have somebody search or

10 something.

11            MR. ALLEN:  I don't wish to postpone the trial

12 and brief this particular issue.  He testified he had

13 notes.  In previous cases I've been getting copies of

14 notes.  If he's testifying that notes no longer exist --

15            THE COURT:  I think he's saying he doesn't

16 know.  I think he doesn't know at this point, that he's

17 always followed practice, which is to submit a 302, which

18 is prepared based upon an agent's note, 302s then

19 prepared and given to opposing counsel, which is the

20 procedure he's followed here, and he doesn't know at this

21 point if the notes exist.

22            Is that fair?

23            SPECIAL AGENT WHITEHEAD:  Yes.  Yes, sir.

24            THE COURT:  All right.

25            MR. ALLEN:  At this point, Your Honor, I don't

 1   think additional briefing is necessary.

 2              THE COURT:  All right.  So you don't -- you

 3   really don't have the grounds for questioning the 302,

 4   the information in the 302, and no grounds to establish

 5   that something in the notes will be different than what's

 6   been provided?

 7              MR. ALLEN:  Based on what I've been given,

 8   Your Honor, no.

 9              THE COURT:  All right.  All right.  Very well.

10              Before we take our break, I think we're moving

11   along probably at the pace the parties anticipated, and

12   there may be one more witness for the government; is that

13   correct?

14              MR. McKINESS:  Yes, sir, that's correct.

15              THE COURT:  All right.  And then will you be

16   ready to go, Mr. Allen, at that point?

17              MR. ALLEN:  I will be, Your Honor, and I will

18   discuss with Mr. Villa whether he wants to testify, but

19   depending on that I'm somewhat hopeful that we would be

20   done by the end of the day.

21              THE COURT:  Do you anticipate that you'll -- if

22   Mr. Villa doesn't testify, do you anticipate at this time

23   that you'll have any witnesses to call?

24              MR. ALLEN:  At this point I will have one

25   witness, Your Honor.

 1                THE COURT:  One witness, okay.

 2                MR. ALLEN:  And I don't think he'll go very --

 3  he won't go for a significant amount of time.

 4                THE COURT:  All right.  Let me ask you about

 5  this.  If we get to the point where we've finished all

 6  the proof in the case, and we have enough time for

 7  closing arguments but not instructions, would you all

 8  prefer to argue this afternoon, break for the evening,

 9  and then I would instruct tomorrow morning and submit the

10  case to the jury at that point?

11                MR. McKINESS:  I'm sorry, could you say that

12  again?  I wasn't sure I got that.

13                THE COURT:  Yes, sir.  If we finish with the

14  proof this afternoon and you have sufficient time for

15  arguments, would you prefer to go ahead and argue the

16  case this afternoon, and then we would come back in the

17  morning for the jury instructions?  Or would you prefer

18  to argue and have the jury instructed at the same -- on

19  the same day?

20                MR. ALLEN:  Me, personally, Your Honor, I would

21  prefer to do the closing at the same time as we do the

22  instructions.

23                MR. McKINESS:  I would agree with that.

24                THE COURT:  All right.  Just wanted to give you

25  the option if you wanted to proceed in that manner.

1              MR. McKINESS:  Thank you, Your Honor.

2              THE COURT:  Let's see, we'll take -- I think we

3    have 15 minutes left, so we'll take a 15-minute recess.

4    The jury will be back in 15.  I believe it was about 2:17

5    when we excused the jury, so we have 15 minutes for our

6    break.

7              MR. McKINESS:  15 minutes from now?

8              THE COURT:  Yes, sir.  Thank you.

9         (Whereupon, a recess was taken at 2:25 p.m.,

10   and Day 1 of the Jury Trial proceedings continued at

11   2:40 p.m., on the record in open court, without the juror

12   members present, as follows.)

13             THE COURT:  All right.  Counsel, I understand

14   the next witness is in the holding cell.

15             MR. McKINESS:  Yes, sir.

16             THE COURT:  Would the parties prefer to go

17   ahead and bring him out now and have him seated on the

18   witness stand?

19             MR. McKINESS:  That would be fine with me.  If

20   he is already in here, we don't have to parade him

21   through.

22             THE COURT:  Very well.  We will have the

23   marshals bring the next witness in.

24        (Whereupon, the witness entered the courtroom.)

25             THE CLERK:  Would you raise your right hand?

 1                    THE COURT:  No, no, no.  He needs to be sworn

 2   in front of the jury.

 3                    Please be seated in the witness box.

 4                    All right.  Thank you.

 5                    We'll bring the jury in.

 6        (Whereupon, the juror members enter the courtroom.)

 7                    THE COURT:  All right.  Thank you, and please

 8   be seated.

 9                    Once again, the record will reflect that all

10   members of the jury are present.

11                    Defendant and counsel are present in the

12   courtroom.

13                    And, Mr. McKiness, if you'd like to announce

14   your next witness, and then we'll have the clerk

15   administer the oath.

16                    MR. McKINESS:  Yes, sir.  The United States

17   next witness is Mr. Gill Garrett.

18                    THE COURT:  Thank you.

19                    Madam Clerk, if you will please administer the

20   oath to Mr. Garrett.

21                    THE CLERK:  Yes, Your Honor.

22                    Please stand and raise your right hand.

23                    Do you swear or affirm that the testimony

24   you're about to give in this matter shall be the truth,

25   the whole truth, and nothing but the truth, as you shall

1   swear unto God, or affirm, subject to the penalty of

2   perjury?

3           THE WITNESS:  Yes, I do.

4           THE CLERK:  Thank you.

5           THE COURT:  Thank you.

6       Mr. McKiness, you may proceed.

7       MR. McKINESS:  Thank you, Your Honor.

8                   GILL GARRETT,

9   having been first duly placed under oath, was examined

10  and testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. McKINESS:

13  Q.   Mr. Garrett, would you please introduce yourself to

14  the jury?

15  A.   My name is Gill Garrett.

16  Q.   And are you currently incarcerated?

17  A.   Yes, I am.

18  Q.   And how long is your current sentence?

19  A.   240 months.

20  Q.   When is your release date?

21  A.   2033.

22  Q.   And back in 2015 were you incarcerated?

23  A.   Yes, I was.

24  Q.   Where?

25  A.   Woodford County Detention Center.

1  Q.   While you were at Woodford County Detention Center,

2  did you have a chance to meet Mr. Edgar Villa-Castaneda?

3  A.   Yes, I did.

4  Q.   And how did you know Mr. Villa-Castaneda?

5  A.   He was in the same cell with me.

6  Q.   Did you know him by any other names?

7  A.   Flaco.

8  Q.   Can you tell the Court how you met Mr. Villa?

9  A.   I met him in Woodford County through we just -- we

10  just started talking as cellmates.

11  Q.   And at what point did you and Mr. Villa become

12  cellmates?

13  A.   August 5th, 2015.

14  Q.   And can you explain to the Court what your cell

15  looked like?

16  A.   It was a four-man cell broke into two rooms, two man

17  per cell.

18  Q.   All right.  And who was in your specific cell?

19  A.   There was Flac -- Flaco, Edgar Villa, I believe his

20  name is.  There was another man named Vernon Saunders,

21  and there was another Hispanic guy.  His nickname was

22  Sosa I believe.  And there was me.

23  Q.   All right.  And were you -- did you ever share a

24  bunk with Mr. Villa?

25  A.   No, I never shared a bunk with him.

1  Q.    You were just in the same cell area?

2  A.    Yes.

3  Q.    And how long did you and Mr. Villa share a cell?

4  A.    I would say at least two months.

5  Q.    And you began being cellmates with him, you said

6  back in August of 2015?

7  A.    Yes.

8  Q.    So two months would be August and September?

9  A.    Yes.

10 Q.    Can you tell us about your relationship with

11 Mr. Villa?

12 A.    We became -- I would -- I would call him as a friend

13 then, and we were -- we conversated a lot.  You know, we

14 talked late nights.

15 Q.    What kind of things would you guys talk about?

16 A.    We would talk about his case and talk about mine.

17 Q.    Did you guys talk about anything else other than

18 just your cases?

19 A.    Pertaining to what?

20 Q.    Did you ever have personal conversations with each

21 other?

22 A.    Pertaining to family or outside our cases?

23 Q.    Yeah.  Like family things, not dealing specifically

24 with your criminal charges.

25 A.    Yes.  We talked about his family, and we talked

GILL GARRETT - DIRECT BY MR. McKINESS                    168

1   about my girlfriend sometimes.

2   Q.   And when you guys would have these communications

3   and conversations late night, what language were you

4   speaking?

5   A.   English.

6   Q.   Do you speak Spanish?

7   A.   No.

8   Q.   So why were your conversations in English?

9   A.   Because I couldn't speak Spanish.

10  Q.   Let me ask this another way.  Did Mr. Villa speak

11  English to you?

12  A.   Yes.

13  Q.   And is he here in this courtroom today?

14  A.   Yes, he is.

15  Q.   And could you please point him out?

16  A.   (Witness indicates)

17  Q.   Could you describe who you're pointing at?

18  A.   Edgar Villa, Flaco.

19  Q.   I mean, describe -- can you describe?  There's two

20  people over where you're point at.

21  A.   He's got black hair, headphones, a dress shirt,

22  dress pants.  He's the Spanish guy.

23          THE COURT:  The witness -- the record will

24  reflect the witness, Mr. Garrett, has identified the

25  defendant.

GILL GARRETT - DIRECT BY MR. McKINESS                592

1   BY MR. McKINESS:

2   Q.   And is that the Mr. Villa that you know as Flaco?

3   A.   Yes.

4   Q.   Did you and Mr. Villa ever talk about your

5   prosecutors?

6   A.   We talked about his.

7   Q.   And did you guys share the same prosecutor?

8   A.   No.

9   Q.   And when you say he talked about his, what did he

10  say about his prosecutor?

11  A.   He said his prosecutors was trying to give him a lot

12  of time, and that he didn't like his prosecutor.

13  Q.   Did he say why he didn't like his prosecutor?

14  A.   Because he was giving him a lot of time and keeping

15  him away from his son.

16  Q.   How did you and Mr. Villa begin talking about his

17  prosecutor and his case?

18  A.   Well, we started -- we talked about his case, and

19  then it sort of -- it just leaned towards him getting

20  emotional, I suppose, and the prosecutor's name came up,

21  and, you know, he just told me how he felt about the

22  prosecutor.

23  Q.   What did he -- what did he say he felt about that

24  prosecutor?

25  A.   He wanted to kill him.

GILL GARRETT - DIRECT BY MR. McKINESS                    170

1  Q.   And did he tell you the name of his prosecutor?

2  A.   Duncan.

3  Q.   Now, when you say that he said he wanted to kill

4  him, you're referring to Mr. Duncan?

5  A.   Yes.

6  Q.   And did he give you anymore detail or -- about what

7  he wanted to do to Mr. Duncan?

8  A.   He went into detail on several occasions.

9  Q.   What did he say to you?

10 A.   Well, the first one was, you know, he -- you know

11 where I talked about my girlfriend, he asked -- he knew

12 that, you know, she was an addict, and that, you know,

13 she was -- if I had a gun and if I did, she could get it,

14 and he would give -- the amount of $10,000, and that

15 would be -- that would help put money in my books and

16 help support her drug habits.  That's one of the

17 occasions.

18 Q.   And how many occasions did he talk about killing

19 Mr. Duncan?

20 A.   I would say a handful.

21 Q.   So more than once?

22 A.   Yes.

23 Q.   And the other times what did he say about

24 Mr. Duncan?

25 A.   Well, when I declined the offer, the second one was

1    that he just told me that, you know, that when he talked

2    to the prosecutor, that he looked the prosecutor in the

3    eyes and said, I want to remember your face even if it's

4    10, 15, 20 years from now.  And then he went on to say

5    that he could -- when he got out of prison that he could

6    come to the courthouse and then shoot the prosecutor with

7    a .22 rifle to be exact with a scope on it.  He could run

8    up and shoot him, or else he could do it from a truck

9    that he has.

10   Q.    What other things did Mr. Villa tell you about how

11   he wanted to kill Mr. Duncan?

12   A.    Another one was he made a suggestion about some type

13   of acid and water inside a container, that you can shake

14   it up and throw it at the prosecutor, and it would kill

15   him because he said something about being in the Army or

16   something like that for four years or so.

17   Q.    And did he ever give you any examples of how to make

18   that concoction you just mentioned?

19   A.    He told me how much water to put in there and the

20   rest with acid.  He said something, he learned that in

21   the military.

22        And one time I remember watching Sci-Fi, and they

23   had something similar to that, and he said, see, there it

24   goes.

25   Q.    And do you recall Mr. Villa ever offering to pay

GILL GARRETT - DIRECT BY MR. McKINESS                    172

1  someone to kill Mr. Duncan?

2  A.   Besides me, I remember going to the rec room where

3  we do our haircuts, and I heard several other guys

4  talking about him being --

5          MR. ALLEN:  Objection, Your Honor.  May we

6  approach?

7          THE COURT:  I'll sustain the objection.  If you

8  could, don't refer to what others would have said.

9          I'll let you repeat the question.  You can

10  narrow the question for him.

11          MR. McKINESS:  All right.

12  BY MR. McKINESS:

13  Q.   I asked you if you knew of any instances where

14  Mr. Villa made offers to pay someone to kill Mr. Duncan,

15  but in answering your question -- in answering the

16  question, please refrain from saying what other people

17  told you or what you heard other people say.

18  A.   Sir, well, I heard him -- I heard -- okay,

19  besides --

20  Q.   Let me stop you.  You can say what he told you, but

21  you can't say what anyone else told you.

22  A.   Okay.  If I heard other people talking about it,

23  that's what I hear.  No one told me that -- they didn't

24  tell me themselves.  I heard them talking about it.

25  Q.   Okay.

1   A.   Is that --

2               MR. McKINESS:  I'll move on, Your Honor.

3               THE COURT:  Okay.

4   BY MR. McKINESS:

5   Q.   But you said he offered you money or your

6   girlfriend?  What did you say about his offer of money?

7   A.   The offer was that he would pay -- pay my girlfriend

8   $10,000.  Okay.  This is what -- I told him that I had a

9   gun in my car.  The reason I -- I didn't really have one,

10  but I said that because his case was so high profile that

11  I sort of wanted to, you know, kind of be up there with

12  him to, you know, fit in with him, you know.  And so that

13  he just told me that if my girl -- that he had money

14  somewhere on the street.  It's a lot of money.  He even

15  showed me a piece of paper where they confiscated $12,000

16  and told me that he still had money on the street.  He

17  even said it would be like in a speaker box or stereo, or

18  it could be under the rug, that his girlfriend had it or

19  something put up.

20  Q.   And that money was supposed to go to your

21  girlfriend?

22  A.   Correct.

23  Q.   Did you have any other conversations with Mr. Villa

24  about killing Mr. Duncan?  Were there any other times

25  that he mentioned it to you?

GILL GARRETT - DIRECT BY MR. McKINESS                    174

```
 1  A.   Not that I can remember.

 2  Q.   Did you take Mr. Villa's threats seriously?

 3  A.   I felt that he was adamant about him.

 4  Q.   And what do you mean by that?

 5  A.   That he was serious.

 6  Q.   And why do you feel that way?

 7  A.   I can -- I can recall him crying, a tear maybe come

 8  out of his eye.  But the way he looked in my eyes I could

 9  tell he was serious.

10  Q.   And when you say the way he looked in your eye, and

11  tears coming out of his eyes, what was happening when he

12  was having those emotions?

13  A.   He was very emotional.

14  Q.   But what were you doing, what were you talking

15  about?

16  A.   Oh, we were sitting -- we were talking about

17  prosecutors in our cases, but it would always -- our

18  conversations would always lead to the prosecutor, but we

19  were sitting in his specific cell.

20  Q.   So you -- you say you took the threat seriously?

21  A.   Yes.

22  Q.   If you took the threat seriously, why didn't you

23  report the threats to anyone?

24  A.   I -- you know, I really didn't want to get involved

25  with his case because I already had so much going on
```

GILL GARRETT - DIRECT BY MR. McKINESS                    175

1  myself.  I was involved in so much myself.

2  Q.  And when you say that you had so much going on

3  yourself, you know, you were in jail.  Why were you in

4  custody?

5  A.  For a conspiracy case and distribution case.

6  Q.  Of?

7  A.  The distribution was of fentanyl, which led to

8  overdose death, and a conspiracy was with several drugs.

9  Q.  And that's why you were in Woodford County Detention

10  Center?

11  A.  Yes.

12  Q.  Now, were you interviewed by the FBI back in October

13  of 2015?

14  A.  Yes, I was.

15  Q.  When you were initially interviewed by the FBI, did

16  you halt the questioning for any reason?

17  A.  Yes, I did.

18  Q.  Why did you halt the questioning?

19  A.  In fear of -- I didn't want nobody know what

20  statements I was making.

21  Q.  So where was your interview with the FBI taking

22  place, in that first interview in 2015 that you halted?

23  A.  The first one was in Woodford County Detention

24  Center.

25  Q.  All right.  And are you saying that other people

GILL GARRETT - DIRECT BY MR. McKINESS                    176

1  would see you talking to him?

2  A.   That too, and because it's a really small jail.

3  Q.   Did you talk to the FBI again?

4  A.   Yes, I did.

5  Q.   And was that also in October 2015?

6  A.   It -- the interview wasn't -- the first interview

7  wasn't the same day as the second interview.

8  Q.   It wasn't the same day, but was it the same month?

9  A.   Yes.  Yes, it was.

10 Q.   Did anyone promise you anything in exchange for your

11 testimony here today?

12 A.   If I testify truthfully, time reduction.

13 Q.   All right.  And can you repeat what you just said

14 and explain what you mean by that?

15 A.   If I was to testify truthfully, then the government

16 would file a motion for a Rule 35, time reduction.

17 Q.   All right.  And so you're saying if you gave

18 truthful testimony, that the United States would move the

19 Court for reduction in your current sentence?

20 A.   Yes, sir.

21 Q.   And who would determine what kind of reduction you

22 would get?

23 A.   I believe the Judge.

24 Q.   Have you received any other benefits from the

25 government in exchange for your testimony here today?

GILL GARRETT - CROSS BY MR. ALLEN                    177

1  A.   No, sir.

2  Q.   Did you want to testify here today?

3  A.   Not at all.

4  Q.   Why not?

5  A.   I'm -- I know Mr. Villa, and I know his son very

6  well, and I was cellmates with his son.  We were really

7  close, and so I, you know, my heart goes out to him.

8           MR. McKINESS:  That's it, Your Honor.

9           THE COURT:  All right.  Thank you.

10          Mr. Allen?

11          MR. ALLEN:  Your Honor, I will just repeat my

12  Rule 26 motion at this time, if there are any --

13          THE COURT:  Any additional materials from this

14  witness?

15          MR. McKINESS:  No, sir.

16          THE COURT:  All right.  Your Honor.

17          MR. ALLEN:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19  BY MR. ALLEN:

20  Q.   Good afternoon, Mr. Gill.

21  A.   Good afternoon.

22  Q.   I'm sorry, Mr. Garrett, I'm sorry.

23       You testified that you are currently a federal

24  inmate; is that correct?

25  A.   Yes.

1   Q.    And you were indicted on or about September 15th of

2   2015.  Does that sound about right?

3   A.    No.  It was -- I would say -- I can't remember the

4   exact date.

5   Q.    Okay.

6   A.    But it was before December.

7   Q.    Okay.  And you testified that you were charged with

8   distributing fentanyl to someone who overdosed; correct,

9   and died?

10  A.    Yes.

11  Q.    And that was a two-count indictment?

12  A.    Two-count indictment, yes, sir.

13  Q.    You pled guilty to both counts; correct?

14  A.    Yes, sir.

15  Q.    Okay.  Now, at the time you were charged, I'm sure

16  your attorney explained this to you, you were facing a

17  mandatory -- a possible mandatory life sentence; is that

18  correct?

19  A.    Correct.

20  Q.    Okay.  And so if you recall, you entered into a plea

21  agreement, and in that plea agreement you agreed to

22  certain facts; correct?

23  A.    Yes.

24  Q.    Okay.  And among those facts would be -- correct me

25  if I'm wrong -- that on or about July 1st, 2015, you

 1  obtained counterfeit pills from a co-defendant,

 2  subsequently sold those co-defendant to a Ms. Berger

 3  Bowman, who subsequently ingested those in your presence.

 4  After she left your presence, is it correct, sir, that

 5  she subsequently ingested more pills and passed away.

 6      Is that correct?

 7  A.   I believe so.

 8  Q.   Okay.  And you accepted responsibility in your plea

 9  agreement for her death; is that correct?

10  A.   Yes, sir.

11  Q.   Okay.  Is it correct, sir, that you entered into

12  your plea agreements, let me see here, it would be April

13  of 2016?

14  A.   That's correct.

15  Q.   Okay.  And you gave your statements to the FBI and

16  in August, September -- August, September of 2015?  I'm

17  sorry, it would be October 2015, thereabouts; is that

18  correct?

19  A.   That's correct.

20  Q.   Okay.  So this was before you even pled guilty and

21  you were sentenced on your current federal offense;

22  correct?

23  A.   That is correct.

24  Q.   Okay.  How old are you now, sir?

25  A.   31.

1  Q.   Okay.  And you were sentenced to 20 years?

2  A.   Yes, sir.

3  Q.   Okay.  Of course, at the time you spoke with the FBI

4  you were facing a mandatory life sentence; correct?

5  A.   Yes, sir, that's correct.

6  Q.   Which would have meant you would have spent the

7  majority of your life in federal custody; correct?

8  A.   It would have been my natural life.

9  Q.   Your natural life.

10      And just going back to your current federal

11 conviction, it's true, isn't it, part of the reason you

12 were facing such a stiff penalty was that you have other

13 felony drug convictions.  Isn't that correct, sir?

14 A.   Yes, sir.

15 Q.   Okay.  One would be from Fayette County from

16 August 2014.  Does that sound right, sir?

17 A.   Yes, sir.

18 Q.   And the other one would be from February 2009,

19 conspiracy to traffic in a controlled substance?

20 A.   Yes, sir.

21 Q.   Okay.  Now, as far as the Fayette County conviction

22 from August '14, that also included unlawful transaction

23 with a minor; is that correct?

24 A.   That's correct.

25 Q.   Okay.  Now, in your statements to the FBI, it's

1   true, isn't it, that you told him Flaco is a nice guy and

2   a very humble person?

3   A.    That is correct.

4   Q.    I believe you already testified you're friendly or

5   friends with his son; correct?

6   A.    Correct.

7   Q.    You testified previously that when you first spoke

8   with Mr. Villa, or in one of your conversations, you said

9   you had a gun in your car?

10  A.    Yes.

11  Q.    And that was, in fact, false; correct?

12  A.    Yes.

13  Q.    Okay.  And you said that as a way to, what, lure him

14  into speaking with you?

15  A.    Speaking with me, no, to give him the level of

16  criminal advancement that he was on.  He had a very high

17  profile case.

18  Q.    And you don't recall exactly.  I think you testified

19  as to the number of conversations.  You don't recall

20  exactly --

21  A.    No.

22  Q.    -- how many times he spoke to you about this; right?

23  A.    No sir.

24        MR. ALLEN:  Okay.  Your Honor, I have no

25  further questions.  Thank you.

1                    THE COURT:  All right.  Thank you.

2                    Let me see if there is any redirect --

3                    MR. McKINESS:  Briefly.

4                    THE COURT:  -- Mr. McKiness.  Yes, sir.

5                         REDIRECT EXAMINATION

6    BY MR. McKINESS:

7    Q.   Mr. Garrett, there's some discussion just on your

8    cross-examination regarding you facing a life sentence

9    and being sentenced to 20 years.  Did you receive any

10   time off your current federal sentence for cooperating

11   with the government in the case against

12   Mr. Villa-Castaneda?

13   A.   No.

14                    MR. McKINESS:  No further questions,

15   Your Honor.

16                    THE COURT:  All right.  Thank you.

17                    Mr. Allen, anything else?

18                    MR. ALLEN:  Just one question, Your Honor.

19                    THE COURT:  Yes, sir.

20                        RECROSS-EXAMINATION

21   BY MR. ALLEN:

22   Q.   To follow up to Mr. McKiness's question.  At the

23   time you spoke with -- just to confirm.  At the time you

24   spoke with the FBI, you had not been sentenced on your

25   current charge; correct?

GILL GARRETT - RECROSS BY MR. ALLEN                    183

1   A.   No.

2   Q.   Okay.  There was no plea agreement or anything at

3   that point.  You were still facing at the time you spoke

4   with them, a mandatory life sentence; is that correct?

5   A.   Yes.

6             MR. ALLEN:  Okay.  Thank you.

7             No further questions, Your Honor.

8             THE COURT:  All right.  Thank you.

9             Mr. McKiness, do you expect to call additional

10  witnesses?

11            MR. McKINESS:  United States closes its case

12  and will call no further witnesses.

13            THE COURT:  All right.  We're going to take

14  just another brief recess, ladies and gentlemen.

15            Before we proceed, I do have one matter to take

16  up with the attorneys.  I would expect it would not take

17  very long, maybe 10 to 15 minutes.

18            So if you could, if you need to take a bathroom

19  break, please go ahead and do that.

20            Otherwise, we'll call you back just as soon as

21  we can.

22            Please keep in mind the admonition that you

23  were given previously.

24            The jury will be excused.

25       (Whereupon, the juror members leave the courtroom.)

184

 1                 THE COURT:  All right.  Thank you.

 2                 I'll excuse the witness at this time.  You may

 3      step down.  He is finally excused from the case.

 4                 Thank you, sir.

 5                 Thank you, and please be seated.

 6                 At this time the United States having announced

 7      close of its case-in-chief, I'll take up any motions that

 8      the parties may wish to make under Rule 29.

 9                 MR. ALLEN:  Your Honor, of course, we move at

10      this time under Rule 29 for a motion of -- for judgment

11      of acquittal.

12                 Basic basis for my motion, Your Honor, would be

13      I'm not moving whether the statement occurred or not, but

14      on the true threat nature of the statements.

15                 And the argument would be, Your Honor, that the

16      United States has not met its burden of proof that beyond

17      a reasonable doubt that it was, in fact, a true threat

18      sufficient to -- for punishment.  At least, I guess,

19      that's with respect to Count 1.

20                 Count 2 we would simply move on the basis of

21      the record that the government has not met its burden of

22      proof with respect to these specific counts, Your Honor.

23                 THE COURT:  All right.  Mr. McKiness.

24                 MR. McKINESS:  United States believes that it

25      has met that burden based on the testimony of every --

1    every witness has essentially testified that they viewed

2    the threats as real, and each witness corroborated the

3    admissions that were made by Mr. Villa to Special Agent

4    Whitehead regarding the repeated nature of the threats,

5    which is something one can look at when determining

6    whether there is a true threat.

7           The circumstances around the threat, as

8    Mr. Gill Garrett testified, about the emotion in his eyes

9    when he was speaking about his feelings for Assistant

10   United States Attorney Mr. Duncan.

11          So the United States believes that it has

12   exceeded the requirements to meet that reference to

13   Count 1.

14          With reference to Count 2, I believe the

15   element that there was essentially corroborative action

16   taken, United States believes that the testimony by

17   Mr. Marshal satisfies that because he testified that the

18   substantial step of giving him the phone number of his

19   sister where he said the money was located to pay for

20   someone to commit the murder satisfies that last

21   requirement.

22          So the United States believes it has satisfied

23   the burden.

24          THE COURT:  All right.

25          All right.  Thank you.

1              Of course, when the Court considers a motion

2    under Rule 29 of the Federal Rules of Criminal Procedure,

3    it takes the evidence in the light most favorable to the

4    non-moving party, in this case the United States.

5              And the question is whether a reasonable jury

6    could return a verdict based on the evidence that is

7    presented in light of the elements that have to be

8    established beyond a reasonable doubt.

9              And in this case there is sufficient evidence

10   presented when taken in the light most favorable to the

11   government to conclude that -- or to determine that a

12   jury could conclude that the elements have been

13   established, and the government has met its burden.

14             The elements are set forth in the preliminary

15   jury instructions that were given to the jury at the

16   beginning of the case.

17             There is sufficient evidence that the defendant

18   did, in fact, make a threat to murder Mr. Duncan who at

19   the time was an Assistant United States Attorney, and it

20   was done in connection with the performance of his

21   duties, specifically prosecution of the defendant.

22             There's also sufficient evidence to conclude

23   that it was a true threat when the Court looks at all of

24   the circumstances surrounding the threat, including the

25   repetitive nature of the threat, the details of the

1    threat, and all of the other information that has been

2    provided to the jury through -- specifically through

3    three witnesses.

4         Of course, the Federal Bureau of Investigation

5    Special Agent who investigated the case and confirmed

6    those threats were, in fact, made, and they were

7    corroborative of the statements given to Mr. Marshal, and

8    Mr. Marshal testified to the details.

9         The Court could also conclude, and the jury

10   could conclude, that the defendant made the threat to

11   impede, intimidate, and interfere with the law

12   enforcement officer in the engagement of his duties in

13   an -- as an act of retaliation in prosecuting not only

14   him, but also his son.  So there are two ways that that

15   can be established, and there's sufficient evidence on

16   either ground.

17        There's also sufficient evidence for the second

18   count, and that is that the defendant -- there's evidence

19   that the defendant intended that another person commit

20   the felony offense involving for specifically to murder

21   the Assistant United States Attorney.

22        And there's sufficient evidence for the second

23   element, which is that he solicited, induced, and

24   otherwise endeavored to persuade another person to commit

25   the felony, and there is corroborative evidence and

1    information of the defendant's intent, specific intent,

2    that the threat be carried out and steps specifically

3    were taken in an effort to do that.

4              So there is sufficient evidence for the Court

5    to present the matter to the jury at this time.

6              The motion under Rule 29 will be -- will be

7    overruled.

8              Before we bring the jury back in, Mr. Allen, do

9    you need additional time to consult with the defendant

10   about testifying in the case?  We'll take a short --

11   we're going to take a short recess anyway.

12             MR. ALLEN:  Well, just a question, Your Honor.

13   You know, I've consulted with him.  He's indicated he

14   does not wish to testify.  Some judges have wanted a

15   colloquy with him.  I don't know if now would be the

16   appropriate time to do that if you --

17             THE COURT:  I can certainly do that.

18             MR. ALLEN:  I think that would be appropriate.

19             THE COURT:  Yes, sir.  We will need to have an

20   interpreter to come up to the sidebar, and you can bring

21   the defendant up as well.

22        (Whereupon, a bench conference was had with the

23   Court, Mr. Allen, and Defendant Villa-Castaneda, out of

24   the hearing of the prosecution and open court, and juror

25   members.)

1            THE COURT:  All right.  Mr. Villa-Castaneda,

2   your attorney has indicated that after consulting, you've

3   indicated that you do not wish to testify in the case.

4            THE INTERPRETER:  Yes.

5            THE COURT:  Ultimately that decision is yours.

6            THE INTERPRETER:  Yes.

7            THE COURT:  But it should be made after

8   consulting with your attorney and after -- after

9   considering his advice.

10           THE INTERPRETER:  Okay.

11           THE COURT:  I do want to advise you that if you

12   were to testify in the case, prior felony convictions

13   could be used for impeachment purposes against you.

14           And you understand that; correct?

15           THE INTERPRETER:  Yes.

16           THE COURT:  All right.  Do you have any

17   questions for me at this time about that decision?

18           THE INTERPRETER:  No, of course not.

19           THE COURT:  All right.  Mr. Allen, anything

20   else?

21           MR. McKINESS:  No.  Judge I advised him, of

22   course, that his right to testify and his right not to

23   testify, the risks associated with that I believe is

24   voluntary.

25           THE COURT:  All right.

```
 1              All right.  Very well.  How much time would
 2   you-all like before we begin?
 3              MR. ALLEN:  I'm ready to go.  It will be one
 4   witness, Your Honor.
 5              THE COURT:  All right.  How long do you think
 6   the direct will be, 15 minutes?
 7              MR. ALLEN:  Yes, 15 minutes.
 8              THE COURT:  All right.  If his decision
 9   changes, you can alert me before I bring the jury out.
10              MR. ALLEN:  Yes, sir.
11              THE COURT:  Thank you.
12         (Whereupon, the bench conference concluded.)
13              THE COURT:  We are going to take about a
14   ten-minute recess before we continue with presentation of
15   the defendant's case-in-chief.
16              I would anticipate that we would be able to
17   complete that proof certainly this afternoon.
18              I don't know if you intend to have any rebuttal
19   witnesses available, but if you do, I would expect we
20   would get to those witnesses this afternoon.
21              MR. McKINESS:  The United States doesn't have
22   any rebuttal witnesses.
23              THE COURT:  Of course, it's hard to say.
24              MR. McKINESS:  Doesn't believe so.
25              THE COURT:  It's hard to tell until we hear
```

1    what the -- all right.

2              We'll take 10 minutes.

3              Thank you.

4        (Whereupon, a recess was taken at 3:15 p.m., and

5    Day 1 of the Jury Trial proceedings continued at

6    3:25 p.m., on the record in open court, with the

7    juror members present, as follows.)

8              THE COURT:  All right.  Thank you.

9              The record will again reflect that all members

10   of the jury are present.

11             Defendant and counsel are also present in the

12   courtroom.

13             The United States has announced close of its

14   case-in-chief, so we'll proceed with defendant's

15   presentation of proof at this time.

16             Mr. Allen.

17             MR. ALLEN:  Your Honor, the defendant calls

18   Vernon Saunders.

19             THE CLERK:  Raise your right hand, please.

20             Do you swear or affirm that the testimony

21   you're about to give in this matter shall be the truth,

22   the whole truth, and nothing but the truth as you shall

23   swear unto God, or affirm, subject to the penalty of

24   perjury?  Do you so swear or affirm?

25             THE WITNESS:  Yes. I swear to God.

 1              THE COURT:  All right.  Thank you.

 2              Mr. Allen, you may proceed.

 3              MR. ALLEN:  Thank you, Your Honor.

 4                          VERNON SAUNDERS,

 5   having been first duly placed under oath, was examined

 6   and testified as follows:

 7                          DIRECT EXAMINATION

 8   BY MR. ALLEN:

 9   Q.    Good afternoon, Mr. Sanders.

10         Good afternoon, Mr. Sanders.

11         Could you state your name for the record, please?

12   A.    Vernon Saunders.

13   Q.    I'm sorry, I called you Sanders.  Saunders.

14         Have any promises been made to you to testify here

15   today?

16   A.    No.

17   Q.    Okay.  Are you familiar with the Defendant Edgar

18   Villa-Castaneda?

19   A.    Yes.

20   Q.    Do you see him in the courtroom today?

21   A.    Yes.

22   Q.    Can you describe what he's wearing?

23   A.    White shirt, headphones.

24              THE COURT:  The record will reflect the witness

25   has identified the defendant.

VERNON SAUNDERS - DIRECT BY MR. ALLEN

1  BY MR. ALLEN:

2  Q.   Thank you, Mr. Saunders.

3       Are you currently incarcerated?

4  A.   Yes.

5  Q.   Where are you incarcerated?

6  A.   Western Kentucky.

7  Q.   Why are you incarcerated, sir?

8  A.   I was convicted of manslaughter 2.

9  Q.   Were you previously incarcerated at the Woodford

10 County Detention Center?

11 A.   Yes.

12 Q.   Okay.  Were you incarcerated at the detention center

13 in September and October of 2015?

14 A.   Yes.

15 Q.   Did you ever cell -- share a cell with my client

16 Mr. Villa-Castaneda?

17 A.   Yes.

18 Q.   Okay.  How long did you share a cell with him?

19 A.   Few months.

20 Q.   When you say a few months, you talking about five

21 months, four months?  Do you recall?

22 A.   I don't recall exactly.  It was more like three

23 maybe.

24 Q.   How would you describe the cells that you shared at

25 the Woodford County Detention Center?  How many inmates

1   were in each cell?

2   A.   Well, there were four racks, four beds.

3   Q.   Okay.

4   A.   But there was usually five people in them.

5   Q.   Were you ever a bunk mate with Mr. Villa?

6   A.   No.

7   Q.   Okay.  But you shared the cell?

8   A.   Yes.

9   Q.   Is that correct?  Okay.

10       Did Mr. Villa ever discuss his case with you?

11  A.   No.

12  Q.   Thank you.

13       In your conversations with -- but did you have

14  conversations with Mr. Villa?

15  A.   Yes.

16  Q.   Okay.  In your conversations did he ever threaten to

17  kill AUSA Rob Duncan?

18  A.   No.

19  Q.   Did you sit down for an interview with the FBI?

20  A.   Yes.

21  Q.   Okay.  Do you recall what you told the FBI?

22  A.   Most of it.

23  Q.   Okay.  Can you tell us -- can you describe what you

24  told the FBI to the extent you can recall?

25  A.   That I didn't know anything about this, whatever he

VERNON SAUNDERS - DIRECT BY MR. ALLEN                    195

1  was into.

2  Q.   Did you tell them that you never heard Mr. Villa

3  discuss killing Mr. Duncan?

4  A.   That's right.  I never heard that.

5  Q.   While you were at the Woodford County Detention

6  Center, did anyone make any threats against Mr. Villa?

7  A.   No.

8  Q.   Are you familiar with a man named Gill Garrett?

9  A.   Yes.

10  Q.   How are you familiar with him?

11  A.   He was a cellmate as well.

12  Q.   Okay.  Would you consider Mr. Garrett to be a

13  reliable person?

14  A.   No.

15  Q.   Okay.  Why would you -- why do you say that?

16  A.   Well, he attended church, but then he didn't really

17  adhere to what was discussed in church, what the sermon

18  was about.  It was like he never even went.

19      And he snuck in some -- had one of the pastors sneak

20  in some markers for him to draw with, and I thought that

21  was really underhanded of him.

22  Q.   Would you consider if he were to tell you something

23  that it would be very truthful?

24  A.   Probably not.

25           MR. ALLEN:  No further questions at this time,

1  Your Honor.

2            THE COURT:  Thank you.

3            Mr. McKiness.

4                    CROSS-EXAMINATION

5  BY MR. McKINESS:

6  Q.   Mr. Saunders, I see you were convicted of second

7  degree manslaughter for killing your brother back in

8  2016?

9  A.   Yes.

10 Q.   And you were also convicted of tampering with

11 evidence and abuse of a corpse in connection with killing

12 your brother?

13 A.   Yes.

14 Q.   And when you were cellmates with Mr. Villa, you were

15 being detained pending your trial for killing your

16 brother?

17 A.   Yes.

18 Q.   And your testimony on direct was that you never

19 heard Mr. Villa talk about killing his prosecutor?

20 A.   That's correct.

21 Q.   And obviously you can't testify as to what other

22 people heard come out of Mr. Villa's mouth, can you?

23 A.   No.

24            MR. McKINESS:  I have no further questions.

25            THE COURT:  Thank you.

```
1              Any redirect?

2              MR. ALLEN:  No redirect, Your Honor.  This

3  witness may be excused.

4              THE COURT:  All right.  Yes, sir.  The witness

5  is finally excused.  Thank you.

6              Mr. Allen, do you anticipate any additional

7  witnesses?

8              MR. ALLEN:  Your Honor, if I may have

9  30 seconds with my client.

10             THE COURT:  Yes, sir.

11      (Whereupon, an off-the-record discussion was had

12  with Mr. Allen and Defendant Edgar Villa-Castaneda, with

13  the interpreter.)

14             MR. ALLEN:  Your Honor, the defense closes.

15             THE COURT:  All right.  Thank you.

16             Mr. McKiness, any rebuttal testimony or

17  evidence to present?

18             MR. McKINESS:  No, sir.

19             THE COURT:  All right.  Both sides have

20  announced close of the case at this time.

21             Ladies and gentlemen, as I told you this

22  morning, I like to tell you what we're going to do and

23  how we're going to proceed.

24             We're going to break for the evening.  I need

25  to have an instructions conference with the attorneys,
```

1    and that will take awhile.  The instructions will take

2    awhile to give those to you, and then we'll have closing

3    arguments.  So we could rush and really do all of that

4    tonight, but I'm not going to hold you here that long.

5    We'll have you come back tomorrow morning, and we'll

6    complete the case at that time.

7            I will ask you to come back and be ready to go

8    at 9 o'clock tomorrow morning, and we'll proceed with

9    closing arguments and then the jury instructions.

10           And as I told you, jury instructions can be

11   fairly lengthy in federal court.  Sometimes as much as

12   30 to 40 pages, sometimes more, regardless of the length

13   the trial.

14           So I need to have my instructions conference

15   with the attorneys tonight, and so I'll ask you to come

16   back tomorrow morning and be ready to go at that time.

17           Now, as you go home tonight, you're going to be

18   tempted to talk about the case with friends or family

19   members.  It's only natural.  But please remember, you

20   can't talk about the case with anyone; spouses, children,

21   friends, boyfriends, girlfriends, whatever the case may

22   be.  You just can't talk about the case until it's over.

23   Now, once the case is over, you can certainly do that,

24   but now is not the time to do that.

25           And, likewise, now is not the time to begin

1    deliberations.  Before you do that, you need to consider

2    the arguments that will be made, and you need to consider

3    the evidence and the arguments in light of the

4    instructions that you'll be given.  They will give you

5    further guidance in the case.

6            So don't talk about the case and really don't

7    start your deliberations tonight as you go home.

8            Remember the other instructions I've given you

9    today about not talking with anyone about the case, not

10   reading, watching, or listening to any accounts of the

11   case if there should be.

12           Please don't do any type of research or

13   investigation.

14           Don't visit any of the locations you've heard

15   about.

16           We also talked about social media.  Please

17   don't communicate through social media, either your

18   position as a juror or anything about the case.

19           And, again, please don't make up your mind

20   about the matter until it is finally submitted to you.

21           When you come in tomorrow morning, you'll be

22   able -- the security officer will be able to bring you

23   back over into the deliberation room.  So if you get here

24   before 9 o'clock, usually the clerks will provide some

25   breakfast items back over here in the jury deliberation

1   room.  So please feel free to get here early to come in,

2   and then we'll start at 9 o'clock.

3          We will finish up the instructions tonight so

4   we will be ready to go when you get here tomorrow morning

5   as I've indicated.

6          Let's see if we have any other issues we need

7   to take up before I excuse the jury.  Anything else,

8   counsel?

9          MR. McKINESS:  No, sir.  We may have some

10  issues after the jury is gone.

11         THE COURT:  Yes, sir, certainly.

12         MR. ALLEN:  Same here, Your Honor.

13         THE COURT:  Does anyone have anything back in

14  the deliberation room you need to pick up?

15         All right.  If not, you can leave your badges

16  on your chair, and we'll give those back to you tomorrow

17  when you come in, but at this point you will be excused

18  until 9:00 a.m. tomorrow morning.

19         Thank you.

20     (Whereupon, the juror members leave the courtroom.)

21         THE COURT:  All right.  Thank you, and please

22  be seated.

23         The record will reflect that the jury is not

24  present at this time.

25         My plan is to give you-all a little bit more

```
 1    time to look through those instructions before we have
 2    our instructions conference.
 3              Mr. Allen, how much time would you like for
 4    that?
 5              MR. ALLEN:  To review the instructions,
 6    Your Honor?
 7              THE COURT:  Yes, sir.  30 minutes?
 8              MR. ALLEN:  I was going to say 30.  I didn't
 9    want to overstate it, Your Honor, but --
10              THE COURT:  That's fine.
11              MR. ALLEN:  -- I think 30 minutes is fine.
12              THE COURT:  Mr. McKiness?
13              MR. McKINESS:  That's fine, Your Honor.
14              THE COURT:  All right.  Were there other issues
15    we need to take up other than jury instructions tonight?
16              MR. McKINESS:  Yes, sir.
17              THE COURT:  All right.
18              MR. McKINESS:  We probably should have done
19    this at the beginning of the case, but United States
20    wanted to put on the record with defense -- with the
21    defendant in court here the previous offers of settlement
22    that it made to make sure that the defendant was aware of
23    the offers.
24              THE COURT:  All right.  Do you want to tender
25    those as documents?  And you can file those under seal in
```

1    the record if you wish.

2            MR. McKINESS:  I'd like to say them out loud so

3    that the defendant can hear them.

4            THE COURT:  That's fine.  I don't know,

5    sometimes there's supplements, but certainly you may go

6    ahead.

7            MR. McKINESS:  Thank you, Your Honor.

8            Back in May 31st, 2017, the United States --

9    actually, let me go back further.

10           April 21st, 2017, the United States offered

11   to -- offered to dismiss Count 1 of the indictment and

12   impose a below guideline and statutory mandatory minimum

13   sentence of 20 years imprisonment, and allowed that -- or

14   argue that that sentence should run concurrently with his

15   prior undischarged federal conviction that's -- that he's

16   currently serving.  That was April 21st, 2017.

17           On May 31st, 2017, United States offered to

18   dismiss Count 2 of the indictment in exchange for a

19   guilty plea, and offered a 10-year consecutive sentence

20   to his currently undischarged federal sentence.

21           And, lastly, on September the 21st, 2017,

22   United States offered to do a B plea for 20 years and

23   agree that the defense could argue for that sentence to

24   run consecutive or concurrently with his undischarged

25   federal sentence, and allow the defendant to argue for a

1  downward variance or a downward departure, and the

2  United States at sentencing would move to dismiss Count 1

3  of the indictment.

4          That is the sum of the offers that the

5  United States made to the defense.

6          THE COURT:  All right.  All right.  Thank you.

7          Mr. Allen, can you confirm that those offers

8  were passed along to the defendant on or about the dates

9  indicated, and that the defendant rejected those offers?

10         MR. ALLEN:  I can confirm that we received

11 those offers, that I discussed those offers with my

12 client, and he maintains his innocence.

13         THE COURT:  All right.  But he declined the

14 offers?

15         MR. ALLEN:  Yes.  Yes, he did.

16         THE COURT:  Very well.  Anything else?

17         MR. McKINESS:  Nothing to add, Your Honor.

18         THE COURT:  All right.  All right.  We'll take

19 about 30 minutes, until about 4:15.  Then we'll come back

20 and have our instructions conference at that -- at that

21 time.

22         We will be in recess.

23      (Whereupon, a recess was taken at 3:45 p.m., and

24 Day 3 of the Jury Trial proceedings continued at

25 4:15 p.m., on the record in open court, without the

1   juror members present, as follows.)

2              THE COURT:  All right.  Thank you.

3              The record will reflect the jury, of course, is

4   not present at this time.

5              We will proceed with our instructions

6   conference.

7              Earlier I had provided the parties with a draft

8   set of instructions to be given.  Of course, that was

9   prior to any proof being presented in the case, and so

10  there are some obvious modifications in the changes that

11  we'll need to make.

12             What I would like to do is go through my

13  changes, my proposed changes first, and then we'll double

14  back, and we will take up any issues that the parties

15  would like to take up.

16             The first change that I would have to the draft

17  that was given earlier would be on page 6, which is

18  instruction number 4.  Let me read the 2 paragraphs that

19  I'm going -- I believe should be modified, and if you

20  have questions about those, we can -- we can take those

21  up.  Paragraph 2.

22             THE INTERPRETER:  Your Honor, forgive me for

23  interrupting.  The interpreters don't have copies.

24  Sometimes it is difficult to follow along.  Could you

25  provide us with a copy of it?

1           THE COURT:  All I have is my copy that has

2  handwritten notes on it, so I can't do that right now.  I

3  can go slow.

4           THE INTERPRETER:  That will help.  Thank you.

5           THE COURT:  All right.  Paragraph 2, which I

6  would propose to make the following changes.  "The

7  evidence in this case includes only what the witnesses

8  said while they were testifying under oath and the

9  exhibits that I allowed into evidence."

10          And then I would remove the highlighted portion

11  inasmuch as there were no stipulations, and no facts were

12  judicially noticed.

13          Paragraph 4 I would modify to read as follows,

14  "During the trial I did not let you hear the answers to

15  some of the questions that the lawyers asked."

16          Then I would go down to -- skip the next two

17  sentences, and it would pick up with, "Do not speculate

18  about what a witness might have said," period.  "This is

19  not evidence, and you're bound by your oath not to let it

20  influence your decision in any way."  I didn't order

21  things disregarded, and so I would modify that paragraph

22  as well as indicated.

23          Any objections to those modifications?

24          MR. McKINESS:  No, sir.

25          MR. ALLEN:  No, Your Honor.

1          THE COURT:  All right.  Page 12, which is

2    instruction number 9, I believe there may have only been

3    one objection to what was about to be hearsay testimony,

4    and I believe the question was modified.  And I don't

5    know that we even need this particular instruction.

6    Unless someone feels strongly about it, I would suggest

7    that it be taken out.

8          MR. McKINESS:  I don't feel strongly about it.

9          THE COURT:  Mr. Allen, do you see a reason to

10    give that?

11          MR. ALLEN:  No, Your Honor.  That's fine.

12          THE COURT:  All right.  Page 15, which is

13    instruction number 12, I would include a paragraph, which

14    would be paragraph 2, numerical paragraph 2, that would

15    read, "The threat was a true threat," which would be an

16    additional element, and then we would have the word

17    "and."  And then what's currently paragraph 2 would

18    become paragraph 3.  I think that would comply with what

19    the parties requested in the preliminary instructions.

20    And if you'll notice the paragraph before the numbered

21    paragraphs does indicate that the elements have to be

22    proven beyond a reasonable doubt.  I think that will take

23    care of the concern earlier.

24          MR. McKINESS:  Yes, sir.

25          MR. ALLEN:  Yes, Your Honor.  Thank you.

1              THE COURT:  All right.  Mr. Allen, let's go

2     over to instruction number 15, defendant's theory.  I've

3     included the standard instruction that I sometimes give

4     that the government hasn't proven the -- hasn't met its

5     burden of proof.  Do you want me to expand upon that?  It

6     has to be based upon evidence that's been presented, and

7     in this case you had the one witness who's testified that

8     he didn't hear any threats being made.  Is there anything

9     else that you would suggest be added?  I know that you've

10    argued it wasn't a true threat, but I think that's more

11    in terms of argument than it is --

12             MR. ALLEN:  That was going to be the only

13    thing, but I agree with you.  That's really -- I'm fine

14    with this instruction as it is, Your Honor.

15             THE COURT:  All right.  Instruction number 17,

16    which is page 23, there is some highlighted bracketed

17    material that I would just take out that reads "or

18    present evidence."  The defendant did present evidence in

19    the case obviously, the testimony of the last witness.

20    And so I would reword that to state that, "A defendant

21    has an absolute right not to testify.  The fact that he

22    did not testify cannot be considered by you in any way."

23             MR. ALLEN:  No objection, Your Honor.

24    Thank you.

25             MR. McKINESS:  No objection.

1          THE COURT:  All right.  Of course, that second

2   version doesn't go in inasmuch as the defendant did not

3   testify.

4          Then going over to instruction 19.  My question

5   for the parties would be whether you would want to

6   include that second sentence of the first paragraph or

7   whether it should just be eliminated.

8          MR. ALLEN:  As instruction 19, Your Honor?

9          THE COURT:  19, yes, sir.

10          Mr. McKiness, what's the government's position?

11          MR. McKINESS:  I like the instruction the way

12   it is.

13          THE COURT:  As it is currently written?

14          MR. McKINESS:  Yes, sir.

15          THE COURT:  With motive reference?

16          MR. McKINESS:  Yes.

17          THE COURT:  Mr. Allen, what is your position?

18          MR. ALLEN:  Your Honor, I have no objection to

19   leaving it as is.

20          THE COURT:  Just leave it as is, okay.

21          All right.  The next instruction, which is

22   number 20, I would modify to read, "You have heard the

23   testimony of Talbert Marshal, Gill Garrett, and

24   Vernon Saunders.  You've also heard that before this

25   trial each was convicted of a crime.  These earlier

1  convictions were brought to your attention only as one

2  way of helping you decide how believable each witness's

3  testimony was."

4          Any objection to that change?

5          MR. McKINESS:  No, sir.

6          MR. ALLEN:  You do intend -- the remainder of

7  that will stay?

8          THE COURT:  Yes.

9          MR. ALLEN:  Okay.  Yes, no objection,

10 Your Honor.  Thank you.

11         THE COURT:  Yeah.  I was just reading the

12 sentences that I changed.

13         Page 29, which is instruction 22, I would

14 suggest that this be reworded as follows, "You heard the

15 testimony of Gill Garrett.  You've also heard that he may

16 receive a reduction of his sentence in exchange for his

17 cooperation in this case."

18         And then the next sentence would read, "It is

19 permissible for the government to make such a promise,

20 but you should consider this testimony with more caution

21 than the testimony of other witnesses."

22         I did not include Mr. Marshal in that based

23 upon his testimony that there had been no promises that

24 have been made to him.  That doesn't present an argument

25 from being made that he may receive some benefit in the

1  future.  I think it's too far of a stretch to argue that

2  he might receive a reduction if he commits a violation of

3  supervision, that that might be some reduction for him at

4  a later time.  There's not been any testimony that that

5  was promised or even discussed with him.  And so I think,

6  again, it may be argument, but I'm not sure it should be

7  included as an instruction.

8            MR. McKINESS:  I agree.

9            THE COURT:  Mr. Allen, what is your position?

10  I know you prefer to include him as well.

11            MR. ALLEN:  I prefer to include him, but I

12  think the Court's reasoning is sound, so no objection on

13  that, Your Honor.

14            THE COURT:  All right.  I would suggest with

15  regard to the next two instructions, draft instructions

16  number 23 and 24, that those come out.

17            MR. McKINESS:  I agree, Your Honor.

18            MR. ALLEN:  No objection, Your Honor.

19            THE COURT:  All right.  I believe that was the

20  extent of those additional changes that I made based on

21  the testimony presented in the case, and so at this time

22  what I'll do is if the parties have any additional

23  modifications that you'd like to propose or consider, we

24  can take those up.

25            Mr. McKiness, do you have some additional?

1          MR. McKINESS:  I do, Your Honor.  I believe

2  they are mostly editorial.  In instruction 11, page 14,

3  the second sentence says, "the number of charges is no

4  evidence of guilt."  I believe it would be more

5  appropriate for it to say "it is not evidence of guilt."

6          THE COURT:  All right.  I assume there's no

7  problem with that change?

8          MR. ALLEN:  No objection, Your Honor.

9          THE COURT:  All right.

10         MR. McKINESS:  I did have some concern about

11  instruction number 18 on page 25 regarding the

12  impeachment of the defendant by prior conviction.  Since

13  he didn't take the stand, he wasn't really impeached by

14  his prior conviction.  It was only used with regard to

15  essentially referencing the motive.

16         THE COURT:  Would you like me to just take out

17  that heading?  Would it still be appropriate?  Well --

18         MR. McKINESS:  Well, it talks about believing

19  how believable his testimony was.

20         THE COURT:  That's correct, yes.  We just

21  remove that entirely?

22         MR. McKINESS:  Yeah, I believe so.

23         MR. ALLEN:  I think that's fine.  I'm trying

24  to -- I mean, obviously, there was evidence about his

25  prior conviction, and late in the day I believe that's

212

1  addressed in another instruction.

2           MR. McKINESS:  There's another instruction that

3  references the prior conviction regarding his motive, and

4  that's the only thing that the jury can use it for.

5           THE COURT:  Right.

6           MR. ALLEN:  I think that's fine, Your Honor.

7           THE COURT:  We'll take out number 18.  It's the

8  next one, I think, number 19 is the one you're referring

9  to that refers to that.

10          MR. McKINESS:  Yes, sir.

11          MR. ALLEN:  Yes, sir, that's correct.  It's

12  getting late in the day, Your Honor.

13          THE COURT:  Yes, sir.

14          MR. McKINESS:  I think you addressed all of the

15  other issues that I was going to bring up, Your Honor.

16          THE COURT:  All right.  Very well.

17          Mr. Allen, do you have any others?

18          MR. ALLEN:  Your Honor, having reviewed them

19  and now going through this, we have no corrections or

20  anything.

21          THE COURT:  All right.  What I will do is I'll

22  make these changes, and we'll go over them tonight to

23  make sure we haven't missed something.  And you'll have a

24  copy on your desk that will be available at 8:30 in the

25  morning since we're bringing the jury in at 9 o'clock.

1    I'll make a couple extra copies as well if you need

2    those.

3              If you see anything else we've missed or maybe

4    something I've added by mistake tonight as we finalize

5    these, we can bring that up before the jury comes in.

6              My plan would be to have arguments first and

7    then give the instructions last.  That's typically what I

8    do in most cases.  I've been experimenting recently with

9    moving that around a bit, but I think it works best to

10   have the instructions last.

11             But I wanted to check with you and see how much

12   time you wanted for your closing.  And, of course, the

13   government can divide it's time and reserve some time for

14   rebuttal.

15             MR. McKINESS:  The United States, I believe I

16   would only need 25 minutes for closing argument and

17   10 minutes for rebuttal.

18             THE COURT:  All right.  So 35 total.

19             Mr. Allen, is that enough time for you?

20             MR. ALLEN:  Absolutely.  I anticipate no more

21   than 20 minutes I'd say.

22             THE COURT:  All right.  I always tell the

23   attorneys when I give you your time, you don't have to

24   use it all if you choose not to.

25             MR. McKINESS:  Well, Your Honor, I try to

1    adhere to that in my opening statements.

2              THE COURT:  I appreciate that.  I appreciate

3    that.

4              All right.  So 35 minutes for each side.

5              Probably what we will do is if you use most of

6    that time, we'll probably take a break before I give the

7    instructions.  If you don't, if both of you are a little

8    shorter than anticipated, it will take -- since we've cut

9    out about four pages of instructions, it will take about

10   30 minutes to give the instructions, and I don't like to

11   have the jury in the box longer than an hour-and-a-half

12   at any one time.  They start to fidget when I do that.

13   So we'll kind of play that by ear.

14             When we do take our break in the morning,

15   generally what I will do is I'll send a menu back for the

16   jury.  So if we get to the lunch hour if they want to

17   order lunch, I generally tell them it will take about an

18   hour for the lunch to get here once we place the order.

19   So they'll need to order obviously an hour in advance of

20   whenever they might want to have their lunch.

21             If they want to just continue to deliberate and

22   not have lunch, of course, that's their option as well,

23   but I will give them that opportunity.

24             Generally the clerks will bring in a pretty big

25   box of sweet rolls and bagels, and you name it, and

215

1  sometimes they fill up on that, and they may not want

2  lunch, but we always give them that option.

3          Are there any other issues we need to take up

4  tonight before we --

5          MR. ALLEN:  Your Honor, the only thing I

6  neglected to do at the close of my case is renew the

7  Rule 29 motion.  I'd be happy to discuss -- argue that in

8  the morning.  I just wanted to make sure I did that.

9          THE COURT:  I assume the parties' position

10  would be the same with respect to the additional evidence

11  that was submitted.

12          MR. ALLEN:  That's correct, Your Honor.

13          THE COURT:  And, again, while it does favor the

14  defendant, the Court must consider the evidence in the

15  light most favorable to the United States in determining

16  whether there's sufficient evidence to present the case

17  to the jury, and there would be for the reasons that were

18  previously given at the close of the government's case.

19  And so I will note that the motion was renewed, but it

20  would be denied for the same reasons that were previously

21  stated.

22          MR. ALLEN:  Thank you, Your Honor.

23          THE COURT:  All right.  Again, just to recap,

24  tomorrow 8:30 you'll have copies of instructions on your

25  tables.  We'll have a couple of extra copies so you can

1    look through those.

2              We'll plan to start with the jury at 9 o'clock.

3    United States will have 25 minutes for its initial

4    argument, defendant has a total of 35 minutes, and then

5    the government has 10 minutes for rebuttal if you want to

6    use it.  And then following the arguments, I'll give the

7    jury instructions.

8              All right.  If you have any issues with the

9    instructions that you pick up tonight or tomorrow

10   morning, bring that to my attention as soon as we can,

11   and we'll take that up.

12             MR. McKINESS:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14             We will be in recess.

15      (Whereupon, Day 1 of the Jury Trial proceedings

16   concluded at 4:40 p.m.)

17                C E R T I F I C A T E

18      I, Peggy W. Weber, certify that the foregoing is a

19   correct transcript from the record of proceedings in the

20   above-entitled matter.

21

22

     March 27, 2018                    s/Peggy W. Weber
23      DATE                           PEGGY W. WEBER, RPR

24

25

1                    W I T N E S S E S

2                                                        <u>Pages</u>

3    <u>PROOF ON BEHALF OF THE GOVERNMENT:</u>

4    Testimony of TALBERT MARSHAL
          Direct Examination by Mr. McKiness              82
5         Cross-Examination by Mr. Allen                  99
          Redirect Examination by Mr. McKiness           107
6
     Testimony of ROBERT M. DUNCAN, JR.
7         Direct Examination by Mr. McKiness             108
          Cross-Examination by Mr. Allen                 115
8         Redirect Examination by Mr. McKiness           117

9    Testimony of JOHN WHITEHEAD
          Direct Examination by Mr. McKiness             119
10        Cross-Examination by Mr. Allen                 141
          Redirect Examination by Mr. McKiness           152
11        Recross-Examination by Mr. Allen               156

12   Testimony of GILL GARRETT
          Direct Examination by Mr. McKiness             165
13        Cross-Examination by Mr. Allen                 177
          Redirect Examination by Mr. McKiness           182
14        Recross-Examination by Mr. Allen               182

15
     <u>PROOF ON BEHALF OF DEFENDANT:</u>
16
     Testimony of VERNON SAUNDERS
17        Direct Examination by Mr. Allen                192
          Cross-Examination by Mr. McKiness              196
18
     Certificate of Reporter                             216
19   Index of Witnesses                                  217
     Index of Exhibits                                   218
20

21

22

23

24

25

1                          E X H I B I T S

2                                                        Admitted

3    Government's Exhibits:

4    No. 1      Letter from Talbert Marshal
                to his attorney Thomas Lyons              90
5
     No. 2      FBI Advice of Rights form
6               signed by Defendant Villa-Castaneda      129

7
     Defendant's Exhibits:
8
     No. 1      Government Memorandum
9               re:  Policy concerning
                electronic recording of statements       145
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25